Kara M. Wolke (SBN 241521)
 *kwolke@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

Ray D. Sulentic (SBN 316913)
 *rsulentic@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150

*Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DERMTECH, INC. SECURITIES LITIGATION | Case No. 3:23-cv-01885-DMS-JLB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Hearing Date: October 25, 2024<br>Time:          1:30 p.m.<br>Courtroom:   13A<br>Judge:         Hon. Dana M. Sabraw |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................1

II.   STATEMENT OF FACTS .............................................................................3

    A.  Overview of DermTech's Business and Revenue ..................................3

    B.  Defendants Overstated Medicare Coverage of the DMT .......................3

    C.  Defendants Misrepresented the Primary Factors that Drove DermTech's Average Selling Price (ASP) ...................................................................4

    D.  Defendants Violated GAAP....................................................................6

    E.  Defendants Misrepresented their Purported New Payor Wins ...............6

    F.  The Truth is Revealed .............................................................................7

III.  LEGAL STANDARD FOR THE TWO ELEMENTS AT ISSUE...................8

IV.   ARGUMENT: THE CAC STATES A CLAIM UNDER § 10(b) ..................10

    A.  The CAC Adequately Pleads Falsity as to Four Sets of Statements.....10

        1.  Defendants Concede Falsity for their LCD Statements .............10

        2.  Defendants' Statements about the "Main Drivers" of ASP Were Materially Misleading.................................................................14

        3.  Defendants' Revenue Statements Were False............................16

        4.  Defendants' New Payor Wins Statements Were Misleading.....17

    B.  The AC Pleads a Strong Inference of Scienter ....................................18

        1.  Defendants' Contradictory Explanations Support Scienter........18

        2.  Defendants' Insider Selling Supports Scienter..........................20

        3.  The Company's Own Selling Further Supports Scienter ...........21

        4.  Revenue Misstatements to Hit Analysts' Estimates Support Scienter .....................................................................................21

        5.  Internal Control Deficiencies; SOX Certifications; and Dobak's Resignation All Independently Support Scienter .......................23

PLAINTIFFS' OPPOSITION TO DEFS' MOTION TO DISMISS PLS' FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

i

6.      FE Allegations Show Access to Information and Support Scienter ................................................................................23

7.      Viewed holistically, Plaintiffs Easily Allege Scienter ...............24

C.      Plaintiffs' Complaint Complies with Rule 8.........................................24

D.      Plaintiffs Allege Control Person Liability (Section 20(a)) ...................25

V.      CONCLUSION: DEFENDANTS' MOTION SHOULD BE DENIED .........25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) ....................................................................17

*Barnes v. Edison Intl*,
  2021 WL 2325060 (C.D. Cal. Apr. 27,2021) .........................................................25

*Baron v. Hyrecar Inc.*,
  2022 WL 17413562 (C.D. Cal. Dec. 5, 2022).....................................................20, 23

*Batwin v. Occam Networks, Inc.*,
  2008 WL 2676364 (C.D. Cal. July 1, 2008) ..........................................................23

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ...........................................................................13, 22

*Bielousov v. GoPro, Inc.*,
  2017 WL 3168522 (N.D. Cal. July 26, 2017) .......................................................23

*Caiafa v. Sea Containers Ltd.*,
  525 F. Supp. 2d 398 (S.D.N.Y. 2007) .................................................................16

*Crews v. Rivian Auto., Inc.*,
  2023 WL 4361098 .............................................................................................22

*Donley v. Live Nation Ent., Inc.*,
  2024 WL 794641 (C.D. Cal. Feb. 23, 2024) .........................................................14

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
  751 F.3d 990 (9th Cir. 2014) .........................................................................10, 19

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
  316 F.3d 1048 (9th Cir. 2003) ...........................................................................25

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................16

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ................................................................... 8

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 747 (9th Cir. 2023) .................................................................... 11

*Hearns v. San Bernardino Police Dep't*,
530 F.3d 1124 (9th Cir. 2008) ................................................................ 25

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000) ................................................................ 25

*In re Accredo Health, Inc. Sec. Litig.*,
2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005) ..................................... 24

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ...................................................... 21

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ....................................................... 21, 22, 24

*In re Finjan Holdings, Inc.*,
58 F.4th 1048 (9th Cir. 2023) ................................................................ 10

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
97 F.4th 1171 (9th Cir. 2024) ...................................................... 8, 14, 24

*In re GlenFed Sec. Litig.*,
42 F.3d 1541 (9th Cir. 1994) .................................................................. 25

*In re GoHealth Sec. Litig.*,
2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ........................................... 15

*In re Immune Response Sec. Litig.*,
375 F. Supp. 2d 983 (S.D. Cal. 2005) ......................................... 9, 15, 21

*In re Iso Ray, Inc. Sec. Litig.*,
189 F. Supp. 3d 1057 (E.D. Wash. 2016) ............................................... 14

*In re Mullen Auto. Sec. Litig.*,
2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ................................. 20, 22

*In re New Century*,
588 F. Supp. 2d 1206 (C.D. Cal. 2008) ........................................................................ 24, 25

*In re OSG Sec. Litig.*,
12 F. Supp. 3d 622 (S.D.N.Y. 2014) .................................................................................. 23

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ....................................................................................... 9, 23

*In re Read-Rite Corp. Sec. Litig.*,
335 F.3d 843 (9th Cir. 2003) ............................................................................................. 19

*In re Urban Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ................................................................................ 22

*In re UTStarcom, Inc., Sec. Litig.*,
617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................................................... 20

*In re Veeco Instruments, Inc. Sec. Litig.*,
235 F.R.D. 220 (S.D.N.Y. 2006) ....................................................................................... 22

*In re VeriFone Holdings, Inc. Sec. Litig.*,
704 F.3d 694 (9th Cir. 2012) ............................................................................................... 9

*In re Yahoo! Inc. Sec. Litig.*,
611 F. App'x 387 (9th Cir. 2015) ....................................................................................... 13

*Karinski v. Stamps.com, Inc.*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020) ...................................................................... 25

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ......................................................................................... 9, 12

*Lloyd v. CVB Fin. Corp.*,
2012 WL 12883522 (C.D. Cal. Jan. 12, 2012) .................................................................. 17

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ............................................................................................................... 9

*Merkamerica Inc. v. Glover*,
2019 WL 8989833 (C.D. Cal. Dec. 3,2019) ...................................................................... 19

*Mild v. PPG Indus., Inc.*,
  2018 WL 6787351 (C.D. Cal. Dec. 21, 2018).........................................................23

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) ............................................................................9

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020).................................................................21

*Nguyen v. Radient Pharms. Corp.*,
  2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) ...............................................17, 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) .........................................................................20

*Oklahoma Firefighters v. Six Flags.*,
  58 F.4th 195 (5th Cir. 2023) ...........................................................................20

*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) .......................................................23

*Provenz v. Miller*,
  102 F.3d 1478 (9th Cir. 1996) .........................................................................14

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ............................................................................9

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) .......................................................19

*S.E.C. v. Phan*,
  500 F.3d 895 (9th Cir. 2007) ..........................................................................12

