

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

IN RE DERMTECH, INC. SECURITIES LITIGATION

Case No.:  23-cv-1885-DMS-JLB

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Pending before the Court is Defendants' Motion to Dismiss Plaintiff's First Amended Consolidated Class Action Complaint.  (Defendants' Motion ("Defs.' Mot."), ECF No. 27).  Plaintiff filed an Opposition, (Plaintiff's Opposition ("Opp'n"), ECF No. 31), and Defendants filed a Reply, (Defendants' Reply ("Reply"), ECF No. 33).  For the following reasons, Defendants' Motion to Dismiss is **GRANTED**.

## I.
## BACKGROUND

Plaintiff Robert Weiner brings this class action on behalf of himself and all others who acquired DermTech, Inc. ("DermTech") securities between March 8, 2021 and May 3, 2023.  (Class Action Complaint ("CAC"), ECF No. 25).  DermTech, now in bankruptcy proceedings, is a molecular diagnostic company that traded on the NASDAQ Stock Market

during the Class Period. (*Id.* at 15); (ECF No. 29). Its "flagship product" is the DermTech Melanoma Test ("DMT"), a non-invasive adhesive patch that tests skin lesions for melanoma. (CAC 5).

Plaintiff sues Defendant John Dobak, DermTech's Chief Executive Officer ("CEO"), and Defendant Kevin Sun, DermTech's Chief Financial Officer ("CFO"), for securities fraud.[1] (*Id.* at 12). Plaintiff claims that Defendants engaged in "fraudulent conduct" and made "false statements" to conceal adverse information about the Company's financial condition and to cause the public to purchase DermTech securities at artificially inflated prices. (*Id.* at 6, 95). Plaintiff's Complaint asserts two causes of action: (1) violation of § 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder; and (2) violation of § 20(a) of the Exchange Act. (*Id.* at 97–101).

## II.

## JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

In their Motion to Dismiss, Defendants attach 19 exhibits and request this Court to take notice of them. (Defendants' Judicial Notice Motion ("JN Mot."), ECF No. 27). Plaintiff filed a response in Opposition, (Plaintiff's Judicial Notice Opposition ("JN Opp'n"), ECF No. 32), and Defendants filed a Reply, (Defendants' Judicial Notice Reply ("JN Reply"), ECF No. 33). Thus, the Court must determine which exhibits it will use in assessing Defendants' Motion.

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under [Federal] Rule [of Civil Procedure] 12(b)(6)". *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). However, two exceptions

---

[1] Although the Complaint names DermTech as a Defendant, Plaintiff voluntarily dismissed all claims against DermTech pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i) on June 20, 2024. (ECF No. 28). DermTech filed for bankruptcy on June 18, 2024. (ECF No. 29).

are judicial notice and incorporation by reference.  *Id.*  Under Federal Rule of Evidence 201, a court "may judicially notice a fact that is not subject to reasonable dispute."  Fed. R. Evid. 201(b).  A fact is "not subject to reasonable dispute" if it "is generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *Id.* at 201(b)(1)–(b)(2).  Courts must make this assessment carefully: "[j]ust because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth."  *Khoja*, 899 F.3d at 999.

Incorporation by reference, by contrast, is a "judicially created doctrine that treats certain documents as though they are part of the complaint itself."  *Id.* at 1002.  Essentially, "a district court ruling on a motion to dismiss may consider a document the authenticity of which is not contested, and upon which the plaintiff's complaint necessarily relies."  *Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th Cir. 1998), *as amended* (July 28, 1998).  "The doctrine prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken—or doom—their claims."  *Khoja*, 899 F.3d at 1002.  While an incorporated document's contents may generally be viewed as true, *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006) (internal quotation marks and citations omitted), "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint", *Khoja*, 899 F.3d at 1003.

The Ninth Circuit has cautioned that, particularly in securities fraud matters, "the unscrupulous use of extrinsic documents . . . risks premature dismissals of plausible claims that may turn out to be valid after discovery."  *Id.* at 998.  Despite this caution, the Court declines to impose a threshold requirement and "outright den[y]" Defendants' Motion based on the number of documents for which Defendants request notice.  (JN Opp'n 4–5).  Even after *Khoja*, courts in this Circuit have granted notice of or incorporated documents in requests containing fifteen or more exhibits.  *See, e.g.*, *In re Sentinelone, Inc. Sec. Litig.*, 2024 WL 3297150, at *2 (N.D. Cal. July 2, 2024) (partially granting request of twenty

exhibits); *Hoffman v. Life Ins. Co. of the Sw.*, 2024 WL 3435418, at \*4 (N.D. Cal. July 17, 2024) (partially granting request of twenty-nine exhibits).

Because Defendants' requests for this Court to judicially notice Exhibits 1 and 3–15 are unopposed, the Court **GRANTS** them. *See, e.g.*, *Rodriguez v. Mondelez Glob. LLC*, 703 F.Supp.3d 1191, 1203 (S.D. Cal. 2023) ("The Court takes judicial notice of Exhibits 1, 3, 9–11, and 14, which are unopposed."); *Salinas v. IA Lodging San Diego, LLC*, 2021 WL 1578957, at \*2 (S.D. Cal. Apr. 22, 2021) ("Moreover, courts within this District have granted unopposed requests for judicial notice pursuant to Civil Local Rule 7.1(f)(3)(c)."); *Haddad v. Bank of Am., N.A.*, 2014 WL 67646, at \*1 n.1 (S.D. Cal. Jan. 8, 2014) ("Pursuant to Federal Rule of Evidence 201 and Civil Local Rule 7.1(f)(3)(c), the unopposed Requests for Judicial Notice are granted."). The remaining exhibits—Exhibits 2 and 16–19—are disputed and will be addressed below.

**A. Exhibit 2**

Exhibit 2 "is a true and correct copy of the Company's Response to Comments: MolDX: Pigmented Lesion Assay, filed with the Centers for Medicare and Medicaid Service ("CMS") on December 16, 2019." (JN Mot. 2). The Court agrees with Defendants that Exhibit 2 is subject to notice because it is a "critical component" of the Final LCD, which Plaintiff extensively cites in his Complaint. (JN Reply 9); (CAC 38–39, 64–67, 74). Exhibit 2 is appropriate context for assessing Plaintiff's allegations. *In re Eventbrite, Inc. Sec. Litig.*, 2020 WL 2042078, at \*7 (N.D. Cal. Apr. 28, 2020) ("*Khoja* thus did not eradicate the rule that alleged false statements must be analyzed in context.") (internal quotation marks and citation omitted). Therefore, the Court **GRANTS** judicial notice of Exhibit 2.

**B. Exhibits 16–18**

Exhibits 16–18 are Securities and Exchange Commission ("SEC") Forms 4, which show changes in the holdings of Defendants during the Class Period. Plaintiff argues these forms are improper for incorporation or notice because they seek to support an affirmative defense. (JN Opp'n 8–9). Defendants contend these documents assist "the Court's

consideration of whether Plaintiff has pleaded facts" showing "a strong inference of scienter". (JN Reply 11–12). The Court partially agrees with Defendants.