*Salzman v. ImmunityBio, Inc.*,
  2024 WL 3100274 (S.D. Cal. June 20, 2024) ................................................17, 22

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ............................................................................9

*SEC v. Cotton*,
  2006 WL 6382128 (C.D. Cal. Dec. 21, 2006).......................................................17

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017)....................................................................19

*Stocke v. Shuffle Master, Inc.*,
615 F. Supp. 2d 1180 (D. Nev. 2009) .....................................................................20

*Sun v. Han,*
2015 WL 9304542 (D.N.J. Dec. 21, 2015) ............................................................24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)...............................................................................................9, 10

*United States v. Holmes*,
2020 WL 666563 (N.D. Cal. Feb. 11, 2020)......................................................13, 22

*Varghese v. China Shenghuo Pharm. Holdings, Inc.*,
672 F. Supp. 2d 596 (S.D.N.Y. 2009) .....................................................................16

*York Cnty. v. HP Inc.,*
2024 WL 1327247 (N.D. Cal. Mar. 27, 2024) ........................................................14

STATUTES

15 U.S.C. §78u-4(b)(2) ...................................................................................................9

Plaintiffs hereby respond to Defendants' Motion to Dismiss. ECF 27.[1]

## I.    INTRODUCTION

Plaintiffs allege a strong case of securities fraud. Defendants misrepresented a material aspect of their business: how often Medicare reimbursed the Company's main product, an adhesive skin cancer test. The Class Period begins March 8, 2021, when Defendants announced that Medicare coverage had been expanded "from one to two tests per date of service." Analysts lauded the Medicare news as a "significant catalyst," forecast 100% revenue growth, or set price targets above $50. DermTech's stock price rose to its Class Period high of $62.50/share on March 22, 2021. But the inflated price was short-lived because Defendants' claims about Medicare coverage were materially false and misleading: Medicare only covered the second test *10% of the time*. Said differently, ***90% of the time, only one test per date of service was covered***. By November 4, 2022, after the truth had mostly emerged, shares traded at $1.34. The Company is now bankrupt. Over $1.5 billion in market cap has been erased.

While investors lost nearly everything, Defendant and former CEO Dobak sold $5.5 million in stock during the Class Period, at artificially inflated prices as high as $51.35 per share in April 2021—just one moth after Defendants' false Medicare coverage statements. Dobak was fired by the Board of Directors after the Class Period.

Sun, the former CFO, is equally culpable. He ignored red flags in DermTech's accounting, which was later revised and reclassified. Sun also had access to adverse facts: former employees allege massive backlogs of many thousands of denied claims were tracked in a spreadsheet that was circulated monthly. Former employees also detail

---

[1] "Defendants" refers to John Dobak ("Dobak") and Kevin Sun ("Sun"). Former Defendant, DermTech Inc. ("DermTech" or "the Company") was voluntarily dismissed on June 20, 2024. ECF 28. Additionally, unless otherwise noted, all emphasis is added; all internal case citations or quotations are omitted; and all ¶_ refer to Plaintiffs' Consolidated First Amended Complaint (ECF 25) ("CAC"). Citations to Defendants' Motion to Dismiss Plaintiffs' CAC (ECF 27) are referred to as "the Motion" or "Mot."

known and widespread—yet undisclosed—problems with DermTech's adhesive skin cancer test, which further impacted the Company's revenue.

Defendants' Motion challenges only falsity and scienter. But, importantly, Defendants do not actually challenge the falsity of their Medicare coverage statements. Moreover, Defendants' statements about revenue were false when made, as admitted in Defendants' later withdrawal or revision of reported revenue figures. On scienter, Plaintiffs only need a tie to defeat the Motion—which is easy here because, *inter alia*, when confronted with the truth of the Medicare coverage statements, CEO Dobak sought to lay blame on a mere clerical "code edit." Dobak said that "code edit" supposedly prompted Medicare to deny coverage and that in turn *hurt* Q2 2022 results. Yet Dobak was contradicted months later when CFO Sun said that "code edits" actually *helped* the Company during "the past couple of quarters", which includes Q2 2022. Logically, one of them is not telling the truth. The "code edit" scapegoat was a farce.

Medicare denied coverage for more than one test (90% of the time) from the beginning of the Class Period. Investors weren't told that. Defendants' Motion, which seeks judicial notice of 19 documents, cites *no document* that support Defendants' claim that Medicare's Final Local Coverage Determination ("LCD") actually expanded the coverage from one to two tests. By contrast, Plaintiffs' CAC included extensive citations to Medicare records and comments supporting their allegation that the coverage was *not* expanded as Defendants claimed during the Class Period. Conspicuously absent from Defendants' 19 proffered exhibits is a copy of the purported Final LCD that Defendants claim expanded the coverage.

Finally, much of Defendants' Motion raises premature factual issues, like whether a statement is material, or how a reasonable investor might interpret technical accounting language. Those issues can't be decided in Defendants' favor on a Rule 12(b)(6) motion. Nor can Dobak's argument that his insider trading should be excused because he sold pursuant to a trading plan. Numerous courts have held that trading plans do not negate

scienter—at best, Dobak's trading plan argument raises an affirmative defense that is not properly decided on this Motion. Defendants' Motion should be denied.

## II.   STATEMENT OF FACTS

### A.   Overview of DermTech's Business and Revenue

DermTech sells small adhesive stickers (patches) that purportedly test for skin cancer. ¶39. Its main product, the DermTech Melanoma Test ("DMT") was marketed as an alternative to having skin lesions biopsied with a scalpel. *Id.* Because patients did not need to have lesions cut out of them, they were presumably more inclined to have multiple lesions tested. Investors were told revenue would grow as tests sold grew. ¶¶64, 52. But the tests did not always work and were often not covered by Medicare or insurance. ¶2. Moreover, even when covered by Medicare, Medicare typically limited coverage to one test per-patient-per-visit. §IV.A. *infra.* Without Medicare coverage, the resulting revenue was, in most cases, zero because most commercial payors, *e.g.*, Blue Cross, tracked Medicare coverage. ¶¶77-79.

During the Class Period, DermTech reported revenue in two segments: Assay Revenue and Contract Revenue. ¶¶46-47. Assay Revenue was generated from sales of DMT stickers. *Id.* DMT stickers did not always sell for the same price. When covered by Medicare, the price was $760. ¶81. Assay Revenue was thus calculated by multiplying the number of DMT stickers sold by the weighted average selling price (ASP). ¶¶47-48. Formulaically, Assay Revenue = units (stickers sold) x ASP. ¶7, n.1. Contract Revenue came from service-related contracts that DermTech had with various entities. ¶50. Assay Revenue accounted for about 86.9% to 94.3% of the Company's reported revenue during the Class Period. ¶¶49-50 (CAC Figure 2).

### B.   Defendants Overstated Medicare Coverage of the DMT

DermTech's Assay Revenue depended on insurers, including Medicare to pay for the DMT. To qualify for Medicare, DermTech had to obtain a Local Coverage Determination (LCD), defining the extent of coverage for the DMT. ¶74.