SEC Forms 4 are publicly available documents that courts in this Circuit regularly notice. *See, e.g.*, *Patel v. Parnes*, 253 F.R.D. 531, 546 (C.D. Cal. 2008) ("Therefore, the court will take judicial notice of the Standard Pacific Forms 4 filed with the SEC[.]"); *Wietschner v. Monterey Pasta Co.*, 294 F.Supp.2d 1102, 1109 (N.D. Cal. 2003) ("On this basis, the Court takes judicial notice of Mr. Hewitt and Mr. Brinkman's SEC Forms 4 and the SEC Form 10–K in that they are clearly, if indirectly, referenced in the Complaint as integral to the stock sale allegations made in the Complaint."); *Hadian v. Fate Therapeutics, Inc.*, 2024 WL 4246083, at *9 (S.D. Cal. Sept. 19, 2024). Defendants do not raise a new affirmative defense. Rather, Defendants seek to show that Plaintiff has not pleaded sufficient factual content to meet an element of his § 10(b) claim. Thus, the Court **GRANTS** judicial notice, with the caveat that "while the Court may consider the filing and existence of the Form[s] 4[], it may not assume the truth of the matters asserted therein for the purposes of disputing Plaintif[f's] trading and scienter allegations." *Id.*[2]

## C. Exhibit 19

Exhibit 19 is a chart summarizing Defendant Dobak's sales of common stock between March 8, 2021 and May 7, 2023. (JN Mot. 4). While "[c]ourts can take judicial notice of charts that compile information", *Tadros v. Celladon Corp.*, 2016 WL 5870002,

---

[2] As noted in *Hadian*, there is a split in this Circuit about whether courts "may take judicial notice of Form[s] 4[] to determine whether insider stock sales raise an inference of scienter." *Hadian*, 2024 WL 4246083, at *9 n.9; *compare City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F.Supp.2d 1045, 1059 (N.D. Cal. 2012) ("Moreover, courts may take judicial notice of SEC Forms 4, even when not referenced in the pleading, to prove that stock sales were made pursuant to a Rule 10b5–1 trading plan."), *with Patel*, 253 F.R.D. at 546 ("Therefore, the court will take judicial notice of the Standard Pacific Forms 4 filed with the SEC, but only to the extent defendants ask that it judicially notice the content of the documents and the fact of their filing."). "Given this split, and the *Khoja* panel's warnings against the over-use of the incorporation by reference and judicial notice doctrines, the Court will not take judicial notice of the truth of the matters asserted in Exhibits [16–18]." *Hadian*, 2024 WL 4246083, at *9 n.9.

at *8 (S.D. Cal. Oct. 7, 2016), *aff'd*, 738 F.App'x 448 (9th Cir. 2018), and the chart shows "historical stock prices", which "are publicly available and not subject to reasonable dispute", *In re Sentinelone*, 2024 WL 3297150, at *3, the Court will not assume the truth of the information in Defendants' SEC Forms 4, which is the basis of this Exhibit.  As such, the Court **DECLINES** to take judicial notice of Exhibit 19.

### III.

### FAILURE TO STATE A CLAIM UNDER THE EXCHANGE ACT

**A. Legal Standard**

**a. Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted". Fed. R. Civ. P. 12(b)(6).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  If Plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible," the Complaint "must be dismissed." *Id.* at 570.

In reviewing the plausibility of a complaint on a motion to dismiss, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But courts are not "required to accept as true

allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

When a court grants a motion to dismiss, it must then decide whether to grant leave to amend. Leave to amend "shall be freely given when justice so requires". Fed. R. Civ. P. 15(a). "[T]his policy is to be applied with extreme liberality." *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). A court should grant leave to amend where there is no (1) "undue delay", (2) "bad faith or dilatory motive", (3) "undue prejudice to the opposing party" if amendment were allowed, or (4) "futility" in allowing amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment." *Intri-Plex Techs. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007).

### b. Heightened Pleading Standard

In addition to Federal Rule of Civil Procedure 12(b)(6), "[a] securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). "[W]here a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the 'time, place, and specific content of the false representations'". *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff's allegations must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-*

*Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)) (internal quotation marks omitted).

The PSLRA also imposes "more exacting pleading requirements" on private securities fraud complaints. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Under the PSLRA, a plaintiff in a securities fraud action must "plead with particularity both falsity and scienter." *Id.* (internal quotation marks and citation omitted). Thus, Plaintiff's § 10(b) claim "must satisfy the 'particularity' requirement of Rule 9(b) of the Federal Rules of Civil Procedure, the 'plausibility' requirement of *Iqbal*, and the scienter requirement of the PSLRA." *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690–91 (9th Cir. 2011).

**B. § 10(b) of the Exchange Act and Rule 10b-5**

§ 10(b) of the Exchange Act prohibits the:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). One rule promulgated under the Exchange Act is Rule 10b-5, which makes it "unlawful for any person . . . in connection with the purchase or sale of any security": (1) "[t]o employ any device, scheme, or artifice to defraud"; (2) "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person". 17 C.F.R. § 240.10b-5.

To prevail on his § 10(b) and Rule 10b-5 claim, Plaintiff must prove "(1) a material misrepresentation or omission by [D]efendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Matrixx*

8

1  *Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).  Defendants contend that
2  Plaintiff has failed to sufficiently plead the first two elements, falsity and scienter.  (Defs.'
3  Mot. 17).  The Court will address each in turn.

### a. Material Misstatements or Omissions (Falsity)

5  To meet the first element of his § 10(b) claim, Plaintiff "must show that [Defendants]
6  made a statement [or omission] that was '*misleading* as to a *material* fact.'"  *Matrixx*
7  *Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).
8  When analyzing whether a plaintiff has met this burden, courts in the Ninth Circuit apply
9  "the objective standard of a 'reasonable investor.'"  *Glazer Cap. Mgmt., L.P. v. Forescout*
10 *Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (internal citation omitted).  A statement or
11 omission is material "when there is 'a substantial likelihood that the disclosure of the
12 omitted fact would have been viewed by the reasonable investor as having significantly
13 altered the 'total mix' of information made available.'"  *Id.* (quoting *Basic*, 485 U.S. at
14 231–32).  In other words, a "reasonable investor" must be substantially likely to "consider
15 [the fact] important in his or her decision making".  *No. 84 Emp.-Teamster Joint Council*
16 *Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003).

17 Making a finding on materiality "requires delicate assessments of the inferences a
18 'reasonable shareholder' would draw from a given set of facts and the significance of those
19 inferences to him".  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  "[T]hese
20 assessments are peculiarly ones for the trier of fact."  *Id.*  "Only if . . . reasonable minds
21 cannot differ on the question of materiality is the ultimate issue of materiality appropriately
22 resolved as a matter of law" at the pleading stage.  *Id.* (internal quotation marks and
23 citations omitted).  Otherwise, materiality "is a question for resolution at trial."  *S.E.C. v.*
24 *Phan*, 500 F.3d 895, 912 (9th Cir. 2007).