LCDs are issued in stages. First, a draft LCD is submitted. ¶¶84-85. The initial draft is then subject to a comment period, during which the public and the Company may submit comments. ¶86. Next, a Medicare Administrative Contractor ("MAC") issues its Response to Comments. ¶87. Then, the LCD has a notice period, when the text of the final LCD is published. *Id.* But the LCD is not effective until after the notice period. *Id.* So a Response to Comments is *an interim step*, not a final coverage decision. ¶96.

DermTech's Final LCD provided that Medicare would cover *only one* test per-patient-per visit, in "most cases." ¶¶89-95. In 10% of cases, Medicare would cover a second test. *Id.* In other words, 90% of the time, Medicare would cover only one test.

Defendants misrepresented to investors that Medicare approved the DMT for up to *two tests*. ¶96.[2] Defendants touted the Final LCD decision as having "expanded the coverage" from one to two tests. ¶98. Defendants said this purported coverage expansion would enable the Company to "generate significant revenues in 2021 and 2022." ¶99. Analysts lauded Defendants' portrayal of the Final LCD coverage determination as a "*significant catalyst* for the Company's growth trajectory." ¶97. The more tests that Medicare covered, the more DMTs would be reimbursed at $760 per unit, and thus, the higher the ASP, which in turn generated more revenue to DermTech.

### C. Defendants Misrepresented the Primary Factors that Drove DermTech's Average Selling Price (ASP)

To grow DermTech's Assay Revenue, it could sell more stickers (increase volume) or increase the average selling price (ASP). ASP was thus a critical metric to investors. ¶¶63-68. Investors needed to understand ASP trends to accurately forecast DermTech's revenue. ¶¶47-48; 64-68; 130. A key driver of ASP was whether Medicare covered the test. ¶7, CAC n.1. Because DermTech generated negligible revenue for an uninsured test, if one-out-of-three tests were insured, then the ASP for those three sales would be $253,

---

[2] Final LCD allegations include: ¶¶2; 4-5; 90-95, 98-102; 179-180; 183-84; 187-88; 189-190; 204-05; 218-219.

whereas if two-out-of-three tests were covered, then it would be $506.[3] By extension, the *key driver* of whether Medicare insured a test is whether the patient had more than one site tested per visit. ¶53.

Investors were told otherwise. ¶¶51-59. Defendants told investors that ASP growth was driven by "three main factors"– none of which was how many tests-per-patient-per-visit were used on average. ¶¶6-7, 51-62. Defendants repeatedly said that "the three main variables" or "main drivers" of ASP were: "sales mix, broader payer coverage, [and] success with appeals." ¶¶51-54, 129. And context makes clear that "sales mix" means getting more commercial payers, *e.g.*, Blue Cross of California *and* Blue Cross of Texas, for example (¶¶6, 51-52); and "broader payer coverage" means getting *more people* covered by Medicare, not getting Medicare to cover *more tests* for the *same* people. ¶52 ("being that Medicare was 23% in Q4, we've got opportunity to improve our ASP by getting *more Medicare patients*."); ¶66 (analyst noting "as payer mix shifts toward Medicare patients, ASP will increase, driving revenue growth"). But even new commercial payers still track Medicare's guidance: more people covered by Medicare doesn't help ASP if those newly-covered people were testing more sites per visit, when insurance was paying only for one. ¶¶59, 78-79.[4]

In response to Defendants' misleading ASP statements, investors and analysts forecast massive revenue for DermTech. ¶¶63-67. These analysts did so, in part, based

---

[3] Calculated as: ($760 +0+0)/3 = $253.33; and ($760+$760+0)/3 = $506.66.

[4] Consider a bar that represents that its average drink price has three main variables: (1) customer mix– *i.e.*, where wealthier patrons tend to buy more top shelf drinks; (2) broader patron coverage–getting more customers in the bar; and (3) success with appeals–getting credit card companies to reverse charge backs for disputed tabs–while omitting (or obscuring) that customers **got free refills** depending on how many drinks they have. An investor would be misled about what drives average drink price if he was told free refills occurred after the *second* drink, rather than after the *first* (90% of the time). Either way, the investor would be misled without being told how many drinks on average customers typically have, because without that figure, it's impossible to assess the impact that the free refill policy has on average drink price.

on the understanding that DermTech's revenue growth could grow "even if volumes remained the same." ¶66 (quoting Lake Street analysts). And because DermTech's Assay Revenue was just volume times price (¶47), Lake Street analysts' statement implicitly meant that they expected DermTech's *ASP* to grow. But ASP could not grow as long as patients tested multiple locations per visit because, as governed by the Final LCD reimbursement schedule, most of the time (~90%), Medicare reimbursed only one DMT per-patient-per-visit. ¶7 n.1, ¶95. ASP thus had a major constraining factor: how many sites each patient got tested. ¶¶7, 129. The more patients testing multiple sites per visit, the more zero revenue stickers included in calculating the average price. ¶¶87, 89, 91-95. All those zeros bring *down* ASP.  Investors were never told this. Defendants said ASP was driven by a misleading set of (other) factors. ¶¶185-86; 194-95.

### D.   Defendants Violated GAAP

**Assay Revenue**. Under GAAP, DermTech's Assay Revenue was not supposed to be subject to reversal, which is another name for written off. ¶48. Under GAAP, prior period reversals are impermissible; revisions are supposed to occur *in the period in which the revisions were made*. ¶49. But that's not what happened here. Defendants improperly booked revenue prematurely, based on the faulty premise that DermTech would get reimbursed for more tests than it was allowed to, causing DermTech to later write off, or reverse, revenue from prior periods. ¶¶143-148, 201-203. Red flags on DermTech's financial statements appeared, but Defendants ignored them. ¶¶164-168.

**Contract Revenue**. Similarly, Defendants said contract revenue would remain in deferred revenue until recognized. ¶50. But that was false too because Defendants reclassified deferred contract revenue by $900,000–essentially admitting that an asset was not only worthless, but in truth, was actually a liability. ¶¶137, 145.

### E.   Defendants Misrepresented their Purported New Payor Wins

After the truth of Defendants' LCD and ASP misrepresentations was revealed, Defendants began to misrepresent their purported new payor wins, *e.g.*, by omitting that such contracts similarly only covered one test in some cases. ¶¶166, 103-109; 220-224.

Yet Former Employees ("FEs") and Defendants' later admissions establish that such contracts were similarly constrained to payment for only one test per patient. ¶224.

### F.    The Truth is Revealed

The truth of Defendants' false statements emerged over several partial disclosures.

*First Partial Corrective Disclosure*. The truth of Defendants' LCD and ASP Statements partially emerged on August 8, 2022, after the market close, when the Company reported its financial results for Q2 2022. ¶¶124-132. The Company lowered its full year 2022 revenue guidance from an initial range of $22 to $26 million, to a reduced range of $16 to $19 million, due in part to payors rejecting more than one testing site per patient-per-visit. ¶¶10, 126-129. DermTech's reduced revenue guidance was also attributed in part to *higher test usage per patient* which was "*causing some of the pressures we're seeing on ASP*." ¶129.