25 Aside from materiality, Plaintiff must also plead that Defendants' statements are
26 misleading.  Per the PSLRA's heightened pleading standard, Plaintiff must "specify each
27 statement alleged to have been misleading [and] the reason or reasons why the statement
28 is misleading".  15 U.S.C. § 78u-4(b)(1).  Further, "if an allegation regarding the statement

or omission is made on information and belief," Plaintiff's Complaint must "state with particularity all facts on which that belief is formed." *Id.*  Misleading is not synonymous with incomplete.  *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).  Rather, it means that a statement or omission "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.*  "Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008–09 (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)).

Plaintiff alleges falsity as to Defendants' statements about (1) Medicare's Local Coverage Determination ("LCD") of the Company's DMT patch; (2) the main drivers of the DMT's average selling price ("ASP"); (3) revenue accounting; and (4) DermTech's new contracts at the start of 2023.  (CAC 6–10).  The Court will analyze each.

### i.  LCD Statements

According to Plaintiff, Defendants "misrepresented the extent to which the Company's DMT patch was covered by Medicare" as provided for in Medicare's Final LCD when stating:

- In DermTech's SEC Form 10-K for 2020 that "[t]he Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA."

- In DermTech's SEC Form 10-Q for the period ending March 31, 2021 that the "Final LCD[] expanded the coverage proposal in the Draft LCD from one to two tests per date of service".

- In DermTech's SEC Form 10-Q for the period ending June 20, 2021 that the "Final LCD[] expanded the coverage proposal in the Draft LCD from one to two tests per date of service".

- In DermTech's SEC Form 10-Q for the period ending September 30, 2021 that the "Final LCD[] expanded the coverage proposal in the Draft LCD from one to two tests per date of service".

- In DermTech's SEC Form 10-K for 2021 that "[t]he Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service for a certain percentage of patients".

- In DermTech's SEC Form 10-Q for the first quarter of 2022 that the "[F]inal . . . LCD[] expanded the coverage proposal in the [D]raft LCD from one to two tests per date of service".

(*Id.* at 6, 63–67, 74, 79). Plaintiff alleges these LCD statements were materially misleading because Defendants "omitted that relevant coverage guidelines covered the second test per-patient-per-visit ***just ten percent of the time***, if at all." (*Id.* at 6) (emphasis in original). Specifically, the Final LCD stipulated that "[o]nly 1 test may be used per patient per clinical encounter in most cases. In roughly 10% of patients a second test may be indicated for the same clinical encounter." (*Id.* at 31–37). Defendants, in response, contend that their statements were not materially false or misleading because the Final LCD "covered over 97% of all DermTech tests submitted based upon data [DermTech] supplied" in a Response to Comments on the Draft LCD. (Defs.' Mot. 29, Exhibit 2).[3]

The Court finds Defendants' statements about the Final LCD materially misleading. Apart from DermTech's SEC Form 10-K for 2021, Defendants represented, without

---

[3] In their analysis of falsity, Defendants also argue that "Plaintiff does not plead facts establishing that DermTech was aware of a history of commercial payers and/or the LCD constantly denying coverage for more than one test per encounter". (Defs.' Mot 28). Because the Supreme Court "treat[s] falsity and scienter as separate requirements", the Court will not address this argument here. *Glazer Cap. Mgmt.*, 63 F.4th at 766. Defendants' reference to old Ninth Circuit caselaw to show that statements must be false or misleading "when made" is unconvincing. (Defs.' Mot. 28–29); (Reply 12–13). The Ninth Circuit clarified in *Glazer* that, contrary to its approach in prior cases, the falsity and scienter inquiries should not be "co-mingl[ed]". *Glazer Cap. Mgmt.*, 63 F.4th at 766.

qualification, that the Final LCD "expanded the coverage proposal in the Draft LCD from one to two tests per date of service". (CAC 6, 63–67, 74, 79). These representations are absolute. A reasonable investor would interpret them as meaning that the Final LCD included two tests per date of service *all the time*, which is "a state of affairs that differs in a material way from the one that actually exists", i.e., that the second test is rarely covered. *Brody*, 280 F.3d at 1006.

Defendants rely on DermTech's Response to Comments on the Draft LCD. (Defs.' Mot. 29). However, as Plaintiff points out, "[t]he issue is not whether a Response to Comments in 2019 was materially false or misleading" but "whether it was material to investors that Defendants represented that the *Final LCD* expanded coverage from one to two tests per visit." (Opp'n 20) (emphasis in original). Additionally, to the extent that Defendants argue that DermTech's Response to Comments was publicly available to investors, they assert a "fraud-on-the-market" defense, available when "material information . . . has been made credibly available to the market by other sources." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir. 1989). This defense is unavailable when material information "has received only brief mention in a few poorly-circulated or lightly-regarded publications" because "[t]he investing public justifiably places heavy reliance on the statements and opinions of corporate insiders" like Defendants. *Id.* at 1116. Because Defendants have not shown that the Response to Comments was "transmitted to the public with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the[ir] one-sided representations", this defense is inapplicable. *Id.*

Even if the substance of DermTech's Response to Comments is correct—that the "Final LCD approved by Medicare covered over 97% of all DermTech tests"—the effect of the coverage of the second test on the Company's profitability is a question of fact that is properly addressed later in this litigation. (Defs.' Mot. 29). Defendants and Plaintiff support their arguments about the materiality of Defendants' LCD statements using mathematical percentages. (*Id.*) (noting that "for over 97% of cases, [DermTech] should

obtain reimbursement without any appeal"); (Opp'n 20) ("The statement was material because, in essence, Defendants overstated Medicare reimbursement coverage by 81.8%."). The Court finds its "delicate assessmen[t]" of these competing theories premature. *TSC Indus., Inc.*, 426 U.S. at 450; *Basic*, 485 U.S. at 240 (noting that materiality is a "fact-specific inquiry"); *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995) ("Similarly, whether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact."); *United States v. Gaudin*, 515 U.S. 506, 512 (1995) (finding in different context that materiality is an "application-of-legal-standard-to-fact sort of question" that "has typically been resolved by juries"). Therefore, Plaintiff, at this juncture, has shown that Defendants' LCD statements were materially misleading.

### ii. ASP Statements

Plaintiff alleges that Defendants' statements about the drivers of ASP growth failed to mention that "a material undisclosed factor critical to . . . growth was the number of sites tested per-patient-per-visit". (CAC 7). Instead, during DermTech's August 4, 2021 earnings call, Defendant Sun represented "the main drivers of ASP growth" as being "sales mix, broader payer coverage, [and] success with appeals and generation of additional data." (*Id.* at 66).

Defendants' statements about ASP growth were incomplete, but not misleading. *Brody*, 280 F.3d at 1006. The Court is convinced that the number of tests patients received at each visit is a "sub-component" of broader payer coverage. (Reply 13). In healthcare, payers, synonymous with payors, are often "health insurance companies [that] provide customers with health plans . . . offer[ing] cost coverage and reimbursements for medical treatment and care services." *Payor*, Definitive Healthcare, *available at* <u>Payor Definition | What is a payor or payer in healthcare? | Definitive Healthcare</u>. Broader payer coverage means that more payers (such as Medicare) cover the cost of DMTs. The extent to which payers cover the cost of DMTs is a function of the number of patients covered *and* the number of tests covered per patient. In other words, payers increase their coverage when

they *either* (1) sponsor more patients or (2) sponsor more tests per patient.  As a result, broader payer coverage and the number of tests patients used at each visit are not separate categories.  While elaborating on the factors affecting broader payer coverage would have been more comprehensive, "it bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Matrixx Initiatives*, 563 U.S. at 44 (internal quotation marks and citation omitted).[4]    As such, Defendants' ASP statements were not misleading.