Defendants claimed that ASP was impacted by purported "Medicare billing code edits" ¶¶10, 125-128. On the August 8th earnings call, Sun was asked what the "average number of samples per patient" was, but Sun demurred. ¶¶128-29, CAC n.21. The next day, analysts at William Blair wrote that "the Medicare pricing issue is associated with cases where patients have multiple body sections tested with the DMT during a single visit." ¶131. The same William Blair analysts also said, "the pricing situation is not straightforward for investors to digest." ¶130.

On all this news, DermTech's stock plummeted $2.87 per share, or 34% to close at $5.56 per share on August 9, 2022. ¶¶11, 132.

*Second Partial Corrective Disclosure.* The truth of the ASP Statements was further revealed on November 3, 2022, following Q3 2022 earnings. ¶¶135-37, CAC n.23. Analysts at Stephens noted that DermTech's Q3 2022 "revenue fell short" and "ASP and volume growth issues appear to be driven mainly by commercial payers increasing denials…The issue is that *other factors* (commercial payers pressuring ASP/Volumes + Medicare denying claims . . . could either slightly or more than offset the ASP benefit." ¶140. Similarly, analysts at William Blair downgraded DermTech

shares on "worsening of commercial payers collections impacting revenue per test [*i.e.*, ASP]." ¶141. William Blair said they would not upgrade DermTech until they saw "better line of sight and transparency into payer coverage and contracting decisions." ¶141. On this news, DermTech's stock fell 44%, to close at $1.66 per share on November 4. ¶139.

*Third Partial Corrective Disclosure*. Defendants' accounting machinations were revealed on March 2, 2023, following Q4 2022 earnings when Sun admitted the Company "took $1.8 million of net downward revenue adjustments" to its Assay Revenue during 2022. ¶143. The 2022 10-K released the same day revealed that $1.0 million of the Company's Contract Revenue was reclassified from an asset to a liability. ¶145. Twelve days later, Dobak participated in an investor conference wherein he admitted that the Company had to "take about $1.5 million of write-off from revenue from samples that were processed 12 to 18 months before", thus further revealing the falsity of DermTech's Assay Revenue accounting. ¶¶ 229-230.

*Fourth Partial Corrective Disclosure*. The truth of the Company's ASP and Purported New Payor wins was further revealed May 4, 2023, when Sun admitted that ASP was "difficult to forecast due to additional delays related to recent coverage wins." ¶18. On this news, DermTech' stock fell $0.84 per share, or 31.0% to close at $2.31 per share on May 5, 2023. ¶¶18-19, 232-233.

## III.  LEGAL STANDARD FOR THE TWO ELEMENTS AT ISSUE

"To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (citation omitted). Here, Defendants challenge just falsity and scienter, thus waiving their right to attack the remaining elements. *See, e.g.*, *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

*Falsity*. A complaint adequately alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading.'" *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 701 (9th Cir. 2012) (some alterations in original). A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.,* 643 F.3d 681, 691 (9th Cir. 2011). Even "literally true" statements may be misleading due to "their context and manner of presentation." *Miller v. Thane Int'l, Inc.,* 519 F.3d 879, 886 (9th Cir. 2008); *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1008-09 (9th Cir. 2018) ("Even if a statement is not false, it may be misleading if it omits material information."). And "once defendants choose to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 705-06 (9th Cir. 2016) (cleaned up). Falsity is subject to heightened pleading, but "courts must be careful not to set the hurdles so high that even meritorious actions cannot survive a motion to dismiss." *In re Immune Response Sec. Litig.,* 375 F. Supp. 2d 983, 1018 (S.D. Cal. 2005). "Such a regime would defeat the remedial goals of the federal securities laws." *Id.*

*Scienter*. The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). "In this circuit, the required state of mind is a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). "[C]ourts must consider the complaint in its entirety. . .The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322. "In making this determination, the court must review all the allegations holistically." *Matrixx Initiatives,*

*Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). A strong inference of scienter arises if, a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26. A "tie goes to the plaintiffs when there are multiple plausible theories at the pleadings stage of litigation." *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

## IV.   ARGUMENT: THE CAC STATES A CLAIM UNDER § 10(b)

### A.   The CAC Adequately Pleads Falsity as to Four Sets of Statements

As Defendants note, Plaintiffs alleged four groups of statements were false. Mot. at 1-2; ¶4. So the CAC's allegations are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *See In re Finjan Holdings, Inc.,* 58 F.4th 1048, 1057 (9th Cir. 2023). The first set, the Medicare LCD statements, Defendants appear to concede are false because they challenge just two aspects: (1) knowledge, *a scienter element*; and (2) materiality, which is rarely analyzed at the pleading stage.[5] Mot. at 22-3. Given that concession, it follows that the second set, the ASP Statements, are similarly false because, as described above, the ASP statements are directly related to the LCD statements as both implicate the number of paid tests per patient. ¶6. The third set, about Defendants' revenue accounting, are either presumptively false as a matter of law (*e.g.*, are the subject of the Company's "little r" restatement) or they are not suitable for dismissal at the pleading stage (*e.g.*, whether Defendants violated GAAP). Finally, the fourth set of statements, about whether the Company overstated its new contract wins, were also false. Defendants have no grounds for dismissal.

#### 1.   Defendants Concede Falsity for their LCD Statements

Throughout the Class Period, Defendants said the Final LCD had "expanded the coverage proposal in the draft LCD from one to two tests per date of service." ¶¶98, 179-

---

[5] Authority for both points is discussed within §IV.A.1

180; 183, 218-19. This was false because the Final LCD stated that "only one test may be used per patient per clinical encounter *in most cases*" and specifically provided that a second test would be *denied 90% of the time*. ¶93. Defendants do not engage with the CAC's allegations on falsity of the LCD Statements but argue: (1) they didn't know the LCD statements were false; and (2) the LCD statements were immaterial. Mot. at 22-23. Their first argument, even if true, is irrelevant to falsity. Their second point is premature.

***Knowledge is not an element of falsity***. "To be abundantly clear, this means that we do not impute the strong inference standard of scienter to the element of falsity." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 766 (9th Cir. 2023) (discussing cases eliminating the combined scienter/falsity analysis). Defendants' purported knowledge requirement—in their *falsity* analysis—is analytically flawed and a red herring. *See id*. Mental state concerns *scienter*.

The question for falsity is, to state the obvious, whether the statement was false or misleading when made. On that question, Defendants concede. Nowhere in their Motion do they argue that the Final LCD actually expanded coverage from one to two tests. Rather, Defendants cite only their own false statements. Mot. at 22.[6] Defendants seem to admit that their many LCD statements were false. In their Motion, Defendants ask the Court to take notice of 19 exhibits. ECF 27-2. Some exhibits refer to multiple documents. Yet **nowhere** is a copy of the "Final LCD [which purportedly] expanded the coverage proposal in the Draft LCD from one to two tests." ¶183. Instead, Defendants point to DermTech's "Response to Comments" from December 16, 2019. Mot at 5, 23. But the CAC makes clear that a Response to Comments is a mere *interim step*. ¶¶87, 89, 91, 93-94, 96. Defendants represented that the *Final LCD* expanded coverage from one to two tests—not that a *Response to Comments* did. ¶98. If what Defendants are arguing now is

[6] Defendants' Motion relies on a carefully drafted factual assertion. *See* Mot. at 22 ("*According to Sun*" there was a change to the LCD guidelines in 2022). Such language is curious: why cite Sun, and not the Medicare or CMS documents that Sun purportedly relied on. Nowhere else in Defendants' Motion does a factual assertion begin with "According to Sun" (or Dobak).

that they did not know what the Final LCD actually said–that is as shocking and reckless as it is irrelevant (to falsity at least).[7]

*Materiality is not decided at the pleading stage*. Defendants' second argument–that the alleged false statement was immaterial is something that "ultimately, a jury should assess [because] materiality [is] a question of fact." *Khoja,* 899 F.3d at 1013 (cleaned up); *S.E.C. v. Phan*, 500 F.3d 895, 912 (9th Cir. 2007) ("whether Phan made a material misstatement of fact in the original filing is a question for resolution at trial."). The Court should not even reach materiality.