### iii.  Revenue Statements

Plaintiff argues that DermTech's downward adjustment of its assay revenue and reclassification of its contract revenue "establish the falsity of previously-reported revenue figures." (CAC 8–9).  However, "restatements are not by themselves sufficient to show that [financial reports] were false when made." *In re Ramp Networks, Inc. Sec. Litig.*, 201 F.Supp.2d 1051, 1065 (N.D. Cal. 2002).[5]  If a restatement is not "accompanied by . . . [a] defendan[t's] admi[ssion] that the restatements were necessitated by accounting errors", a plaintiff must "alleg[e] specific facts concerning particular transactions during the same time period that violated GAAP". *Id.* at 1065–66.  "Such allegations would raise an inference that . . . the restatements were necessitated by incorrect accounting." *Id.* at 1066.[6]

Here, Defendants did not admit to adjusting or reclassifying revenue because of accounting errors.  (Reply 14); *In re Ramp Networks*, 201 F.Supp.2d at 1065 ("Three of the cases relied on by Plaintiffs are distinguishable because the restatements in those cases

---

[4] Defendants later discussed this very factor during their August 8, 2022 earnings call.  (Defs.' Mot. Exhibit 9) ("As it relates to the average selling price, or ASP, . . . Medicare insurance claim processing has been problematic due to code edits that reject claims where patients have multiple body sites tested on the same day.").

[5] Regardless of whether these actions are characterized as "restatements", (CAC 54), or "routine accounting measures", (Reply 14), the analysis weighs in favor of Defendants.  At the pleading stage, the Court will accept Plaintiff's allegation that these are restatements. *Iqbal*, 556 U.S. at 678.

[6] Plaintiff cites out-of-Circuit decisions to argue that restatements alone are concessions of falsity. (Opp'n 24).  These citations are less persuasive to the Court.

14

were accompanied by statements by the defendants admitting that the restatements were necessitated by accounting errors."); *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *9 (C.D. Cal. Feb. 6, 2014) ("Here, too, because Ambo[w] never expressly nor implicitly revealed the alleged impropriety of its accounting practices to the market, the fact that Ambow decided to change its revenue recognition practices and adjust its prior revenue statement does not show that earlier statements regarding revenue were false."). Plaintiff thus must have described transactions violating GAAP during the Class Period. *In re Ramp Networks*, 201 F.Supp.2d at 1065–66. Parts of the Complaint vaguely reference accounting errors. (CAC 8) ("Defendants misrepresented the Company's revenue recognition practices, including compliance with applicable accounting standards[.]"); (*Id.* at 58) ("Yet Defendants' improper accounting persisted."). Plaintiff does not, however, connect these conclusory allegations to GAAP or describe transactions violating GAAP. While Plaintiff alleges facts concerning Defendants' lack of compliance with DermTech's stated accounting policies, it is unclear to the Court whether these are similarly GAAP violations. Accordingly, the Court cannot conclude that Defendants' adjustment of assay revenue and reclassification of contract revenue establish falsity.[7]

### iv.  Contract Statements

Plaintiff makes two arguments about why Defendants' statements in early 2023 about "purported new pay[e]r wins" were materially misleading. (*Id.* at 40). First, Plaintiff contends that Defendants' statements about obtaining "favorable coverage policies" from plans in Hawaii and New York and being "recommended" by the "U.S. General Services Administration . . . for coverage by the Veteran Health Administration" ("VHA") were "over-hyp[ed]" because "the payers had not actually added the [DMTs] to their formularies". (*Id.* at 40–41). The Court disagrees. Nowhere did Defendants insinuate that

---

[7] Further supporting this conclusion are Defendants' public warnings to investors that revenue was highly variable and that contracts were subject to cancellation. (Defs.' Mot. Exhibits 7, 12); *Hadian*, 2024 WL 4246083, at *16.

DMTs had been added to the payers' formularies.  Rather, when "tout[ing] positive information to the market" about the new policies, Defendants "disclos[ed] adverse information that cu[t] against the positive information." *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016) (internal quotation marks and citation omitted); *see also Hadian*, 2024 WL 4246083, at *16 ("Fate also repeatedly disclosed the risks associated with the Collaboration Agreement . . . Given these disclosures, the Court cannot find that Defendants' statement . . . was materially misleading.").  Specifically, Defendant Dobak warned in DermTech's March 2, 2023 earnings call that "[i]t's important to remember that in all cases where we are awarded coverage, the financial benefit could be delayed one to two quarters or more as additional administrative contracting and billing steps need to be taken by both parties." (Defs.' Mot. Exhibit 14).  In the question-and-answer portion of the call, Defendant Sun expressed the same, divulging that "it does take at least one to two quarters or possibly longer to see [a financial] benefit" and "[a]s of thus far, we have seen little benefit".  (*Id.*).  At best, the statements on which Plaintiff relies anticipate the new policies' potential reach.

Second, Plaintiff asserts that even if Defendants accurately represented the existence of new payer contracts, Defendants "failed to disclose other practical restrictions that would either delay or otherwise refuse coverage" such as "only allowing the test to be used one time" or requiring the patient to be of adult age.  (CAC 41).  Although this argument is like the one made by Plaintiff with respect to the Final LCD statements, *see supra* III.B.a.i, Plaintiff did not link these allegations to the VHA, Hawaii, or New York plans.  Instead, Plaintiff is vague, asserting only that there were undisclosed restrictions in "new payer wins" where "commercial payers might acknowledge that there was a contract with DermTech".  (CAC 41, 81).  It is unclear which new contracts are at issue and which restrictions apply to these new contracts (Plaintiff alleges a non-exhaustive list of restrictions, noting that there were "others").  (*Id.*).  As a result, Plaintiff has failed to meet the "formidable pleading requirements" of the PSLRA and the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).  *Metzler Inv. GMBH v. Corinthian*

*Colls., Inc.*, 540 F.3d 1049, 1055 (9th Cir. 2008). As written, Plaintiff's Complaint is not "specific enough to give [D]efendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee*, 236 F.3d at 1019. Accordingly, Defendants' statements concerning contract wins were not materially misleading.

### v. Conclusion

In sum, only Defendants' Final LCD statements were material misstatements or omissions. Plaintiff fails to demonstrate that Defendants' ASP, revenue, and contract statements were false.

### b. Scienter

The second element of a § 10(b) claim requires Plaintiff to "state with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To show scienter, Plaintiff's Complaint must allege that Defendants acted "either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotation marks and citations omitted). Deliberately reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (adopting 7th Cir. standard articulated in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044–45 (7th Cir. 1977)). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent[] but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone*, 704 F.3d at 701.