But even if the Court were to indulge in a merits analysis on materiality, Defendants' framing is wrong. The issue is not whether a Response to Comments in 2019 was materially false or misleading. Mot. at 23 (citing Ex. 2). The issue is whether it was material to investors that Defendants represented that the *Final LCD* expanded coverage from one to two tests per visit. Of course it was. Indeed, a January 2, 2020 analyst described DermTech's announcement of expanded test coverage as a "*significant catalyst* for the Company's growth." ¶97. The same analyst report specifically attributed the *Final LCD* as covering two tests—because that's what Defendants told investors. ¶97. That statement was material because, in essence, Defendants overstated Medicare reimbursement coverage by 81.8%.[8] Using DermTech's average Medicare reimbursement price of $760, if two tests are reimbursed, DermTech generates $1,520 in revenue; whereas for 1.1 tests, revenue would be $836. ¶¶99, 183, 7 (at n.1). That 81.8% difference in revenue tracks the 73.9% difference between DermTech's May 2022

---

[7] Defendants also argue Plaintiffs fail to allege that DermTech was "aware of a history of commercial payers constantly denying coverage for more than one test per encounter." Mot. at 22. First, Plaintiffs do not have to allege *knowledge* of falsity to allege falsity. Besides, Plaintiffs do allege such knowledge. For example, Plaintiffs allege that Defendants "subtly added the qualifier" that the second test was covered "for a certain percentage of patients" in March 2022. ¶101.

[8] Which is the percentage increase from 2 tests being covered, as compared to 1.1 (where the ".10" represents the 10% of patients eligible for a second test). Calculated as: $(2 / 1.1) - 1 = 81.8\%$ increase.

revenue guidance of $22 to $26 million (¶8), and its final reported revenue of $13.8 million—after taking its "little r" restatement. The true Medicare reimbursement rate was *highly* material to investors. *cf. United States v. Holmes*, 2020 WL 666563, at *13 (N.D. Cal. Feb. 11, 2020) ("Materiality . . . only requires the alleged misstatements to have a 'natural tendency to influence.' [The challenged statements] give the false impression to an investor that Theranos' business was growing, that it was a profitable company, and that it was a good investment.").

Still, Defendants argue that in 2019, 97% of tests were covered, so what the LCD actually says is immaterial, it's just a little 3% lie, they say. Mot. at 23. But the document they cite, Ex. 2, is not one Plaintiffs alleged to be false. No matter what percentage of patients required a second test in *2019*, Defendants kept repeating their "expanded coverage" false statements throughout the Class Period, which begins two years later.[9] That large temporal difference is one reason why Defendants' authority doesn't immunize their false statements, nor even apply here.[10]

Defendants separately misled the market by claiming that a second test was covered "for a certain percentage of patients" (*e.g.*, ¶¶101, 204), when that "certain percentage" was known by Defendants to be *a maximum* 10% (*i.e.*, rarely). ¶¶91-95. *Cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) ("[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.").

Finally, to the extent Defendants argue that their 2019 response to the MAC put investors on notice about DermTech's "positions" regarding reimbursement (Mot. at 2-

---

[9] ¶¶99, 183-84 (May 2021); ¶187 (August 2021); ¶189 (Nov. 2021); ¶218 (May 2022).

[10] Defendants rely on *In re Yahoo! Inc. Sec. Litig.*, 611 F. App'x 387, 390 (9th Cir. 2015), to suggest that they corrected their false statements in time. Mot. at 23. But there, "Appellees corrected their allegedly false and misleading pre-class period statements on May 10, 2011—*six weeks* after appellees discovered, on March 31, 2011, information tending to show the falsity of the prior statement." Here, Defendants falsely represented their Medicare coverage *for years*.

3), that is a variant of the truth-on-the-market defense, which cannot be decided at the pleading stage. *See Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016) ("As a general rule, the truth-on-the-market defense is intensely specific, so courts rarely dismiss a complaint on this basis.") (collecting cases). ***Neither the 2019 document Defendants cite nor the Final LCD was ever even transmitted to investors***, let alone with the same "degree of intensity and credibility" as Defendants' many false statements here were. Notably, in arguing that investors should be charged with knowledge of what *Defendants said to the MAC* in a Response to Comments in 2019, Defendants blatantly ignore that the Final LCD—the operative document governing Medicare payments—clearly *informed Defendants* that the MAC did *not* pay for two tests per patient per visit, as Defendants misled investors to believe.

### 2. Defendants' Statements about the "Main Drivers" of ASP Were Materially Misleading

"[D]isclosure is required if, under the circumstances, nondisclosure would render some other corporate statement misleading." *Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th at 1182. "An omission of a material fact is unlawful if the omitted fact is 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.'" *Id.* Courts in this Circuit have repeatedly held that a defendants' reference to an incomplete enumeration that purports to describe the "primary factors" of a company's success or failure is misleading. *See e.g.*, *Rivian*, WL 4361098, at *11, *13 (finding that statements "painted a misleading picture by misidentifying and omitting the most important factor" impeding profitability); *Donley v. Live Nation Ent., Inc.*, 2024 WL 794641, at *9 (C.D. Cal. Feb. 23, 2024) ("Plaintiffs have raised multiple allegations that undermine Defendants' claim that Ticketmaster's success is primarily due to their quality ticketing system and services" rather than anticompetitive practices); *York Cnty. v. HP Inc.,* 2024 WL 1327247, at * 18 (N.D. Cal. Mar. 27, 2024) ("repeated references to currency and competitive pricing as the primary

causes of decline were materially misleading"); *cf*. ¶¶64-68 (alleging ASP was a key metric), ¶129, CAC n.21; ¶¶140-41 (analysts citing undisclosed factors for stock drop).