The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (internal citations omitted) (emphasis in original). A "court must consider

plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. According to the Supreme Court, "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* Although "[t]his is not an easy standard to comply with", *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003), if there are multiple plausible theories at the motion to dismiss stage, "a tie goes to the plaintiffs", *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

Under Ninth Circuit law, this Court must "conduct a two-part inquiry for scienter: first, [it] determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [it] conduct[s] a holistic review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

Plaintiff alleges there is a strong inference of scienter based on (1) insider sales of stock; (2) DermTech's at-the-market ("ATM") offerings; (3) inconsistent explanations of billing code edits; (4) Defendants' motive to satisfy analysts' estimates; (5) adjustment and reclassification of revenue; (6) the taking of remedial measures and making of Sarbanes–Oxley certifications; and (7) former employees' testimony. (CAC 41–44, 57–58, 84–90).[8] The Court will analyze each allegation individually before considering them together. *Webb v. Solarcity Corp.*, 884 F.3d 844, 855 (9th Cir. 2018) ("The [district] court did not

---

[8] The Court will not review Plaintiff's argument, raised for the first time in his Opposition, that Defendant Dobak's resignation supports scienter. (Opp'n 31) ("Indeed, Dobak's replacement alone supports scienter."); *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 (9th Cir. 1998) ("The 'new' allegations contained in the inmates' opposition motion, however, are irrelevant for Rule 12(b)(6) purposes. In determining the propriety of a Rule 12(b)(6) dismissal, a court *may not* look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.") (emphasis in original).

err in considering each allegation on its own before holding that they also failed to support a strong inference of scienter in combination . . . such an analytical process is permitted under our precedents.").

### i. Insider Sales

According to Plaintiff, scienter is evidenced by Defendant Dobak selling shares on the open market. (CAC 84).[9]  Although "unusual or suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter, insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information." *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted).  "[T]hree factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history." *Id.* (internal quotation marks and citation omitted).

Looking to the first factor, the Ninth Circuit generally gives "great weight to the percentage of stock sold." *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  However, when "stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings." *Id.* (finding strong inference of defendant's scienter from $900 million in net sales).

---

[9] While Plaintiff's Complaint also alleges that the selling of stock by Claudia Ibarra, DermTech's Chief Operating Officer, and Todd Wood, DermTech's Chief Commercial Officer, supports scienter, (CAC 13–14, 84), "stock sales by non-defendant executives are immaterial in the absence of allegations explaining why those non-defendants' sales are related to defendants' scienter." *Lamartina v. VMware, Inc.*, 2021 WL 4133851, at *13 (N.D. Cal. Sept. 10, 2021).  Plaintiff does not explain the relevance of Ibarra's and Wood's sales in his Complaint.  (*See* CAC 84).  He also does not address Defendants' argument about their irrelevance in his Opposition.  (Defs.' Mot. 21); (Opp'n 28).  Accordingly, the Court finds the non-parties' sales immaterial to Defendants' scienter.

Regarding the second factor, plaintiffs must "plead how the timing of any specific sale . . . is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions." *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F.Supp.2d 1033, 1052 (N.D. Cal. 2007). "[W]hen the [c]lass [p]eriod is long[,] 'it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made.'" *Hadian*, 2024 WL 4246083, at *37 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002)).

Finally, the third factor requires plaintiffs to "provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted). This is a bright-line rule: the unavailability of a defendant's history, even if "for reasons beyond a plaintiff's control", does "not excus[e]" the plaintiff "from pleading the relevant history." *Id.*

Here, Plaintiff fails to plead sufficient facts about Defendant Dobak's sales. Plaintiff states only the number of shares sold and their price. (CAC 84) ("Defendant Dobak executed the direct sale of 120,366 shares on the open market[] and received in exchange $5,592,843 in proceeds . . . throughout the Class Period."). The Complaint fails to allege the percentage of shares sold, which is important because $5,592,843 in net proceeds is not "significant enough to stray from the Ninth Circuit's typical percentage analysis." *Hadian*, 2024 WL 4246083, at *38 (finding $58.8 million in net sales as insufficient to apply Ninth Circuit exception to traditional analysis). It also fails to explain how Defendant Dobak's sales over a 112-week Class Period relate to Defendants' material misstatements or omissions and to provide Defendant Dobak's trading history. *In re LeapFrog*, 527 F.Supp.2d at 1052 ("Plaintiffs' generalized allegations that defendants sold shares between July 24, 2003 and October 21, 2003 when they knew that shipping problems and competition with PowerTouch caused sales to decline and between October 22, 2003 and February 10, 2004 when they knew of these same problems and had also drastically reduced prices are inadequate."); *In re Vantive*, 283 F.3d at 1092 (noting that 63-week class

period is "unusually long" and allows "the plaintiffs to sweep as many stock sales into their totals as possible, thereby making the stock sales appear more suspicious than they would be with a shorter class period"); *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted). The fact that Defendant Dobak's sales occurred when the share price was high is not "determinative." *Ferreira v. Funko Inc.*, 2021 WL 880400, at *30 (C.D. Cal. Feb. 25, 2021). Ultimately, "[w]ithout more allegations to establish each of the three *Zucco* . . . factors, the Court is unable to determine whether these stock sales were suspicious." *Id.* at *29. "The paucity of the [Complaint's] allegations about these transactions demonstrate[s] Plaintif[f's] fail[ure] to establish a strong inference of scienter on this basis." *Id.*

## ii. DermTech's ATM Offerings

Plaintiff argues that Defendants had motive to "sell shares at artificially inflated prices via its [ATM] offerings." (CAC 43). Specifically, "DermTech's weighted average sales price of $46.33, for shares offered through its ATM [o]fferings, was roughly 20 times its share price of $2.31 on May 5, 2023, . . . the last day of the Class Period." (*Id.* at 44). Motive alone, however, is insufficient to show a strong inference of scienter. *In re VeriFone*, 704 F.3d at 701; *Zucco*, 552 F.3d at 1006 ("To create a strong inference of scienter, therefore, the corporate stock sales must be significant enough and uncharacteristic enough to cast doubt on the defendant company's motives."). Here, there is a "compelling . . . opposing inference one could draw from the facts alleged": the Company's ATM offerings were an effort to raise capital. *Tellabs*, 551 U.S. at 324. "[R]outine business objectives . . . cannot normally be alleged to be motivations for fraud." *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1038 (9th Cir. 2002). "To hold otherwise would . . . support a finding of fraudulent intent for all companies that plan to . . . expand sales." *Id.*; *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (routine corporate objectives are insufficient to show scienter because "to hold otherwise would support a finding of scienter for any company that seeks to enhance its business

prospects"); *Webb*, 884 F.3d at 856 ("Surely every company that goes public wants to . . . maintain a high share price[.]").