Accordingly, Defendants' statements that DermTech's ASP was purportedly "mainly driven" by three factors was misleading because the largest driver of ASP—whether Medicare reimbursed the DMT—was directly influenced by how many tests each patient used at each visit. ¶¶5-8, 51-62. So the issue here is not just one of incompleteness (*contra* Mot. at 20-21) but inaccuracy too.[11] Defendants' statements about the main drivers of ASP were inaccurate. Where (a) the biggest driver of ASP is whether Medicare covered the test; and (b) the most obvious way to jeopardize Medicare coverage is when a patient has more than one test per visit, then it logically follows that (c) the average number of tests per-patient-per-visit is one of the main drivers of ASP. Thus, Defendants' representation that "the three main variables" or "main drivers" of ASP: "sales mix, broader payer coverage, [and] success with appeals" (¶¶51-54, 129)—was misleading. No matter how many patients were covered by Medicare (*i.e.*, broader payer coverage), they were only covered for *one test* per visit in most cases *i.e.*, the free refill problem. ¶5; n.4 *supra*. ASP would not rise as long as patients were testing multiple sites per visit, and that made Defendants' references to ASP factors misleading. ¶¶51-59. And investors had no idea how many patients were being tested multiple times per visit because they were not told that factor was important to ASP. ¶¶66-67, 69. Indeed, when the truth was finally revealed, analysts concluded that "***other factors***"—including "Medicare denying claims for tests above the 2 tests/patient/day limit"—was weighing on ASP. ¶140. On November 4, 2022, analysts at William Blair downgraded DermTech in part because "worsening of commercial payer collections [was impacting] revenue per

---

[11] Though even incompleteness can be misleading, which is a factual question in any event. *See Immune Response*, 375 F. Supp. 2d at 1019 ("Plaintiffs' criticism is not that what was said was inaccurate, but that it was incomplete, . . .Whether Defendants' statements were accurate is not an issue at this stage."). "At this stage, the Court need not determine that the statements were in fact misleading—plausibly alleging as much suffices." *In re GoHealth Sec. Litig.*, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022).

test [*i.e.*, ASP]." ¶141. William Blair said it would not change its view until there was "better **transparency** into payer coverage." ¶141; *cf. Rivian*, WL 4361098, at *11, 13.

Finally, because Defendants concede their statements about Medicare were false, their ASP statements necessarily were too: the statements were related. ¶6.[12]

### 3.     Defendants' Revenue Statements Were False

***The "little r" restatements are concessions of falsity.*** When a company restates its financials, many courts have held that "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544 (S.D.N.Y. 2017); *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 410 (S.D.N.Y. 2007) (same). DermTech took ***two*** "little r" restatements (¶153): (1) Assay Revenue booked in prior quarters was <u>written off</u> *ex post facto* (¶¶138, 143-144, 147); and (2) Contract Revenue was <u>reclassified</u> (¶¶137, 145). Plaintiffs alleged *both* were "little r" restatements. ¶153. Defendants do not appear to challenge the falsity of the Assay Revenue write-off statements. Mot. at 19-20, 23-24 (arguing only the Company's Contract Revenue reclassification was not false).[13]

Nevertheless, the Company "reclassified" certain material metrics, which the SEC calls "little r" restatements because companies use them to avoid the stigma of a full-blown restatement, even though, in effect, they are substantially the same. *See* ¶¶153–159. The Court should treat Defendants' "little r" restatements just like any other restatement: as a concession that a previously-issued financial statement was false. ¶160; *cf. Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 606

---

[12] Defendants argue Plaintiffs don't allege Defendants' *knowledge* of falsity as to the ASP statements. Mot. at 21. Again, knowledge of falsity is irrelevant to the falsity element.
[13] Plaintiffs' unchallenged Assay Revenue allegations include: ¶¶138, 143-144, 147, 153, 175-76, 193, 199, 201, 209. While Defendants say in their *Statement of Facts* (Mot. at 3-4) that they complied with GAAP, that conclusory assertion is unsupported.

(S.D.N.Y. 2009) ("Misreported financial information clearly amounts to a false statement of fact.").

Defendants argue that a reclassification is not an admission Defendants *knew* the statements were false when made. Mot. at 19. They miss the point: it is a concession that the statements *were false* when made.[14] ¶163. That's enough on falsity. Nor did Defendants warn that revenue could be reclassified due to cancelled contracts–including in their cited Exhibit. Whether a reasonable investor would take the clause "segments of these contracts may be increased delayed or eliminated" as a warning that contract revenue could later be *reclassified from an asset to a liability*, is an issue for the trier-of-fact. *Cf. Nguyen v. Radient Pharms. Corp.*, 2011 WL 5041959, at *7 (C.D. Cal. Oct. 20, 2011) (collecting cases). "Dismissal at this stage is warranted **only if** the adequacy of the disclosure 'is so obvious that reasonable minds could not differ." *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *5 (S.D. Cal. June 20, 2024). "This is a high threshold, and Defendants do not meet it." *Id*.

In any event, whether accounting practices comply with GAAP is a question of fact: the "Court should not make such a factual determination at the pleadings stage." *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *14 (C.D. Cal. Jan. 12, 2012) (cleaned up); *accord SEC v. Cotton*, 2006 WL 6382128, at *6 (C.D. Cal. Dec. 21, 2006) ("Whether [defendants'] accounting practices . . . were consistent with GAAP is a question of fact, best resolved by expert testimony.").

**4.     Defendants' New Payor Wins Statements Were Misleading**

After revelation of Defendants' false LCD and ASP statements, DermTech's stock cratered. To boost it, Defendants then made misleading statements about its purported new payor wins by suggesting that a coverage recommendation had been made to

---

[14] "Although a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements **were false** when made." *Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004). Defendants again conflate falsity with scienter.

millions of potential customers when such contracts contained material undisclosed restrictions or limitations. ¶¶14-16, 224. For instance, Defendants claimed that the Company's VHA deal would make the DMT available to "over 9 million veterans." ¶16. But this was misleading because Defendants did not disclose that such contracts contained similar restrictions to the LCD Final Coverage determination (*e.g.*, about one test per patient per visit). ¶224. That was false or misleading for substantially similar reasons as the statements in §IV.A.1, *supra*.

**B.      The AC Pleads a Strong Inference of Scienter**

**1.      Defendants' Contradictory Explanations Support Scienter**

Upon revealing the truth of Defendants' misrepresentations about Medicare reimbursement, Defendants gave conflicting and irreconcilable explanations about how the Final LCD impacted ASP. Dobak and Sun said there were billing code changes (*i.e.*, "code edits"), but the timing and impact contradicted each other. During the 2Q 2022 earnings call in August, Dobak stated, "we are revising our full-year 2022 outlook [downward] to reflect a lower average selling price (ASP) for our DMT. ***The ASP pressure is primarily the result of Medicare billing code edits.*** " ¶¶243-45; 135-36. Yet the very next quarter, Sun contradicted Dobak. Sun stated, "[t]he code edit was implemented at the beginning of October [2022]" and, unlike Dobak, Sun claimed that the Company "did take ***some benefit*** of this into the past couple of quarters and it has again ***some positive impact to ASP***." ¶¶246-47. Defendants' statements cannot be reconciled: it is impossible that a code edit purportedly hurt Q2 2022 ASP when—just one quarter later (in Q3)—the same code edit *helped* "the past couple quarters", which obviously included Q2. And if the "code edit" emerged in *October* 2022, as Sun says (¶246), how did Dobak know about it in *August* (¶243)? Logically, someone is not telling the truth. Not only are their explanations at odds, but nowhere among Defendants' encyclopedia of exhibits is *any* evidence that this purported code edit *even exists*. *See* Mot. at 22 ("*According to Sun*, this recent change departed from the LCD.") (citing Sun's earnings call remarks.). As with the Final Medicare LCD determination, none of

Defendants' 19 exhibits sheds any light on this "code edit" contradiction. Indeed, to this day, Defendants have never explained it. Defendants' June 3, 2024 pre-motion letter that preceded Defendants' Motion is instructive because it has five bullet points on scienter (excluding the CW and holistic scienter analysis), yet nothing in response to §VII.B of the CAC (¶¶243-248). Plaintiffs' counsel raised the contradiction at the pre-motion conference and there too Defendants had no explanation. Defendants' Motion is *completely silent* on this issue.