According to Plaintiff, Defendants had motive to use DermTech's ATM offerings to avoid bankruptcy. (CAC 44). This allegation is like those found insufficient to support scienter in *Webb*. In *Webb*, the plaintiff argued that the defendants had motive to inflate the profitability of SolarCity Corporation's sales division because it was "critical to the company's successful IPO." *Webb*, 884 F.3d at 854. SolarCity allegedly "needed a successful IPO to generate badly needed cash, to allow SolarCity to attract and retain employees, and to fund capital expenditures and strategic acquisitions that would increase the company's efficiency and lower its costs." *Id.* On appeal, the Ninth Circuit held that allegations about the defendants' "motive to boost the company's profitability and stock prices in the months surrounding the company's IPO [we]re not 'specific' or 'particularized,' as our precedents require." *Id.* at 856. So too here. Rather than explain Defendants' motive with particularity, Plaintiff alleges the ATM offerings were critical to "ke[ep] the lights on at DermTech by continuing to fund operations". (CAC 44); *see also* (Opp'n 29) ("Without those sales, the Company—which generated no positive cash flow—would have been bankrupt even sooner than it was."). Like the plaintiff in *Webb*, Plaintiff points only to a general objective of all companies: to maximize profitability and remain in business. *Webb*, 884 F.3d at 856.

Aside from "keeping the lights on", Plaintiff alleges Defendants had motive to use DermTech's ATM offerings "to fund the Defendants' compensation". (CAC 44). This argument is similarly unsuccessful. "[I]t is common", in fact, "for executive compensation . . . to be based partly on the executive's success in achieving key corporate goals." *In re Rigel Pharms.*, 697 F.3d at 884. "[G]iven the holistic approach to assessing scienter adopted in *Tellabs* and the requirement that [this Court] take into account plausible opposing inferences, [this Court] will not conclude that there is fraudulent intent merely because [Defendants'] compensation was based in part on such successes." *Id.*; *see also Hadian*, 2024 WL 4246083, at *38 ("Accordingly, the Court finds that Plaintiffs'

allegations regarding . . . executive compensation . . . do not strengthen Plaintiffs' theory of scienter."). As such, DermTech's ATM offerings are insufficient to show scienter.

### iii. Billing Code Edit Explanations

Plaintiff alleges that Defendants' "shifting explanations" about the effect of Medicare's code edits on ASP are indicative of scienter. (CAC 85–87). Particularly, on August 8, 2022, Defendant Dobak attributed the lowering of ASP to "Medicare billing code edits", which "reject[ed] claims where patients ha[d] multiple body sites tested on the same day". (*Id.* at 85). Then, on November 3, 2022, Defendant Sun noted that a Medicare code edit had "some positive impact to ASP." (*Id.* at 86).

While "[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement", *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003), Defendants' statements were not contradictory because there were two code edits at issue, (Reply 5–6). In DermTech's August 8, 2022 earnings call, Defendant Dobak explained there was "pressure" on ASP from "*ongoing* Medicare billing impacts" that "reject[ed] claims where patients ha[d] multiple body sites tested on the same day." (Defs.' Mot. Exhibit 9) (emphasis added). Defendant Dobak later shared that, following negotiations with Medicare's billing contractor, DermTech "expect[ed] new insurance code edits to be adopted in the fourth quarter of 2022 . . . [to] improve this issue." (*Id.*). The existence of two code edits was further made clear to the public in the question-and-answer portion of the call by Defendant Sun. (*Id.*).[10] Defendant Sun confirmed the implementation of the new code edit in DermTech's November 3, 2022 earnings call, noting that "ASP pressure was partially offset by a modest improvement in Medicare ASP

---

[10] In response to a question, Defendant Sun clarified: "So with Medicare billing and the LCD, there is a limitation of number of body site tests that can be done on the same patient on the same date of service. We've seen a trend where that proportion has been increasing. And as that increases, it just pushes delays for when we can actually collect on those claims and when we can recognize the revenue for those. So[,] the code edit that's being put in, we expect it in the fourth quarter. It changes the code edits to actually match what the LCD approves . . . so we can get paid [for] 2 tests on a date of service."

due to the recently-updated code edit." (*Id.* at Exhibit 11).    Accordingly, Defendants' statements about Medicare's billing code edits were consistent.  They do not support Defendants' alleged scienter.

### iv.  Analysts' Estimates

Plaintiff contends that Defendants had motive to overstate new payer contracts like the Hawaii plan because analysts commented on "the uncertainty around DermTech's commercial payers."  (CAC 87).  This argument fails for the reasons stated in III.B.b.ii, namely that general allegations of motive to commit fraud do not create a strong inference of scienter.  *In re Rigel Pharms.*, 697 F.3d at 884; *Webb*, 884 F.3d at 856.  Plaintiff pleads no specific facts showing Defendants' intent to overstate the progress of new contracts.  As a result, the analyst allegations do not strengthen Plaintiff's theory of scienter.

### v.  Adjustment and Reclassification of Revenue

Plaintiff alleges that Defendants acted with scienter when "recording revenue above amounts that could later be reversed."  (CAC 57).  Plaintiff takes issue with Defendants' $1.8 million downward adjustment of its assay revenue, especially in light of "DermTech's swelling accounts receivable ("A/R") and days sales outstanding ("DSO") balances", and $1 million reclassification of its contract revenue.  (*Id.* at 51–52, 57).

"In general, the mere publication of a restatement is not enough to create a strong inference of scienter."  *Zucco*, 552 F.3d at 1000.  There are, however, two exceptions to this rule.  *Id.*  First, general allegations about "management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements" may "create a strong inference of scienter when these allegations are buttressed with 'detailed and specific allegations about management's exposure to factual information within the company.'"  *Id.* (quoting *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)).  Second, an inference of scienter is permissible "where the information misrepresented is readily apparent to the defendant corporation's senior management."  *Id.* at 1001.  This occurs only when the "falsity is patently obvious", i.e., the "facts [are] prominent enough that it would be 'absurd to suggest' that top management

was unaware of them." *Id.* (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008)).  Aside from the general rule and its exceptions, to constitute evidence of scienter, restatements must be of "considerabl[e] . . . magnitude" and reduce revenue by a significant percentage.  *In re Aspeon, Inc. Sec. Litig.*, 168 Fed.Appx. 836, 839 (9th Cir. 2006) (no evidence of scienter when restatement reduced revenue by 1.57%); *Zamir v. Bridgepoint Educ., Inc.*, 274 F.Supp.3d 1057, 1071 (S.D. Cal. 2017) (no evidence of scienter when restatement reduced revenue by 2.2%).

"[A] failure to follow GAAP, without more, [similarly] does not establish scienter." *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir. 1994) (internal quotation marks and citation omitted).  More than just a "misapplication of accounting principles", the "plaintiff must prove that the accounting practices were so deficient . . . that no reasonable accountant would have made the same decisions if confronted with the same facts." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994) (internal quotation marks and citation omitted).  "[T]o distinguish 'deliberate recklessness' from 'ordinary carelessness,' allegations of GAAP violations must be augmented by 'facts that shed light on the mental state' of defendants, rather than conclusory allegations that [the] defendant must have known of the accounting failures due to the degree of departure from established accounting principles." *In re Cornerstone Propane Partners, L.P.*, 355 F.Supp.2d 1069, 1091 (N.D. Cal. 2005) (quoting *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390–91 (9th Cir. 2002)).