All these facts strongly support scienter because "a later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003). That later statement here includes the code edit contradictions (¶¶135, 243-246) as well as the fact that Defendants subtly changed the disclosure language in the 2021 10-K (¶101), but then removed it and continued making the unqualified statements in May, June, and August 2022 (¶102). *Cf. Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) ("by making detailed factual statements, contradicting important data to which the Defendants had access, a strong inference arises that they knowingly misled the public as to its clear meaning.");[15] *Merkamerica Inc. v. Glover*, 2019 WL 8989833, at *7 (C.D. Cal. Dec. 3, 2019) (same). "[S]cienter can be established by the fact that the Defendants touched on the specific issue ... in their public statements." *Roberti v. OSI Sys., Inc.,* 2015 WL 1985562, at *12 (C.D. Cal. Feb. 27, 2015).  At a minimum, the fact that Dobak and Sun were informed and discussing the granular details of a supposed Medicare "code edit" makes it absurd to suggest that they would not know whether one or two tests were actually covered under the Final LCD that was supposedly impacted by these purported

[15] Defendants had access to the data because they kept track of how many patients sought more than one test per-visit. ¶128 ("we haven't disclosed those metrics, but . . . more tests are being done on average per patient than there *were a year ago in this period*."). To compare annual changes, Defendants necessarily tracked the figure.

code edits. *Cf. In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *9 (C.D. Cal. Sept. 28, 2023). The Ninth Circuit instructs that a tie is a win for Plaintiffs. *Eclectic Props.*, 751 F.3d at 999 n.8. Here, Defendants can't tie because they make *no point* about their own contradictions.

### 2.    Defendants' Insider Selling Supports Scienter

Defendants' stock sales support scienter. Dobak sold stock at $51 per share, $46 per share, and prices below that, for total sales of $5.5 million at a weighted average price of around $36.50 per share. ¶237. The Company is now bankrupt. ECF 29. Over the course of the Class Period, DermTech's stock fell from a Class Period high of $62.50 per share, to $2.31 on the last day. ¶¶238, 260. And now it's at zero. So Defendants' sales are suspiciously-timed and large enough to support scienter. *Cf. Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *11 (C.D. Cal. Dec. 5, 2022) ("Courts should give less weight to the fact sales 'may represent a small portion of the defendant's holdings' if the amount of money made from the sale is sufficiently high in magnitude.") (quoting *Oracle*, 380 F.3d 1226, 1232 (9th Cir. 2004)). Just as in *HyreCar*, where the CEO sales of $5.2 million in stock supported scienter, Dobak's sales of $5.5 million are even larger—they too support scienter. *Contra* Mot. at 17, n.9. *Cf. Oklahoma Firefighters v. Six Flags*. 58 F.4th 195, 215 (5th Cir. 2023) (large stock grant relative to base salary supported scienter). In *Six Flags*, the compensation at issue consisted of "equity awards." *Id*. There, the court found desire to obtain an equity award equal to 300 to 600% of salary showed motive. *Id*. Dobak's sale of $5.5 million in stock preserved equity-created wealth worth 9.4x his salary. ¶237. Put differently, Dobak's well-timed sales netted him more money than nearly a decade of DermTech salary could. That's no immaterial motive. *See id*.

Dobak argues that he had a 10b5-1 plan, but that is an affirmative defense that can't be decided at the pleading stage. *See In re UTStarcom, Inc., Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009); *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("The Court cannot make such factual findings when considering a motion to dismiss because it must draw all inferences in favor of the non-moving party.").

Besides, "[a]llegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021).

### 3.   The Company's Own Selling Further Supports Scienter

In total, Defendants caused DermTech to issue $23.8 million worth of DermTech stock at a weighted average price of $46.33 per share during 2021, which is more than 20 times the $2.31 share price on the last day of the Class Period. ¶¶3, 121-22. Without those sales, the Company–which generated no positive cash flow–would have been bankrupt even sooner than it was. ¶¶119, 123, 242. *Cf. Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1029 (N.D. Cal. 2020) ("though insufficient standing alone, allegation of motivation to inflate stock price in order to conduct a successful secondary public offering and obtain much-needed operating capital was motive evidence ... stronger than the generic 'desire to raise capital' which can be attributed to every company"); *Nguyen*, 2011 WL 5041959, at *8 ("a desire to raise company financing, combined with the 'red flags' of a company's financial condition, are sufficient to plead scienter."); *Immune Response*, 375 F. Supp. 2d at 1023 ("Defendants' motive, according to Plaintiffs, was to obtain continuing financing.").

### 4.   Revenue Misstatements to Hit Analysts' Estimates Support Scienter

DermTech's revenue misstatements impacted the key metric that analysts focused on. ¶¶47, 252, 63-69 (discussing analyst price targets). For example, on August 4, 2021, Wall Street analysts at Oppenheimer based their $58 price target on DermTech's 2025 estimated revenue of $172.7 million. ¶64. Similarly, analysts at investment firm BTIG based their $53 price target on DermTech's then forecast "revenue growth from ~100% in the near-term." ¶65. Even DermTech's current CEO (Dobak's replacement) stated that the Company's "primary objective" was "growing revenue." ¶172. But such revenue growth was illusory because it depended on improper accounting and included amounts subject to reversal. n.13 *supra*; *cf. In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820

(N.D. Ill. 2017) (scienter alleged where "accounting violations had the near-uniform effect of increasing its reported revenue and net income…unlike what one might expect from…innocent mistakes."). Indeed, "accounting manipulations involving premature revenue recognition ... are especially indicative of conscious misbehavior since such violations do not commonly occur inadvertently, but instead suggest a conscious decision to improperly recognize revenue." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006). That Defendants' promises of 100% revenue growth in May 2022—with four months of the year already on the books—was the key metric investors cared about and came in response to analysts' questions about the main variable of ASP growth (¶194) is "the most powerful evidence of scienter" according to some courts.[16] *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("the most powerful evidence of scienter is the content and context of the statements made by [Defendants], which were made in response to analysts questions.").