Plaintiff's Complaint fails to satisfy either exception to the rule that the "mere publication of a restatement is not enough to create a strong inference of scienter." *Zucco*, 552 F.3d at 1000.  First, Plaintiff does not specifically allege Defendants had access to factual information. *Id.* (quoting *S. Ferry*, 542 F.3d at 785).  Instead, Plaintiff primarily relies on the assumption that, by virtue of their position as high-level executives, Defendants "had access to[] other members of the Company's management team, internal reports[,] and other data and information about the Company's finances, operations, and sales at all relevant times".  (CAC 98).  Although Plaintiff alleges that DermTech's

increased A/R and DSOs "were glaring red flags to Defendants that a looming write-off was on the horizon", Plaintiff's Complaint does not state that Defendants had access to these metrics.  (*Id.* at 58).  Irrespective of this omission, this Court cannot infer scienter only from Defendants' knowledge of two negative metrics about the Company's financial condition.  *Zucco*, 552 F.3d at 1000 ("Although the SAC includes allegations that senior management . . . closely reviewed the accounting numbers generated by Digimarc each quarter . . . and that top executives had several meetings in which they discussed quarterly inventory numbers, this is not enough[.]"); *DSAM*, 288 F.3d at 390 ("Appellants argue that Pricewaterhouse must have consciously disregarded the improper revenue recognition because it had access to the documents that revealed Altris' improper revenue recognition at the very time it conducted the original audit.  That fact does not strongly compel an inference of intentional or deliberately reckless conduct as opposed to ordinary carelessness."); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F.Supp.3d 1023, 1041 (S.D. Cal. 2014) ("Although Plaintiff has alleged that the individual defendants attended sales-related meetings and had access to sales reports, this does not support the inference that the individual defendants must have known about the accounting misconduct.").  Second, this is not a "rare circumstanc[e] where the nature of the relevant fact" is of extraordinary "prominence".  *S. Ferry*, 542 F.3d at 786.  While Medicare's reimbursement affected the DMT's ASP, Defendants repeatedly told investors that revenue was "highly variable". (Defs.' Mot. Exhibit 7).

Regarding alleged violations of GAAP, Plaintiff provides little information in his Complaint.  He alleges only that Defendants "misrepresented the Company's . . . compliance with applicable accounting standards" and engaged in "improper accounting". (CAC 8, 58).  As a result, "Plaintiff has not presented the necessary information about accounting principles . . . to allow this Court to evaluate whether the individual Defendants should have been or must have been aware of the violations."  *In re Maxwell Techs.*, 18 F.Supp.3d at 1040–41.

Accordingly, neither DermTech's adjustment of assay revenue, reclassification of contract revenue, nor Defendants' alleged accounting violations create a strong inference of scienter.

### vi.  Remedial Measures and SOX Certifications

Plaintiff argues that Defendants "knew or were deliberately reckless in not knowing that the Company's . . . assay revenue was overstated . . . because the Company claims to have undertaken a remediation plan to remediate a previously-identified material weakness over internal control." (CAC 88).  Plaintiff references DermTech's 2022 10-K, where the Company stated that it "implemented an effective risk assessment process to identify and assess risks of misstatement related to controls over assay revenue" and "implemented new control activities that sufficiently mitigated . . . financial reporting risks".  (*Id.* at 89–90). It is unclear to the Court how Defendants' remedial measures support scienter.  Indeed, Plaintiff's Complaint fails to explain this legal conclusion.  (*Id.*); (Defs.' Mot. 23) ("However, the CAC makes it impossible to discern exactly why Plaintiff believes the material weakness, and the steps the Company took to remediate it, are evidence of scienter.").  As such, the Court cannot conclude Defendants' remediation is evidence of Defendants' scienter.

Plaintiff's contention that "Defendant[s'] [Sarbanes–Oxley] certifications . . . contribute to a strong inference of scienter" is also unavailing.  (CAC 90).  "Boilerplate language in a corporation's 10–K form, or required certifications under Sarbanes–Oxley [S]ection 302(a) . . . add nothing substantial to the scienter calculus."  *Zucco*, 552 F.3d at 1003–04.  In fact, "Sarbanes–Oxley certifications are not enough to create a strong inference of scienter and do not make . . . otherwise insufficient allegations more compelling by their presence in the same complaint."  *Id.*  The Court thus "gives no weight" to Plaintiff's allegations "concerning Defendants' false Sarbanes–Oxley certifications either individually or in the Court's holistic analysis."  *Zamir*, 274 F.Supp.3d at 1072; *see also In re Maxwell Techs.*, 18 F.Supp.3d at 1040.

### vii.  Confidential Witnesses

Plaintiff alleges that statements by former unnamed employees support a showing of scienter.  (CAC 41–42); (Opp'n 31–32).  In the Ninth Circuit, there are "two hurdles" to overcome when using confidential witnesses to allege scienter.  *Zucco*, 552 F.3d at 995.  First, "the confidential witnesses . . . must be described with sufficient particularity to establish their reliability and personal knowledge."  *Id.*  This prong "analyzes whether a complaint has provided sufficient detail about a confidential witness' position within the defendant company to provide a basis for attributing the facts reported by that witness to the witness' personal knowledge."  *Id.*  The Court must "look to the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  *Id.* (internal quotation marks and citations omitted).  Specifically, a plaintiff must "detail . . . confidential witnesses' employment information, including their responsibilities", and demonstrate that the witnesses had firsthand knowledge.  *Hadian*, 2024 WL 4246083, at *33 (collecting cases).

Second, "those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Zucco*, 552 F.3d at 995.  Statements that are vague or based on hearsay generally do not suffice.  *Hadian*, 2024 WL 4246083, at *34 (collecting cases).  Rather, confidential witnesses must typically communicate "with the individual defendants or upper management."  *Id.* (collecting cases).

Because "assessing the credibility of confidential sources is a fact-intensive inquiry," the Court will "addres[s] each confidential witness in turn."  *Id.* at *35.

### 1.  Former Employee 1 ("FE1")

FE1 "was a Regional Sales Manager at DermTech from September 2021 through July 2023."  (CAC 14).  FE1 allegedly told Plaintiff that medical assistants, not medical professionals, administered the DMT to patients and that samples were frequently dropped in the lab.  (*Id.* at 41–42).  These allegations lowered ASP because they required tests to

be readministered to patients free of charge.  (*Id.*).  FE1 also allegedly accused Defendants of "over-hyping" DermTech's new payer contracts.  (*Id.* at 10).