DermTech's reliance on the DMT for the vast majority of its revenue further supports scienter under the core operations doctrine. Given Medicare reimbursements made the difference between the Company receiving $760 or nothing for the sale of a small plastic sticker, "it would be 'absurd to suggest' that top management was unaware of" how many stickers were reimbursed per visit. *Berson*, 527 F.3d at 989. "It is simply not credible that [DermTech] senior executives would be unaware of the" the main driver of its revenue, the Medicare reimbursement rate. *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14; *cf. US v. Holmes*, 2020 WL 666563, at *15 ("Defendants, were both officers of Theranos; their position indicated that they knew about Theranos' technology."). Plaintiffs thus allege a "core operations" theory that supports scienter. *Cf. Alphabet,* 1 F.4th at 706; *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *11; *Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *9.

---

[16] ¶¶8, 12 (In May 2022, Defendants stated they expected more than 100% revenue growth from 2021 to 2021); ¶68 (March 2021 statement by Dobak that "we often field questions from the investment community about the overall speed of our revenue.").

### 5.    Internal Control Deficiencies; SOX Certifications; and Dobak's Resignation All Independently Support Scienter

Internal control deficiencies support scienter. *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter.") (*contra* Mot. at 17). Defendants' failure to remedy a known internal control weakness (¶¶253-55) supports it further—particularly because the internal control weakness dealt with the Company's Assay Revenue, which was later written off, and shortly thereafter Dobak was replaced (¶169). *Cf. Mild v. PPG Indus., Inc.*, 2018 WL 6787351, at *7 (C.D. Cal. Dec. 21, 2018) ("Based on the timing of Kelly's termination and PPG's announcement of remedial measures, the Court finds that these allegations add to the inference of scienter."); *Batwin v. Occam Networks, Inc.,* 2008 WL 2676364, at *13 (C.D. Cal. July 1, 2008) (similar). Indeed, Dobak's replacement alone supports scienter. *See Bielousov v. GoPro, Inc*., 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of the company's president bolstered the inference of scienter). As do Defendants' signatures on the Company's SOX Certifications. ¶¶181, 256. *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, at *14 (S.D.N.Y. Apr. 14, 2020) ("The Fund has plausibly pleaded that Defendants acted with scienter by attesting to the adequacy of their internal controls in the SOX certifications.").

### 6.    FE Allegations Show Access to Information and Support Scienter

The FE allegations support scienter because they are "described with sufficient particularity to establish their reliability and personal knowledge" and are "indicative of scienter." *Quality Sys.* 865 F.3d at 1144-45. The CAC adequately alleges the FE's "job titles, descriptions of duties, responsibilities, and period of employment to sufficiently meet the PSLRA's requirements for confidential witnesses." *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *9; ¶¶35-37, 107-09; 111-117. The FEs also alleged Defendants had access to information. ¶116. (FE2 stated that Sun "signed off on any deal" involving reimbursement and was "heavily involved with sales."); *cf. Batwin* 2008 WL 2676364,

at *11 ("CW2 also stated that it was company policy to involve the CEO and CFO in any sales transaction worth more than $250,000, which included most of Occam's sales.").

The Ninth Circuit has held that it is not always necessary to allege that an executive read a report with contradictory information when he had access to it, as Sun did here. *See Alphabet,* 1 F.4th at 706 ("Although the complaint does not directly allege that Page read the Privacy Bug Memo, we may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue."). Similarly, FE3 stated that there was a backlog of "many thousands" of denied claims that existed and were tracked in a spreadsheet that was circulated monthly, called XiFin. ¶117.

The combination of that swelling backlog and DermTech's growing DSOs—which indicate slowing collections of accounts receivable and serve as a red flag—further supports an inference of knowledge or deliberate recklessness. ¶¶165-168; *cf. In re New Century*, 588 F. Supp. 2d 1206, 1230–31 (C.D. Cal. 2008) (growing backlog supported scienter for statements related to adequacy of reserve); *In re Accredo Health, Inc. Sec. Litig.*, 2005 WL 8152649, at *16 (W.D. Tenn. Apr. 11, 2005) ("Plaintiffs have alleged that there were 'red flags,' such as the 300 day DSO and $60 million dollars worth of uncollectible accounts receivable, that should have been obvious to Defendants."); *Sun v. Han,* 2015 WL 9304542, at *17 (D.N.J. Dec. 21, 2015) (rising DSOs support scienter).

### 7. Viewed holistically, Plaintiffs Easily Allege Scienter

Viewing the allegations holistically, as the Court must under *Tellabs*, Plaintiffs have **at least** a tie here. At a minimum, it was deliberately reckless to tell investors that Medicare covered two tests, when it really covered only one test, 90% of the time.

### C. Plaintiffs' Complaint Complies with Rule 8

Defendants make a passing reference suggesting that the CAC violates Rule 8. Mot. 1, 11. But the Ninth Circuit recently observed that a 289-paragraph complaint "is not significantly more prolix than complaints that we have found generally adequate in other securities class actions." *See Genius Brands*, 97 F.4th at 1180, n.4. Indeed, the Ninth

Circuit has cautioned against applying a strict requirement for a "short" statement under Rule 8 given the heightened pleading standards of Rule 9(b) and the PSLRA. *See In re GlenFed Sec. Litig.*, 42 F.3d 1541, 1555-56 (9th Cir. 1994). Courts have held much longer complaints are appropriate.[17] In any event, Defendants rightly discerned that Plaintiffs' §10(b) claim is based on four categories of statements (Mot. at 1-2). *Cf. Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *9 (C.D. Cal. Jan. 17, 2020) ("Moreover, based on the Motion, Defendants appear to have been able to identify the alleged misstatements and the reasons why the statements were misleading."). Plaintiffs made this clear in a plain statement in ¶¶1, 3-22.

### D.   Plaintiffs Allege Control Person Liability (Section 20(a))

Defendants' main argument on Plaintiffs' §20(a) claim is the supposed lack of a primary violation, which rises or falls with Plaintiffs 10(b) claim. Mot. at 25. Defendants' alternative argument, a purported lack of control by the CEO and CFO over DermTech is, like many of their arguments, premature. *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000) ("Whether the defendant is a controlling person is an intensely factual question."). It is also their burden, which their one-sentence, unsupported and conclusory assertion fails to meet. *See id.*

### V.   CONCLUSION: DEFENDANTS' MOTION SHOULD BE DENIED

Alternatively, should the Court grant any portion of Defendants Motion, Plaintiffs request leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

---

[17] *Cf. Barnes v. Edison Intl*, 2021 WL 2325060, at *6 (C.D. Cal. Apr. 27,2021) (175-page complaint with 510 paragraphs "meets the Rule 8(a) requirement"); *New Century*, 588 F. Supp. 2d at 1219 (complaint with "nearly 375 pages of allegations, with nearly 200 additional pages of charts," did not warrant dismissal). So "verbosity or length is not by itself a basis for dismissing a complaint based on Rule 8(a)." *Hearns v. San Bernardino Police Dep't*, 530 F.3d 1124, 1131 (9th Cir. 2008).

DATED: August 23, 2024         **GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Raymond D. Sulentic*
      _____

Raymond D. Sulentic
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150
Email: rsulentic@glancylaw.com

Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email:  kwolke@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Putative Class*

## <u>PROOF OF SERVICE BY ELECTRONIC POSTING</u>

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On August 23, 2024, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 23, 2024, at San Diego, California.

*s/ Raymond D. Sulentic*
Raymond D. Sulentic