While Plaintiff's Complaint states FE1's job title and period of employment, it fails to allege FE1's description of duties and responsibilities.  Nowhere in the Complaint does Plaintiff state what FE1's duties are as a Regional Sales Manager.  "At a bare minimum, the Ninth Circuit requires that the [C]omplaint describe . . . not just witnesses' job description[s], but also [their] responsibilities."  *McGovney v. Aerohive Networks, Inc.*, 367 F.Supp.3d 1038, 1053 (N.D. Cal. 2019).  Like the plaintiff's complaint found insufficient in *McGovney*, which "states only of CW1 that he or she was a 'former inside sales representative from October 2016 to July 2017'", *id.*, Plaintiff's Complaint states only that FE1 "was a Regional Sales Manager at DermTech from September 2021 through July 2023", (CAC 14).  Because "a description of [FE1's] responsibilities is missing", the Court cannot consider FE1 reliable.  *McGovney*, 367 F.Supp.3d at 1053; *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *9 (C.D. Cal. Dec. 5, 2022) ("[T]he court is unable to determine from the SAC's allegations the job responsibilities and duties of CW1, CW7, CW9, and CW11 with sufficient specificity to gauge their reliability[.]").  It is unclear how FE1's role as a Regional Sales Manager provides FE1 with firsthand knowledge of the alleged errors.  *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (noting that "the witnesses lack first hand knowledge regarding what the individual defendants knew").  Plaintiff does not articulate why FE1 would have such knowledge, which is fatal to his argument. *Zucco*, 552 F.3d at 996; *Applestein v. Medivation, Inc.*, 861 F.Supp.2d 1030, 1037 (N.D. Cal. 2012), *aff'd*, 561 F.App'x 598 (9th Cir. 2014) ("Plaintiffs fail to adequately allege that the confidential witnesses were in a position to have the knowledge they profess.").

Looking to the second prong, Plaintiff similarly does not show how FE1's statements are indicative of Defendants' state of mind.  Plaintiff provides a list of people to whom FE1 reported, including, at the highest level, Todd Wood, DermTech's Chief Commercial Officer during the Class Period.  (CAC 14).  Plaintiff does not, however, allege that FE1

had direct contact with Defendants or even Todd Wood. (*See id.*) ("FE1 reported to Sales Director Jason Rhodes, who in turn reported to Ben Saval. Ben Saval Reported to Vice President of Sales, Ray Bassi, who in turn reported to Todd Wood."); *In re Accuray, Inc. Sec. Litig.*, 757 F.Supp.2d 936, 949 (N.D. Cal. 2010) (noting that because six of the seven defendants "had no personal interactions with any of the CWs, . . . it is difficult to surmise how the opinions and observations of the CWs could support a reasonable inference about what these individual [d]efendants knew or did not know at the time each of the challenged statements was made"); *Hadian*, 2024 WL 4246083, at *34 (collecting cases). He also fails to allege that FE1 communicated his concerns about human error and the overstating of new contracts' progress to Defendants or upper management. *Jun Shi v. Ampio Pharms., Inc.*, 2020 WL 5092910, at *6 (C.D. Cal. June 19, 2020) ("There are no particularized allegations that any of these confidential witnesses communicated concerns about AP-003-C to Defendants."). Accordingly, FE1's statements do not support Plaintiff's theory of scienter.

### 2. Former Employee 2 ("FE2")

FE2 "was a Former Manager of Strategic Channels at DermTech from February 2022 through July 2023." (CAC 14). Allegedly, FE2 "observed" that testing samples often "did not provide enough [genetic] material to run the test", "listened" to DermTech's earnings calls and "felt there was a lot of sugarcoating in the calls", and "communicated" that "[Defendant] Sun signed off on any deal involving reimbursement and was heavily involved with sales." (*Id.* at 42). FE2 also allegedly told Plaintiff that new contracts included undisclosed "practical restrictions that would either delay or otherwise refuse coverage", which lowered ASP. (*Id.* at 41).

As pleaded, FE2's statements in Plaintiff's Complaint are insufficient to show a strong inference of scienter for the same reasons articulated in III.B.b.vii.1. Importantly, the Complaint does not state FE2's responsibilities. *McGovney*, 367 F.Supp.3d at 1053; *Hadian*, 2024 WL 4246083, at *33 (collecting cases). As a result, Plaintiff fails to adequately allege how FE2 knew about recurring issues in testing samples, undisclosed

restrictions in new contracts, and Defendant Sun's signing activity.  *Applestein*, 861 F.Supp.2d at 1037.  There are similarly no facts confirming that FE2 had contact with Defendant Sun.  *In re Accuray, Inc.*, 757 F.Supp.2d at 949.  Therefore, FE2's statements are insufficient to show scienter.

### 3.  Former Employee 3 ("FE3")

FE3 "was a . . . Reimbursement Specialist at DermTech from June 2021 through December 2022."  (CAC 14).  In this role, FE3 "worked on appealing denied complaints" and observed that "there was a backlog of denied claims pending appeals by DermTech", "maintained in a spreadsheet . . . that was distributed on a monthly basis."  (*Id.* at 42).

While Plaintiff's Complaint explains FE3's responsibilities as a Reimbursement Specialist and draws an adequate link between these responsibilities and FE3's knowledge of a backlog of denied claims, it fails to explain how this backlog supports a strong inference that Defendants acted intentionally or deliberately reckless.  The Court is left guessing as to how Defendants' knowledge of a backlog relates to their alleged material misstatements or omissions.  Thus, as pleaded, FE3's statements do not create a strong inference of scienter.

### viii.  Holistic Assessment

Under *Tellabs*, this Court must assess "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter".  *Tellabs*, 551 U.S. at 323 (emphasis in original).  This means "a series of less precise allegations [may] be read together to meet the PSLRA requirement."  *S. Ferry*, 542 F.3d at 784.  "Vague or ambiguous allegations are now properly considered as a part of a holistic review when considering whether the complaint raises a strong inference of scienter".  *Id.*  However, "[e]ven if a set of allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation."  *Zucco*, 552 F.3d at 1006.  Here, nearly all of Plaintiff's scienter allegations contain minimal factual content.  Their combination still lacks teeth and falls short of the innocent explanation that, upon learning of the Final LCD's limitation to one test per visit, Defendants disclosed this information to

the market and sought to resolve the issue.  Without more, the Court cannot accept Plaintiff's theory of scienter.

### ix.  Conclusion

Because Plaintiff has failed to plead scienter, Plaintiff's § 10(b) claim against Defendants is **DISMISSED** without prejudice.

**C. § 20(a) of the Exchange Act**

Under § 20(a) of the Exchange Act,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.  Essentially, "a defendant employee of a corporation who has violated the securities laws will be jointly and severally liable to the plaintiff, as long as the plaintiff demonstrates a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator."  *Zucco*, 552 F.3d at 990 (internal quotation marks and citations omitted).  Although an "intensely factual question", *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993), § 20(a) claims "may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of [§] 10(b)", *Zucco*, 552 F.3d at 990.  *See also LifeVoxel Virginia SPV, LLC v. LifeVoxel.AI, Inc.*, 622 F.Supp.3d 935, 947 (S.D. Cal. 2022) ("Section 20(a) requires an underlying violation of the 1934 Act.").  Plaintiff has failed to plead a § 10(b) violation.  The Court thus **DISMISSES** his § 20(a) claim without prejudice.

### IV.

### CONCLUSION AND ORDER

Based on the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss with leave to amend.  Because the deficiencies identified may be curable, Plaintiff may file a Second Amended Consolidated Class Action Complaint within forty-five (45) days of the

date of this Order. *Intri-Plex*, 499 F.3d at 1056 (dismissal without leave to amend is proper only if it is clear that "the complaint could not be saved by any amendment").

**IT IS SO ORDERED.**

Dated:  December 2, 2024

_____
Hon. Dana M. Sabraw, Chief Judge
United States District Court

33