Kara M. Wolke (SBN 241521)
*kwolke@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

Ray D. Sulentic (SBN 316913)
*rsulentic@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150

*Lead Counsel for Plaintiffs*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE DERMTECH, INC. SECURITIES LITIGATION | Case No. 3:23-cv-01885-DMS-JLB<br><br>**SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

I. NATURE OF THE ACTION AND OVERVIEW .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES AND RELEVANT NONPARTIES .......... 7

IV. SUBSTANTIVE ALLEGATIONS .......... 10

A. Defendants Misrepresented the Revenue Generated By Sales of DermTech's Skin Cancer Test ("Assay Revenue") .......... 10

B. Defendants Portrayed DermTech As a Rapid Revenue Growth Stock That Was Mainly Driven by Three Factors .......... 14

C. DermTech's Revenue, Revenue Drivers, And Revenue Growth Were the Key Metrics Upon Which Investors Focused .......... 18

D. The DMT Faced Undisclosed Reimbursement Issues, Which Directly Pressured ASP, and Thus the Company's Assay Revenue .......... 21

1. Overview of the Local Coverage Determinations ("LCDs"), CMS, and Medicare and Medicaid .......... 21

2. Commercial Payors Typically Follow Medicare or Medicaid Coverage Determinations .......... 22

3. DermTech's LCDs Limit Reimbursement to one test per-patient-per-visit in most cases, with a second test potentially allowable in roughly 10% of patients .......... 23

4. Despite Receiving LCDs Which Restrict Coverage To One Test Per Patient Per Visit in Most Cases, DermTech Misleadingly Stated That Coverage Had Been Expanded From "One To Two Tests Per Date Of Service." .......... 32

5. Defendants' Subtle Changes to the LCD Coverage Description in their SEC Filings Establish Their Knowledge .......... 34

E. According to Multiple Former Employees, DermTech Had Widespread and Undisclosed Testing Issues That Were Also Negatively Impacting ASP .......... 35

F. DermTech's Scheme to Artificially Boost Revenue and Prop up DermTech's Stock To Capitalize on Equity Offerings.........................37

G. The Truth Begins to Emerge...........................................................38

1. Q2 2022 Results...........................................................38

2. Q3 2022 Results...........................................................43

3. Q4 2022 and FY 2022 Results Confirmed the Q3 2022 Corrective Disclosure...........................................................46

4. March 14, 2023 Oppenheimer Healthcare Conference.............48

5. Q1 2023 Results...........................................................49

H. The Company's "Little r" restatement...............................................50

I. DermTech's "Little r" Restatement is a de facto admission of Falsity 52

J. Defendants Were, at a Minimum, Deliberately Reckless In Recording Revenue Above Amounts that Could be Later Reversed.....................54

K. Post Class Period Events...........................................................57

V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD .58

A. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Fourth Quarter and FY 2020 Results .............58

B. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's First Quarter 2021 Results.............................62

C. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Second Quarter 2021 results...........................62

D. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Third Quarter 2021 results.............................64

E. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Fourth Quarter and Full Year 2021 Results ...65

F. Defendants' False and/or Misleading Statements and/or Omissions Relating to DermTech's First Quarter 2022 Results ............................71

VI. LOSS CAUSATION .......... 73
VII. ADDITIONAL SCIENTER ALLEGATIONS .......... 75
A. Defendants' Motive To Prop Up DermTech's Share Price For Pecuniary Gain .......... 75
1. Insider Selling Supports Scienter .......... 75
2. Defendants Were Motived to Prop Up the Company's Stock During the ATM Offering .......... 77
B. Defendants' Subtle Changes to the LCD Coverage Language in DermTech's Filings Establishes Defendants' Knowledge of Facts Contradicting Their Public Statements .......... 77
C. Defendants' Had Access to Information that Contradicted Their Public Statements Which Supports Scienter .......... 79
D. Dobak's Departure Supports Scienter .......... 82
E. The Core Operations Doctrine Supports Scienter .......... 82
F. Defendants' Repeated Statements About LCD Coverage, Including in Response to Analysts' Questions Further Supports Scienter .......... 82
G. Defendants' Half-truths Regarding Billing Code Edits Support Scienter .......... 83
H. Defendants Were Motived to Meet Analysts' Estimates, Which Support Scienter .......... 85
I. Defendants' Attestations on their SOX Certifications Supports Scienter .......... 86
J. Corporate Scienter Allegations .......... 87
VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) .......... 87
IX. CLASS ACTION ALLEGATIONS .......... 89
X. UNDISCLOSED ADVERSE FACTS .......... 91
XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND/OR BESPEAKS CAUTION DOCTRINE .......... 92

XII. CLAIMS FOR RELIEF .......... 93
XIII. PRAYER FOR RELIEF .......... 97
XIV. JURY TRIAL DEMANDED .......... 97

Lead Plaintiff Robert Weiner ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by DermTech, Inc. ("DermTech" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by DermTech; and (c) review of other publicly available information concerning DermTech, such as analyst reports and market commentary; and (d) interviews with Former Employees ("FEs").

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that purchased or otherwise acquired DermTech securities between March 8, 2021 and May 3, 2023, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2. DermTech is a molecular diagnostic company that develops and markets a test to aid the diagnosis of skin cancer. The Company's flagship product, the DermTech Melanoma Test ("DMT") was formerly known as the Pigmented Lesion Assay ("PLA") test. The DMT is a commercial test marketed to medical professionals who then offer it to patients to assess pigmented skin lesions, like moles, for melanoma. The DMT's value proposition is that it uses samples collected via adhesive patches as a non-invasive alternative to the surgical biopsy pathway in the assessment of pigmented skin lesions. In other words, the DMT is appealing for patients who would rather test a suspicious mole by placing a sticker on it, and then sending that sticker to a lab to test the genetic makeup from the cells attached to that sticker, rather than having a dermatologist cut a biopsy out of the skin with a scalpel and looking at that biopsy under a microscope. While not specifically branded as such, the DMT is

essentially a stickers-over-scalpels value proposition. But the stickers didn't always work, and the tests were often not covered by Medicare or insurance – particularly when the same patient used more than one sticker per doctor's appointment. In such cases, the prevailing Medicare guidance, which was followed by private insurance, only allowed one test to be reimbursed in most cases, with a second test *potentially* reimbursable, up to roughly 10% of the time. But Defendants said two tests were covered.

3. The alleged fraud here is extensive and multifaceted. Broadly speaking, it can be distilled into fraudulent conduct and false statements. The conduct involved recording revenue in ways that enabled the Company to sell stock to the public at inflated prices. Following such improper revenue booking, Defendants executed recurring stock offerings, enabling Defendants to capitalize on artificially inflated prices, which in turn filled the corporate coffers with cash. The Company sold $23.8 million of shares of DermTech stock at an average price of $46.33, or roughly 20 times the $2.31 price of DermTech's shares on the last day of the Class Period.

4. The false statements here comprise three general categories. ***First***, Defendants misrepresented the extent to which the Company's DMT patch was covered by Medicare. For instance, in the Company's Form 10-Qs for the first, second, and third quarters of 2021, Defendants represented that "the Medicare Final Coverage Decision, or Final LCD [Local Coverage Determination], ***expanded the coverage*** proposal in the Draft LCD ***from one to two tests*** per date of service and it allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied."

5. Yet while Defendants often touted that Medicare had "expanded" coverage from one test, to two, they omitted that relevant coverage guidelines covered the second test per-patient-per-visit ***just ten percent of the time***, if at all. And this single per-site-per-patient-per-visit restriction was particularly problematic for DermTech because its DMT patches were marketed to dermatologists in packs of

four, thus leaving many unused patches. Accordingly, when reporting Q2 2022 results, Defendants revealed that "Medicare insurance claim processing ***has been problematic*** due to code edits that ***reject claims where patients have multiple body sites tested on the same day.*** Some commercial payers have also adopted these code edits, further eroding the ASP."

6. ***Second***, and somewhat related, the Company misrepresented which factors drove its average selling price ("ASP") of its DMT stickers, and in turn, the Company's revenue, which was calculated by multiplying the ASP times the units (i.e., stickers/patches) sold. Defendants represented that there were three "main drivers" of DermTech's ASP. For example, during the Company's August 4, 2021 earnings call, for the period ending June 30, 2021 ("the Q2 2021 earnings call"), Sun represented that, "we continue to focus on the main drivers of ASP growth, which are [1] sales mix, [2] broader payer coverage, [3] success with appeals and generation of additional data." The context of Sun's statements (discussed below) made it seem as if DermTech just needed to (1) get more customers covered by Medicare; (2) find more payors (i.e., sign up new insurance companies); and (3) win more appeals for denied claims — and then DermTech's ASP would in turn increase. But Sun's characterization was incomplete and misleading because a material undisclosed factor critical to DMT ASP growth was the number of sites tested per-patient-per-visit, along with the number of tests per-patient-per-visit paid for under then existing LCD guidelines. That undisclosed factor had the ability to materially shape DermTech's ASP growth because payors, such as Medicare, would, and often did, deny coverage when more than one site had been tested at a particular visit.

7. So by failing to disclose that the Company was often not reimbursed when more than one sticker had been used per-patient-per-visit, Defendants concealed a limiting factor for DermTech's ASP. Simply getting more payors – who would in turn deny claims for significant numbers of patients (i.e., those who had more than one test per-visit administered) – would *not* improve ASP. And that key undisclosed

driver of ASP acted as a hidden drag on the Company's revenue. In truth, DermTech's ASP was highly dependent upon how many tests were administered to each patient per visit – a metric that Defendants tracked, but did *not* disclose to investors.[1]

8. ***Third***, Defendants misrepresented the Company's revenue recognition practices, including compliance with applicable accounting standards and the Company's own revenue recognition policy. This conduct enabled Defendants to materially overstate both the revenue the Company stated it expected to generate in 2022 (i.e., its guidance), and the revenue it actually generated during the Class Period (i.e., its actual reported revenue). For example, in May of 2022, with more than four months of 2022 already on the books, Defendant Sun represented that by yearend 2022, the Company expected to achieve more than 100% revenue growth when compared to 2021, giving guidance of $22 to 26 million for the Company's Assay Revenue (the DMT revenue) for the year. But this guidance lacked a reasonable basis when made because it included amounts that were subject to reversal, contrary to the Company's stated accounting policy.

9. As a result of the foregoing, DermTech generated just $13.8 million in Assay Revenue for 2022, $1.8 million of which had been "downwardly adjusted" to reflect "write offs" of revenue from prior periods — and separately reclassified $1.0 million of its short-term deferred revenue to accrued liabilities — transforming an asset to a liability. These "reclassifications" and "write offs"—referred to by the

[1] The following hypothetical illustrates: suppose **Patient A** has one test (just one) and DermTech is ultimately reimbursed for that single test at a price of $760. DermTech could record $760 as the ASP for Patient A. By contrast, suppose **Patient B** has four suspicious skin lesions tested at the same visit (the number in a DermTech pack), and DermTech is ultimately reimbursed for just the first test. As to Patient B, even if the first test is sold at higher price, say $1,000, Patient B will still lead to a lower ASP for DermTech — just $250 (($1,000 + 0 + 0 + 0) / 4). For investors who forecast revenue growth based on DMT tests sold x ASP, ASP growth was critical to revenue growth.

Securities & Exchange Commission as "little r" restatements—establish the falsity of previously-reported revenue figures.

10. The truth of Defendants' misrepresentations was revealed over a series of partial corrective disclosures and/or materializations of the risk. For instance, just three months after Sun stated that DermTech should achieve $22 to $26 million in annual revenue, on August 8, 2022, after the market closed, the Company lowered that guidance to just $16 to $19 million, due in part to lower ASP from payors rejecting more than one testing site per-patient-per-visit. The same day, DermTech also announced its second quarter 2022 financial results which revealed that the Company expected "a lower average selling price (ASP) for [its] DMT," due to "Medicare billing code edits . . . as well as less favorable collection patterns from commercial payors."

11. On this news, the Company's stock price fell $2.87, or 34%, to close at $5.56 per share on August 9, 2022, on unusually heavy trading volume, thereby damaging investors.

12. A few months later, on November 3, 2022, DermTech's full year guidance was again lowered – to just $13 million, barely surpassing the $11 million recorded the year prior, and sharply lower than the "at least" 100% revenue growth Defendants promised in May of 2022. The lowered guidance reflected that the fourth quarter would ultimately have material amounts of revenue written off due to unfavorable reimbursement of DermTech's DMT tests, which the Company would later admit. By this November 3, 2022 disclosure, DermTech's 2022 revenue guidance had fallen by almost 50% in just six months' time.

13. On this news, the Company's stock price fell $1.34, or 44.7%, to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

14. Finally, on May 4, 2023 after the market close, the Company reported Q1 2023 results. Therein, DermTech announced that despite a 24% increase in sample volumes, test revenues dropped 3%, largely due to a downward revenue adjustment

due to changes in collection estimates from prior periods. On the earnings call, Sun admitted that that "ASP remains difficult to forecast" and the Company would not be "providing revenue guidance until we have better visibility on these factors."

15. On all this news, DermTech's stock fell $0.84 per share, or 31.0%, on significant trading volume, to close on $2.31 per share on May 5, 2023, thereby damaging investors.

16. Shortly thereafter analysts at Stephens downgraded DermTech's stock and lowered their price target on DermTech's shares to $2.50 from $7.00 per share. They noted "we're moving to the sidelines until we gain clarity on coverage and DMTK's operations going forward."

17. All told, DermTech's stock fell from a high of $55.42 on the first day of the Class Period, to just $2.31 per share on May 5, 2023, the day the Class Period ends. More than $1.3 billion in market value was destroyed in the process.

18. Yet while investors were decimated, Defendant Dobak, DermTech's former CEO, reaped more than $5.5 million in proceeds from stock sales during the Class Period, including over $1.0 million in sales at an average of $40.95 per share, more than 17.7 times higher than where the stock closed at the end of the Class Period.

19. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages. This is a quintessential securities fraud.

## II. JURISDICTION AND VENUE

20. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES AND RELEVANT NONPARTIES

### Parties

24. Lead Plaintiff Robert Weiner, as set forth in the accompanying certification filed herewith, purchased DermTech securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions and/or fraudulent conduct alleged herein.

25. Defendant Dr. John Dobak ("Dobak") was the Chief Executive Officer ("CEO") of DermTech at all relevant times. Dobak received a Bachelor's Degree from the University of California, Los Angeles and a Medical Doctorate from the University of California, San Diego. Dobak served as CEO and on the board of directors of DermTech Operations between June 2012 and August 2019 prior to the Business Combination. Dobak has served as the Company's CEO since the completion of the Business Combination in August 2019. Dobak is also the founder and President of the JAKK Group, a life sciences technology accelerator, which has created several companies including Lithera, Inc., INNERCOOL Therapies, Inc.,

CryoGen, Inc., and CryoCor, Inc. Dobak previously served as the founder and CEO of Lithera, Inc., from 2006 until 2011.

26. Defendant Kevin Sun ("Sun") was the Chief Financial Officer ("CFO") at DermTech at all relevant times. Sun has served as CFO, Treasurer and Secretary at DermTech since September 2019. Sun holds a B.S. in Business with a dual major in Accounting and Finance, a minor in Psychology, a Masters in Strategic Management and an MBA from the Kelley School of Business at Indiana University. Sun joined DermTech Operations as Vice President of Finance in August 2019 as part of the Business Combination. Previously, from June 2008 to November 2018, Sun served in various positions at Dexcom, Inc. including: Vice President, Corporate Controller and Treasury, Interim Chief Financial Officer, and Vice President of Finance.

27. Defendants Dobak and Sun (collectively the "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. Defendants Dobak and Sun were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Defendants are liable for the false statements pleaded herein.

**Relevant nonparties.**

28. Former Defendant DermTech was at all relevant times incorporated under the laws of Delaware with its principal executive offices located in San Diego, California. Until its June 2024 bankruptcy filing, DermTech's common stock traded on the NASDAQ exchange under the symbol "DMTK."

29. Claudia Ibarra ("Ibarra") was the Chief Operating Officer ("COO") at all relevant times until her February 2, 2024 departure from the Company. Ibarra joined DermTech in October 2019 as COO and, following a transition period, assumed day-to-day leadership of Company operations in March 2020. Ibarra has over 25 years of experience in clinical laboratory operations in the areas of oncology, immunology and molecular biology. Previously, Ibarra served in various management roles at Exagen Inc, including as Senior Vice President of Laboratory Operations. Prior to that, Ibarra served in various roles of increasing responsibility at Genoptix, Inc., including as the Director of the Molecular Oncology Laboratory and the Molecular Genetic Training Program Coordinator. Ibarra holds a degree in Biochemistry with specialization in clinical laboratory science from the University of Buenos Aires, Argentina and a California License as Clinical Laboratory Scientist.

30. Todd Wood ("Wood") was the Company's Chief Commercial Officer ("CCO") at all relevant times. Wood joined DermTech in February 2019 as CCO, and oversaw the Company's sales and marketing functions. Before being hired at DermTech, Wood launched multiple dermatological products including Juvéderm, Lumigan and Rhofade, aligned operational execution of brands like Botox, and assisting in restructuring complex transitioning organizations like Allergan's $2 billion Eye Care franchise.

31. The unnamed nonparties identified below are former DermTech employees.

32. "**FE1**" was a Regional Sales Manager at DermTech from September 2021 through July 2023. FE1 reported to Sales Director Jason Rhodes, who in turn reported to Ben Saval. Ben Saval Reported to Vice President of Sales, Ray Bassi, who in turn reported to Todd Wood.

33. "**FE2**" was a Former Manager of Strategic Channels at DermTech from February 2022 through July 2023. FE2 reported to Leda Marie Beaty, who reported to Ray Bassi. FE2 FE2 was responsible for, among other things, developing

relationships with large employer groups and Integrated Delivery Networks, or "IDNs", which are also referred to as hospital systems. As part of FE2 responsibilities, FE2 would As part of FE2 responsibilities, FE2 reviewed billing data for DermTech client accounts. FE2 confirmed that he had dealings with both Dobak and Sun and that on bug contracts, Sun would get involved.

34. "**FE3**" was a DermTech Reimbursement Specialist at DermTech from June 2021 through December 2022. FE3 reported to Carl Cool, who was, upon information and belief, DermTech's Director of Reimbursement and Analytics from October 2021 through September 2023.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Defendants Misrepresented the Revenue Generated By Sales of DermTech's Skin Cancer Test ("Assay Revenue")

35. **Company Background**. DermTech is a San Diego-based molecular diagnostic company. As of year-end 2023, it had 208 employees. By June 2024, it had just 60 employees.

36. DermTech's flagship product is the DMT, which is essentially a sticker that the Company claims enables non-invasive and early detection of melanoma using genomic analysis. The DMT's value proposition is, in brief, that it is less invasive than the alternative – a dermatologist's scalpel, and – according to the Company -- more accurate too.

37. DermTech became a public company in August 2019 through a business combination with Constellation Alpha Capital Corp. ("Constellation"), a publicly traded special purpose acquisition company ("SPAC"). On August 29, 2019, Constellation, and DermTech Operations, Inc., consummated the business combination, by and among the Company, DT Merger Sub, Inc., and DermTech Operations (the "Business Combination"). In connection with, and prior to the completion of the Business Combination, Constellation re-domiciled out of the British Virgin Islands and continued as a company incorporated in the State of

Delaware. Following the Business Combination, the Company was named DermTech, Inc.

38. On August 30, 2019, DermTech's common stock and certain of its warrants began trading on the Nasdaq Stock Market under the ticker symbols "DMTK" and "DMTKW," respectively. Immediately following the Business Combination, all of Constellation's officers and directors resigned and DermTech's senior management began running the Company.

39. After the Business Combination, and at all relevant times during the Class Period, DermTech was run and controlled by Defendant Dobak, who acted as Chief Executive Officer ("CEO") and Director. Dobak resigned just after the end of the Class Period, on May 9, 2023.

40. **DermTech's DMT**. DermTech's DMT works by measuring melanoma associated genomic markers. The DMT purportedly performs early detection of melanoma with a higher diagnostic performance than biopsy, the pathology standard of care. The Company estimates that more than three million surgical procedures are performed each year to assess pigmented lesions for melanoma, and the Company claimed that the DTM could be used in a significant majority of these assessments to non-invasively facilitate the early detection of melanoma.

41. The DMT is performed using the Company's Adhesive Skin Collection Kits and DermTech Smart Stickers. The DermTech Smart Stickers are applied to a pigmented lesion suspected to be melanoma. The Sticker collects skin cells and the Stickers are then shipped to the DermTech Gene Lab where RNA is extracted from the skin cells preserved on the Sticker. Genomic analysis can then be performed on those samples to determine the probability of the lesion being melanoma.

42. The DMT was marketed by DermTech's salesforce to dermatologists and other healthcare providers nationwide. While the ultimate DMT customer is the patient, given the interplay with health insurance and Medicaid/Medicare, the customer and the payor for the DMT are not always the same. For instance, depending

on whether the patient carries insurance, and whether such insurance provider offered coverage for the DMT, such factors would determine whether the cost of the test would be covered, and thus, if DermTech would ultimately receive payment.

**Figure 1 DermTech Melanoma Test Smart Sticker.**



43. **DermTech's Revenue**. DermTech generates revenue in two ways – sales of its DMT stickers and by providing certain laboratory services to other healthcare businesses, like pharmaceutical companies.[2] Accordingly, the Company reports, and at all relevant times reported, revenue in two segments: "Assay Revenue" (for the DMT), and "Contract Revenue," (for the services). Assay Revenue represented the vast majority of the Company's overall revenue. *See* Figure 2 below.

44. ***Assay Revenue***. DermTech's Assay Revenue generation is, in its most basic sense, a function of volume and price, where volume represents how many DMTs DermTech sells. So, revenue equals the number of stickers, times the average price they were sold. Accordingly, because price is such an important determinant of

[2] Services purportedly included sample collection kits, test development, patient segmentation and stratification, genomic analysis, data analysis and reporting that DermTech performed for its customers.

DermTech's Assay Revenue, which, in turn, is the largest contributor to DermTech's overall revenue, DermTech's reported Average Selling Price, or "ASP" for its DMT products sold (on a weighted-average basis) during any given reporting period. ASP was closely followed by investors as it was a key variable that comprised DermTech's revenue.

45. The Transaction Price (the "P" in DermTech's ASP metric) of the Company's Assay Revenue was described in the Company's SEC filings, including its 10-K for the period ending December 31, 2021 ("the 2021 10-K") as being limited to the "unconstrained portion of such consideration" received for its DMT sales. "In other words, the Company recognized revenue up to the amount of variable consideration that was <u>not subject to a significant reversal</u> until additional information is obtained or the uncertainty associated with the additional payments or refunds is subsequently resolved." But this was false because the Company would later take a "write off" or "write downs" from prior periods. "Write offs" are functionally equivalent to "reversals" — revenue that is booked in one period which is ultimately reduced.

46. The Company further explained that differences between original estimates and subsequent revisions about its Transaction Price for the DMT, "including final settlements, represent changes in the estimate of variable consideration and are <u>included in the period in which such revisions are made</u>." This too was false because Dobak would later admit that DermTech incurred "write-offs from revenue from samples that were processed 12 to 18 months before."

**Figure 2**

| | 2021 | | | | | 2022 | | | | | 2023 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | FY | Q1 | Q2 | Q3 | Q4 | FY | Q1 | Q2 | Q3 |
| Revenue ($ 000s) | | | | | | | | | | | | | |
| Assay Revenue | 2,190.0 | 2,910.0 | 2,954.0 | 2,969.0 | 11,023.0 | 3,518.0 | 4,147.0 | 3,433.0 | 2,692.0 | 13,790.0 | 3,425.0 | 3,565.0 | 3,692.0 |
| Contract Revenue | 334.0 | 209.0 | 76.0 | 196.0 | 815.0 | 200.0 | 86.0 | 140.0 | 302.0 | 728.0 | 52.0 | 415.0 | 223.0 |
| **Total Revenue** | **2,524.0** | 3,119.0 | **3,030.0** | **3,165.0** | **11,838.0** | **3,718.0** | **4,233.0** | **3,573.0** | **2,994.0** | **14,518.0** | 3,477.0 | 3,980.0 | 3,915.0 |
| Revenue (% of total) | | | | | | | | | | | | | |
| Assay Revenue | 86.8% | 93.3% | 97.5% | 93.8% | 93.1% | 94.6% | 98.0% | 96.1% | 89.9% | 95.0% | 98.5% | 89.6% | 94.3% |
| Contract Revenue | 13.2% | 6.7% | 2.5% | 6.2% | 6.9% | 5.4% | 2.0% | 3.9% | 10.1% | 5.0% | 1.5% | 10.4% | 5.7% |
| **Total Revenue** | 100% | 100% | 100% | 100% | 100% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

47. ***Contract Revenue***. Contract revenue was purportedly generated by providing genomic services to help other companies design drugs to treat dermatologic conditions. Deferred revenue associated with the Company's Contract revenue was described by the Company's SEC filings, such as its Q1 2022 10-Q (among others), as representing advanced payments that "will remain in deferred revenue until we process the laboratory portion of the contracts allowing us to recognize the revenue." Nothing in the Company's SEC filings warned that contract revenue could be "reclassified" due to contract cancellations, nor even that such contracts could be cancelled. And indeed, that would later occur: the Company "reclassified" $900,000 of revenue due to contract cancellations, which was revealed on November 3, 2022 when the Company issued its form 10-Q for the period ending September 30, 2022 ("the Q3 2022 10-Q"). That $900,000 reclassification represented just over one-quarter of DermTech's Q3 2022 total revenue.

### B. Defendants Portrayed DermTech As a Rapid Revenue Growth Stock That Was Mainly Driven by Three Factors

48. Throughout the Class Period, Defendants made misleading statements about the "main drivers" that would drive DermTech's Assay Revenue growth. For example, during the Company's August 4, 2021 earnings call for the period ending June 30, 2021 ("the Q2 2021 earnings call"), Sun represented that "we continue to focus on the main drivers of ASP growth, which are sales mix, broader payer coverage, success with appeals and generation of additional data." But this was incomplete and misleading because a material undisclosed factor was critical to ASP growth – the number of sites tested per patient, per visit, along with the number of tests per visit that would be paid for. That key factor had the ability to materially shape DermTech's ASP growth because payors, such as Medicare, would, and often did, deny coverage when more than one site had been tested at a particular visit.

49. Months later, on March 1, 2022, the Company hosted an earnings call with analysts and investors (the "Q4 2021 Earnings Call"). During the Q4 2021 Earnings Call, Defendant Sun stated, inter alia:

> KEVIN SUN: Yes. As we mentioned on the call, ***so increasing our ASP, we've got 3 main variables***; increasing the Medicare and covered billable sample proportion. So being that Medicare was 23% in Q4, we've got opportunity to improve our ASP by getting more Medicare patients as we raised the awareness in that population. And then also the covered contracts we have in California, Texas, Illinois, and others. We also plan to increase our appeal success, and then additional coverage.
>
> So we model moderate growth over the year, because we can't predict when a payer will come on-board. But ***as we can pull these levers*** with proportion and appeal success that we can drive activity in, we model some steady growth throughout the year. And then that's how we say that the revenue guide is essentially *at least doubling from 2021* with the upside based on our top-end of the range of our guidance.

50. But Sun's statements above were false and/or misleading because Sun did not disclose the extent that multiple stickers were sold together (in packs of four), nor that a material driver of DermTech's ASP was whether a payor would ultimately reimburse for more than one test per patient, per visit. Accordingly, Sun failed to disclose that a material omitted variable — the number of test sites administered per patient per visit — materially altered the Company's ASP because commercial payers would often deny coverage for instances where a patient had more than one test site per-patient-per-visit, submitted for reimbursement, under then existing LCD guidelines, as Defendants would later reveal.

51. Another undisclosed factor that weighed on DermTech's ASP related to quality control, including whether the technician applying the DMT sticker collected enough genetic material to properly test for melanoma. According to several former employees, oftentimes tests would have to be rerun at no cost to the patient, and thus

no revenue to DermTech because insufficient material had been collected from the patient, requiring a re-test. *See* §IV.E infra.

52. Dobak similarly stated during the Company's Q4 2021 Earnings Call held on March 1, 2022, that what the Company needed to do to monetize the significant levels of adoption of the DMT, was to increase DMT's ASP. Accordingly, Dobak explained that the three main variables purportedly driving ASP were, "[one] increasing the Medicare and covered billable sample proportion, two, increasing our appeal success; and three, attaining additional payer coverage from third-party payers." Yet Dobak's statements were misleading and failed to state material facts because increasing the proportion of Medicare patients would not, by itself, increase DermTech's ASP because DermTech's ASP could be reduced by a high proportion of Medicare patients who happened to have multiple tests per clinical encounter. Thus, by choosing to speak on this topic, Dobak was required to speak truthfully, yet he did not.

53. Defendants also touted DermTech's rapid revenue growth and expressed comfort in being able to achieve more than 100% year-over-year revenue growth from 2021 to 2022. For instance, also on the March 1, 2022 Q4 2021 Earnings Call, CEO Dobak told investors that he was "clearly seeing significant levels of adoption relative to our peers with the melanoma test, which is bringing transformational change to dermatology" and that "the table is set for a robust 2022."

54. During the same Q4 2021 Earnings Call, Sun represented that if DermTech were to achieve a "broader payer coverage," then potential "Assay revenue that could be recognized from having broader payer coverage is still meaningfully higher than the reported revenue." With those factors in mind, Sun represented that he thought the Company could achieve full year 2022 Assay revenue of between $22 and $26 million, which would represent growth of 100% to 136% over 2021.

55. During the Q&A portion of the Q4 2021 Earnings Call, when asked what the Company's ASP assumptions were behind its 2022 revenue guidance, Dobak responded that "we're comfortable with that guidance we gave."

56. Despite Defendants' representations regarding the supposed factors that would lead to DermTech's ASP growth, and thus DermTech's Assay Revenue expansion, and thus "at least" 100% revenue growth from 2021 to 2022 — Defendants did not disclose that DermTech's revenue growth throughout the Class Period was constrained by how many locations a particular patient got tested during a particular visit[3] because Medicare and most of DermTech's commercial payors ***would reimburse for more than one test site per-patient-per-visit no more than 10% of the time*** during the Class Period. *See* §§ IV.D.3 – IV.D.4 *infra*. Nor did Defendants disclose that the skill of the technicians could also weigh on DermTech's ASP.

57. Moreover, during the Company's Q1 2022 earnings call held on May 3, 2022 (the "Q1 2022 Earnings Call") — with four months of 2022 already complete — Sun reiterated his expectation for the Company to generate between $22 and $26 million in Assay Revenue for 2022 (or more than 100% over the $11.0 million reported in 2021) given the purported "strong growth of key financial and operational metrics [observed] during Q1 2022."

58. Dobak noted during the Company's Q1 2022 Earnings Call that "2022 is off to a solid start hitting various all-time records" and that "We expect to further realize the benefits of our scaled commercial organization with continued traction in the dermatology channel, which will drive the vast majority of our revenue growth in 2022."

59. Yet at no point during the Q1 2022 Earnings Call did Dobak or Sun disclose that the Company's guidance included revenue that was subject to reversal,

[3] At various times, the term "encounter" is used instead of "visit", but the two are synonymous and used interchangeably herein.

nor based on the implied assumption that two tests were reimbursable when LCD guidance limited the percentage of time when a second test per patient per visit could be compensable to just 10% of the time (see ¶88), both of which would later contribute to the Company ultimately missing its 2022 revenue guidance. Nor did Defendants caution investors that its Assay Revenue guidance depended upon the key undisclosed metric of how many stickers were used at one time on a particular patient during a particular visit – because most commercial payors would not reimburse for more than one sticker per-patient-per-visit in 90% of cases, under then existing guidelines.

### C. DermTech's Revenue, Revenue Drivers, And Revenue Growth Were the Key Metrics Upon Which Investors Focused

60. To investors, DermTech was a revenue story, and earnings were of far less importance. While some companies focus on growing earnings, say through cost-cutting measures, or by developing new technologies, DermTech's theme was, by-and-large, focused on growing revenue (*i.e.*, the topline).

61. As a result, Defendants touted DermTech's revenue growth potential, and investors in turn focused on it. For instance, on August 4, 2021, Oppenheimer issued an analyst report entitled "DermTech: Commercial Expansion Sets Table for Accelerating Topline in 2022; 2Q21 Beats on Revenue." This August 4, 2021 report noted the importance for DermTech of securing new payors, and also set its price target based on DermTech's 2025 revenue:

> Continue to view ***securing new reimbursement contracts as the best leading indicator of revenue growth***. Lastly, we believe DMTK is making solid progress on menu expansion with plans to launch Luminate in 4Q21, launch Carcinome in middle of 2022, and expand validation study for its AD therapy response prediction assay. Collectively, view update as supportive of accelerating growth in 2022**.**

* * *

> Our ***$58 PT is based on a price-to-sales analysis*** assuming a 14x multiple on 2025 estimated revenue of $172.7M and 29.6 million shares outstanding discounted back three years at 15%. Multiple is in line with our peer group of high-growth diagnostic companies' multiple of around 17.0x.

62. The next day, on August 5, 2021, a different Wall Street analyst, BTIG, issued an analyst report on DermTech which based its price target on a discounted cash flow model (DCF) that was in turn based on DermTech's rapid revenue growth projections:

> WHAT YOU SHOULD KNOW: 2Q21 revenue beat; 25% sequential billable sample volume growth: Total revenues of $3.1mm, +270% y/y beat the consensus estimates of $2.8mm, +237% y/y, and Assay revenue of $2.9mm, +349% y/y came in at above the guidance range ($2.4-2.8mm).
>
> * * *
>
> Valuation: Our $53 PT is based on DCF (FCF through 2031, revenue growth from ~100% in the near-term decelerating to mid-teen percent growth over the period, ~35% EBIT margin in the terminal year, 5% perpetuity growth, 11% discount rate).
>
> * * *
>
> We expect a significant commercial ramp for DermTech Melanoma Test over the next several years, potentially targeting a TAM of >$3bn, and benefiting from recent and potential new positive reimbursement decisions.

63. Similarly, on August 27, 2021, Lake Street Capital Markets published an analyst report on DermTech which highlighted how ASP would increase ***even if volumes remained the same*** (i.e., "flat") and underscored the importance of Medicare:

> We remain convinced DermTech is forging new path in non-invasive dermatology diagnostics, with a pipeline of opportunities to drive long-term growth.
>
> * * *
>
> Importantly, ***as the payer mix shifts toward Medicare patients***, ***ASP will increase, driving revenue growth (even on flat volumes)***.

64. On January 6, 2022, Stephens published an analyst report on DermTech, which stated, *inter alia*, that it expected DermTech to have revenue growth of more than 100% from 2022 to 2023:

> We view DermTech Melanoma as a differentiated test with clear advantages over the current clinical pathway for early-stage melanoma diagnosis, offering improved care at a lower cost. In addition to the large testing opportunity (>4 million/year), the attractive economics, and shrewd positioning of the test, we expect ***ramping commercial initiatives*** to support outsized test volume and ***revenue growth*** over the coming years.
>
> * * *
>
> Putting this together, we think DermTech Melanoma will show ***robust revenue growth*** of >100% in 2022 and 2023.

65. Acknowledging investors' focus on revenue growth, Dobak commented on the March 1, 2022 Q4 2021 earnings call that, "we often field questions from the investment community about the overall speed of our revenue and test volume ramp up."

66. Yet throughout the Class Period, DermTech's revenue growth was constrained by payors' frequent and consistent refusal to reimburse more than one test per patient per visit, and this constraint was not disclosed by Defendants until the truth was later partially revealed, beginning on August 8, 2022 when the Company reported its Q2 2022 results, and more fully revealed thereafter.

### D. The DMT Faced Undisclosed Reimbursement Issues, Which Directly Pressured ASP, and Thus the Company's Assay Revenue

#### 1. Overview of the Local Coverage Determinations ("LCDs"), CMS, and Medicare and Medicaid

67. Reimbursement and billing for diagnostic services involves multiple steps and multiple parties. Depending on the patient, medical providers, like labs and dermatologists, must bill various payors, such as commercial insurers, and/or state and federal health care programs, such as Medicare and Medicaid, and each may have different billing requirements.

68. The U.S. Department of Health and Human Services, under the Health Insurance Portability and Accountability Act (HIPAA), designates the Centers for Medicare and Medicaid Service ("CMS") to maintain a national coding system to streamline reporting, processing claims, and developing guidelines for medical care. Accordingly, CMS developed the Current Procedural Technology ("CPT") Codes. CPT Codes offer doctors and health care professionals a uniform language for coding medial services. All CPT codes are five-digits and can be either numeric or alphanumeric, depending on the category, for example Category I codes generally correspond to a procedure or service, Category II codes are used to track performance, and Proprietary Laboratory Analyses ("PLA") codes, a subset of the CPT codes, are used to describe tests either performed by a single laboratory or licensed to be performed in multiple laboratories.

69. Here, DermTech's DMT sticker was assigned a PLA code (described further below).

70. Once a CPT code is designated as "Established" it may be used as a means to identify a test when submitting a bill to Medicare or Medicaid for reimbursement. The CMS publishes a yearly Clinical Laboratory Fee Schedule which sets the expected value of reimbursement per code. For example, DermTech has a

CPT code, within the PLA category subset, assigned as "0089U", which sets a price of $760 for the DMT sticker.

71. However, before a physician may be reimbursed for a procedure, a Local Coverage Determination ("LCD") must be made. An LCD, as defined in §1869(f)(2)(B) of the Social Security Act, is a determination by a Medicare Administrative Contractor ("MAC") regarding whether or not a particular item or service is covered in a MAC's jurisdiction in accordance with Section 1862(a)(1)(A) of the Act. MACs are Medicare contractors that develop LCDs and process Medicare claims.

72. LCDs can be requested by beneficiaries residing in or receiving care within the MAC's jurisdiction, health care professionals providing care in MAC's jurisdiction, or any interested party doing business in the MAC's jurisdiction. These proposed LCDs, or Draft LCDs, are subject to a public comment period where the MAC will accept comments to the proposed LCD terms of coverage.

73. An LCD determines how, when, and how much, providers will be reimbursed for services, and under what conditions. An LCD sets out specific coverage criteria, certain limitations, and indications for use, including, for example, an LCD may outline how many tests may be used per patient per clinical encounter, or put relevant limitations on when a physician may order a certain test or procedure.

### 2. Commercial Payors Typically Follow Medicare or Medicaid Coverage Determinations

74. In addition to receiving reimbursement from Medicare or Medicaid, a medical service provider, may also bill though commercial payors. Commercial payors most often refer to insurance companies like UnitedHealth, Aetna, or Humana that provide individual and group health insurance plans.

75. In general, commercial payors use the same CPT code that CMS does. Because CMS publishes the codes, relative values, and payment policies for the CPT codes, commercial payors often follow Medicare coverage and payment decisions.

Though there are exceptions to that general rule. Even so, during the Class Period, Dobak stated that most commercial payers that DermTech brought on as of November 2021 have similar pricing to Medicare pricing.

76. Each commercial payor generally determines for its own enrollees or insured patients whether to cover or otherwise establish a policy to reimburse certain services. Though, as Dobak stated during a November 2021 conference, most DermTech payors have similar pricing to Medicare.

77. Commercial payors may be contracted or non-contracted. Large commercial payors who are contracted, will enter into an agreement with a lab or manufacturer, under which coverage terms are negotiated, including payment terms and transaction price. The contracted service will then be “in network.” Conversely, a non-contracted provider is considered “out of network”, and any services performed may not be reimbursed by the commercial payor.

**3. DermTech’s LCDs Limit Reimbursement to one test per-patient-per-visit in most cases, with a second test potentially allowable in roughly 10% of patients**

78. In late October 2019, the American Medical association provided DermTech with a PLA Code of 0089U. On December 24, 2019, CMS published its Clinical Laboratory Fee Schedule for Calendar Year 2020 which set a price of $760 for the PLA Code 0089U. The published reimbursement code 0089U remained $760 in subsequent CMS Clinical Laboratory Fee Schedule for the calendar years 2021, 2022 and 2023.

79. DermTech subsequently pursued and was issued, multiple LCDs for the DMT Test (identified as “MolDX: Pigmented Lesion Assay”).

80. DermTech now holds five LCDs through CMS for the Pigmented Lesion Assay, aka the DMT, associated with code 0089U as shown in **Figure 3** below.

**Figure 3: DermTech's LCDs**

| ID | Title | Type | Contractor |
|---|---|---|---|
| Title Results (5) | | | |
| L38111 | MolDX: Pigmented Lesion Assay | LCD | CGS Administrators, LLC (MAC - Part A, MAC - Part B) |
| L38151 | MolDX: Pigmented Lesion Assay | LCD | Noridian Healthcare Solutions, LLC (MAC - Part A, MAC - Part B) |
| L38153 | MolDX: Pigmented Lesion Assay | LCD | Noridian Healthcare Solutions, LLC (MAC - Part A, MAC - Part B) |
| L38051 | MolDX: Pigmented Lesion Assay | LCD | Palmetto GBA (MAC - Part A, MAC - Part B) |
| L38178 | MolDX: Pigmented Lesion Assay | LCD | WPS Insurance Corporation (MAC - Part A, MAC - Part B) |

(Source: https://www.cms.gov/medicare-coverage-database)

81. Due to the complexity of the process, Figures 4 through 7 (in ¶¶82 - 85) below depict different stages of the LCD approval process for one of DermTech's LCDs, LCD L38051 as an exemplar.

82. First, a draft LCD, styled as **D**L38051 (with a "D" to denote draft status), is submitted. Here, DL38051 was submitted on March 28, 2019. The initial draft DL38051 contained a coverage requirement limiting the test to one per patient per clinical encounter.

**Figure 4: Draft Submission DL38051**

SUPERSEDED | Local Coverage Determination (LCD)

## MolDX: Pigmented Lesion Assay

DL38051

Expand All | Collapse All

PROPOSED LCD
Learn more

SUPERSEDED
To see the currently-in-effect version of this document, go to the Public Versions section.

**Coverage Criteria**

The PLA is indicated only for use by dermatologists on pigmented skin lesions, for which a diagnosis of melanoma is being considered. The specific characteristics that the lesion must have are as follows:

- The lesion must meet one or more ABCDE criteria (Asymmetry, Border, Color, Diameter, Evolving)
- Primary melanocytic skin lesions between 5mm and 19mm
- Lesions where the skin is intact (i.e. non-ulcerated or non-bleeding lesions)
- Lesions that do not contain a scar or were previously biopsied
- Lesions not located in areas of psoriasis, eczema or similar skin conditions
- Lesions not already clinically diagnosed as melanoma or for which the clinical suspicion is sufficiently high that the treating clinician believes melanoma is a more likely diagnosis than not
- Lesions in areas other than palms of hands, soles of feet, nails, mucous membranes and hair covered areas that cannot be trimmed

Additional coverage requirements:

- The ordering dermatologist must also have a plan at the time of ordering the test to continue to monitor the skin lesion for changes if the test is negative.
- The ordering physician must clearly document the lesion site on the patient's body
- The test may not be ordered for the same lesion a second time.
- Only one test may be used per patient per clinical encounter.

The PLA is not intended to be used as a screening test in patients without melanocytic skin lesions. It is also not covered as an adjunctive test in lesions that are considered to already warrant a biopsy. The PLA is a decision tool for atypical melanocytic lesions prior to the decision to biopsy.

(Source: https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=38050:3&)

83. Next, the draft undergoes a comment period, in this case from May 6, 2019 until June 20, 2019, during which the public, and the Company, may submit comments. Here, DermTech submitted its own comments, requesting up to four tests be approved per patient per clinical encounter. In response, the MAC published its ***Response to Comments***, in this case noting, "we will cover up to 2 PLA tests per date of service without an appeal." See **Figure 5** below.

**Figure 5: Responses to Comments for L38051**



## Response to Comments: MolDX: Pigmented Lesion Assay

A57916

Expand All | Collapse All

The comment period for the MolDX: Pigmented Lesion Assay DL38111 Local Coverage Determination (LCD) began on 05/07/19 and ended on 06/21/19. The notice period for MolDX: Pigmented Lesion Assay L38051 LCD begins on 01/30/2020 and will become effective on 03/16/2020. The comments below were received from the provider community.

### Response To Comments

| Number | Comment | Response |
| --- | --- | --- |
| 1 | DermTech, Inc. appreciates the opportunity to comment on the draft Local Coverage Determination (LCD) MolDX: Pigmented Lesion Assay (DL38151) to be harmonized with MolDX Palmetto's DL38051 as we understand from your proposed LCD document and from the recent meeting in San Diego where we had the opportunity to present. We are writing to express our support for the positive draft LCD. | We will respond to each comment using the format 1.x for clarity in numbering. |

0.3% did the PLA status change, which also triggered a change in management that included surgical biopsies and closer monitoring. These findings demonstrate that rare additional PLA testing on changing lesions can pick up new molecular risk factor findings to further guide pigmented lesion management.

Comment 4: Number of tests per date of service. The draft LCD currently states that 'only one test may be used per patient per clinical encounter'. We propose to change this language to: '*Only up to ~~four tests may be used per patient per clinical encounter~~*'. ~~This conservative proposal attempts to~~ address potential concerns of over-utilization we do not see in our data. Only about 13% of PLA tests are used on more than one lesion (please see Table 1 below for details), while multiple surgical biopsies on the same date of service are seen in 42% of cases based on 2016 Medicare Physician Utilization Databases. Our data sets do suggest that clinicians are faced with situations where they have more than one suspicious lesion presented occasionally, and they believe the test is medically necessary for more than one lesion in such situations. Insofar as we get samples and requests for multiple lesions on a single date of service, it is our policy to process and report those samples. While the number is small, it would be financially burdensome for patients if these additional tests were considered non-covered, and we were required to obtain an Advance Beneficiary Notice in order to be made financially whole for performing the tests (it can furthermore raise compliance issues if we were to give away additional tests to patients while at the same time billing the first test to Medicare). It may be appropriate to establish a limit consistent with or close to current practice for biopsies that enables for instance one CPT 11102 biopsy plus up to 6 more CPT 11103 biopsies (based on most recent 2019 Practitioner Services MUE Values; spreadsheet within https://www.cms.gov/Medicare/Coding/NationalCorrectCodInitEd/MUE.html).

This seems especially appropriate given the findings that the PLA test can improve diagnostic performance and save burdensome procedures. Table 1 below demonstrates that covering up to 4 PLA tests per date of service (3 less than for e.g. shave biopsies under CPT 11102 and 11103) addresses the needs of over 99% of patients benefiting from PLA testing.

reasonable and necessary.

1.4 We will cover up to 2 PLA tests per date of service without an appeal. Given the data provided above, this coverage allowance appears to cover what is ordered for nearly all patients. We will defer to the laboratory as to whether to bill patients for the small number of services that will not be covered or to appeal them.

(Source:https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57916&ver=4)

84. As shown in **Figure 5** above, the MAC's Response to Comments is an interim action. Following that step, the LCD still undergoes a notice period where the text of the LCD is published. For L38051, the subsequent notice period ran from December 26, 2019 until February 10, 2020. Once that notice period ends, the LCD becomes effective. Here, L38051 was published containing the provision that "***Only one test*** may be used per patient per clinical encounter in most cases. In roughly 10% of patients a second test may be indicated for the same clinical encounter." **See Figure 6** below. This LCD became effective February 10, 2020.

# Figure 6: Original LCD Published[4]

SUPERSEDED | Local Coverage Determination (LCD)

## MolDX: Pigmented Lesion Assay

L38051

Expand All | Collapse All

**SUPERSEDED**

To see the currently-in-effect version of this document, go to the Public Versions section.

- Lesions in areas other than palms of hands, soles of feet, nails, mucous membranes and hair covered areas that cannot be trimmed

Additional coverage requirements:

- The ordering clinician must also have a plan at the time of ordering the test to continue to monitor the skin lesion for changes if the test is negative. The record must also contain a photograph of the lesion at the time that the PLA is ordered to allow for appropriate evaluation in subsequent follow-up.
- Records must clearly support that the ordering clinician has the knowledge, skills, and experience to evaluate and biopsy pigmented skin lesions. If this information is not contained with the chart of the beneficiary to whom a service is being rendered, it must be supported by other readily available documentation, such as credentialing documentation, or documentation of training in the performance of such tasks. Such documentation should be provided if there are documentation requests.
- The ordering physician must clearly document the lesion site on the patient's body
- The test may not be ordered for the same lesion a second time.
- Only one test may be used per patient per clinical encounter in most cases. In roughly 10% of patients a second test may be indicated for the same clinical encounter. For rare cases where more than 2 tests are indicated in a single clinical encounter, an appeal with supporting documentation may be submitted for additional tests.

# Figure 7: Operative L38051

Local Coverage Determination (LCD)

## MolDX: Pigmented Lesion Assay

L38051

Expand All | Collapse All

- Lesions in areas other than palms of hands, soles of feet, nails, mucous membranes and hair covered areas that cannot be trimmed

Additional coverage requirements:

- The ordering clinician must also have a plan at the time of ordering the test to continue to monitor the skin lesion for changes if the test is negative. The record must also contain a photograph of the lesion at the time that the PLA is ordered to allow for appropriate evaluation in subsequent follow-up.
- Records must clearly support that the ordering clinician has the knowledge, skills, and experience to evaluate and biopsy pigmented skin lesions. If this information is not contained with the chart of the beneficiary to whom a service is being rendered, it must be supported by other readily available documentation, such as credentialing documentation, or documentation of training in the performance of such tasks. Such documentation should be provided if there are documentation requests.
- The ordering physician must clearly document the lesion site on the patient's body.
- The test may not be ordered for the same lesion a second time.
- Only 1 test may be used per patient per clinical encounter, in most cases. In roughly 10% of patients, a second test may be indicated for the same clinical encounter. For rare cases where more than 2 tests are indicated in a single clinical encounter, an appeal with supporting documentation may be submitted for additional tests.

### Revision History Information

| Revision History Date | Revision History Number | Revision History Explanation | Reasons for Change |
|---|---|---|---|
| 12/23/2021 | R2 | Under ***CMS National Coverage Policy*** updated section headings for regulations and deleted CMS Internet Only Manuals, Pub 100-02 Medicare Beneficiary Policy Manual chapter 15, §80.2. Under ***Bibliography*** changes were made to citations to reflect AMA citation guidelines and updated accessed date for the second reference. Formatting, and punctuation were corrected throughout the LCD. Acronyms were defined and inserted where appropriate throughout the LCD. | • Provider Education/ Guidance |
| 06/25/2020 | R1 | Annual Validation was performed on 6/16/20. No revision was performed. | • Provider Education/ Guidance |

Public Versions

| Updated On | Effective Dates | Status | |
|---|---|---|---|
| 12/13/2021 | 12/23/2021 - N/A | Currently in Effect | You are here |

[4] The original LCD depicted in Figure 6 registers as "superseded" because minor revisions, including formatting, punctuation and citation access date updates, occurred in December of 2021, which lead to a new version of the document being published, as show in Figure 7. After these minor revisions, the Currently-in-Effect LCD was published and became effective December 23, 2021.

85. A similar comment and response process, with some variations, occurred for each of DermTech's five LCDs, which are described with more particularly below.

86. ***L38111.*** On April 18, 2019 Proposed LCD DL38111 was published to MAC CGS Administrators, LLC. DL38111 stated "only one test may be used per patient per clinical encounter." After a comment period of May 7, 2019 to June 21, 2019, DL38111 received a ***Response to Comments*** following the comment period, which stated, inter alia "We will cover up to 2 PLA tests per date of service without an appeal." [5] A response to comments is an *interim step* that precedes the final coverage determination. Following the comment period, including the response to comments, LCD L38111 was published with an effective date of March 30, 2020 and nonetheless contained coverage criteria stipulating that "[***o]nly one test may be used per patient per clinical encounter***."[6] Thus, notwithstanding the response to comments that stated "we will cover up to 2 PLA tests", the final coverage criteria was more restrictive and specific: it only allowed one test per patient per clinical encounter in most cases.

87. L38111 was further updated on September 30, 2022, to a version effective between October 6, 2022 to October 25, 2023, during which the coverage criteria continued to state ***"[o]nly one test may be used per patient per clinical encounter***."[7] On October 19, 2023 L38111 was updated once more, as effective

[5] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database,* Response to Comments, Article A57916, available at https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=57916

[6] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38111, effective 12/23/2021-10/05/2022, *available at* https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=38111:6.

[7] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38111, effective 10/06/2022 - 10/25/2023, *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=38111&ver=7&

October 26, 2023, to the version currently in effect at the time of writing, which continues to read ***"[o]nly one test may be used per patient per clinical encounter."***[8] L38111 is associated with Billing and Coding Article A57915 which lists applicable code 0089U.

88. ***L38151***. On May 16, 2019, proposed LCD DL38151 was posted to MAC Noridian Healthcare Solutions, LLC. DL38151 stated "[o]nly one test may be used per patient per clinical encounter." After a comment period of May 30, 2019 to July 15, 2019, and revisions on April 16, 2020, DL38151 received a ***Response to Comments*** which stated, *inter alia* "We will cover up to 2 PLA tests per date of service without an appeal." A response to comments is an *interim step* that precedes the final coverage determination. Following the comment period, including the response to comments, L38151 nonetheless limits coverage to one test per patient in most cases, stating:[9]

> ***Only one test may be used per patient per clinical encounter in most cases. In roughly 10% of patients*** a second test may be indicated for the same clinical encounter. For ***rare cases*** where more than 2 tests are indicated in a single clinical encounter, an appeal with supporting documentation may be submitted for additional tests.

---

[8] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38111, effective 10/26/2023 - N/A (Currently in Effect), *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=38111&ver=8&=

[9] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38151, effective 06/07/2020 - N/A (Currently in Effect), *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=38151&ver=4

89. LCD L38151 was published as effective June 7, 2020 and remains currently in effect at the time of writing.[10] L38151 is associated with billing and coding article A58052 which lists the applicable 0089U code.

90. ***L38153***. On May 16, 2019, proposed LCD DL38153 was posted to MAC Noridian Healthcare Solutions, LLC. After a comment period between May 30, 2019 and July 15, 2019, and updates on April 14, 2020, L38153 received a ***Response to Comments*** containing substantially the same terms as L38151. A response to comments is an *interim step* that precedes the final coverage determination. L38153 was published with an original effective date of June 7, 2020, and remains currently in effect at the time of writing.[11] L38153 sets out coverage requirements which limits coverage to "***only one test may be used per patient per clinical encounter in most cases***. In roughly 10% of patients a second test may be indicated for the same clinical encounter."[12] L38153 is associated with billing and coding article A58053 which lists the applicable 0089U code.

91. ***L38051***. On March 28, 2019, proposed LCD DL38051 was posted to MAC Palmetto GBA. After a comment period between May 6, 2019 and June 20, 2019, L38051 received a ***Response to Comments*** containing substantially the same terms as L38151. A response to comments is an *interim step* that precedes the final coverage determination. L38051 was published with an original effective date of February 10, 2020, containing a coverage requirement that "[***o***]***nly one test may be used per patient per clinical encounter in most cases***. In roughly 10% of patients a

---

[10] *Ibid*.

[11] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38153, effective 06/07/2020 - N/A (Currently in Effect), *available at* https://www.cms.gov/medicare-coverage database/view/lcd.aspx?lcdid=38153&ver=5

[12] *Ibid*.

second test may be indicated for the same clinical encounter."[13] L38051 was updated on June 2, 2021, to a version effective for services between June 25, 2020 to December 22, 2022, which contained the same coverage requirement limiting tests to one patient per clinical encounter in most cases.[14] On December 13, 2021, L38051 was updated once more, to a version effective starting December 23, 2021, which remains currently in effect at the time of writing, and which contained the same coverage requirement limiting tests to one patient per clinical encounter in most cases.[15] L38051 is associated with billing and coding article A57868 which lists the applicable 0089U code.

92. ***L38178***. On April 25, 2019, proposed LCD DL38178 was posted to MAC WPS Insurance Corporation. After a comment period from April 25, 2019 to June 9, 2019, L38178 received a ***Response to Comments*** containing substantially the same terms as L38151. L38178 was published with an original effective date of April 12, 2020, containing a coverage requirement which stated "***[o]nly one test may be used per patient per clinical encounter in most cases.*** In roughly 10% of patients a second test may be indicated for the same clinical encounter."[16] On December 30, 2021, L38178 was revised to a version effective between December 30, 2021 to

---

[13] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38051, effective 02/10/2020 - 06/24/2020, *available at* https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=38051:5&

[14] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38051, effective 06/25/2020 - 12/22/2021, *available at* https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=38051:7

[15] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38051, effective 12/23/2021 - N/A (Currently in Effect), *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdId=38051

[16] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38178, effective 04/12/2020 - 12/29/2021, *available at* https://localcoverage.cms.gov/mcd_archive/view/lcd.aspx?lcdInfo=38178:3

December 27, 2023 which contained the same coverage requirement limiting "[o]nly 1 test may be used per patient per clinical encounter, in most cases."[17] L38178 was updated once more with an effective date of December 28, 2023, to a version which remains currently in effect at time of writing, and which continues to limit coverage to one test per patient per clinical encounter in most cases.[18] L38178 is associated with billing and coding article A57983 which lists the applicable 0089U code.

#### 4. Despite Receiving LCDs Which Restrict Coverage To One Test Per Patient Per Visit in Most Cases, DermTech Misleadingly Stated That Coverage Had Been Expanded From "One To Two Tests Per Date Of Service."

93. Notwithstanding the above-described coverage limitations, Defendants misleadingly suggested that the DMT was authorized for "up to two tests" or that it had been "expanded from one to two tests", when those assertions appear to be based on the LCDs "Response to Comments", an interim step. For example, in a pre-Class Period statement made on January 2, 2020, DermTech issued a press release stating that "*DERMTECH'S PIGMENTED LESION ASSAY (PLA) RECEIVES MEDICARE COVERAGE*." The January 2, 2020 press release continued, "clinicians with sufficient skill and experience to decide whether a pigmented lesion should be biopsied may order the PLA test, with up to two (2) tests allowed per patient for each date of service."

94. The same day, Wall Street analysts at Lake Street Capital issued a report titled, "Final Coverage Determination Received, Priming DermTech for Significant

---

[17] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38178, effective 12/30/2021 - 12/27/2023, *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=38178&ver=5

[18] *U.S. Dep't of Health & Human Servs., Medicare Coverage Database*, LCD L38178, effective 12/28/2023 - N/A (Currently in Effect), *available at* https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?lcdid=38178&ver=7

2020 Growth. Affirm Buy Rating." The January 2, 2020 Lake Street Report continued, "DermTech announced this morning it has received its ***final coverage*** determination from CMS, ***an expected and significant catalyst for the Company's growth*** trajectory [and] [t]he final coverage determination will allow healthcare providers to test up to two lesions per patient per date of service."

95. Defendants' misleading statements continued throughout the Class Period. For instance, within the Company's 2020 10-K, filed Mach 8, 2021, the Company represented that "[t]he Medicare final LCD, or Final LCD, first made available on December 26, 2019 expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA."

96. Similarly, Defendants continued to tout that the DMT was granted a Local Coverage Determination which expanded the coverage from "one to two tests per date of service" and "[w]ith Medicare coverage granted, we have the opportunity to approach commercial payors, and as a result, we believe that the PLA may generate significant revenues in 2021 and 2022," as was stated in the following quarter in the Company's Form 10-Q filed on May 13, 2021 ("Q1 2021 10-Q"). Therein, Defendants represented that the Pigmented Lesion Assay was granted an LCD which expanded coverage to two tests per date of service, stating in relevant part:

> The Pigmented Lesion Assay, which we refer to as PLA, became eligible for Medicare reimbursement on February 10, 2020. In late October 2019, the American Medical Association, or AMA, provided us with a Proprietary Laboratory Analyses Code, or PLA Code. Pricing of $760 for the PLA Code was published on December 24, 2019 as part of the Centers for Medicare and Medicaid Services Laboratory Fee Schedule, or CLFS, for 2020. ***The Medicare Final Coverage Decision, or Final LCD, expanded the coverage proposal in the Draft LCD from one to two tests per date of service*** and it allows clinicians

> to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

97. Substantially similar representations were made in the Company's Form 10-Qs for the periods ending June 30, 2021, and September 30, 2021 (the "2Q 2021 10-Q" and "3Q 2021 10-Q" respectively) which again represented, in substantially the same language as above, that the Pigmented Lesion Assay was granted an LCD which expanded coverage to two tests per date of service, without disclosing that that the Company's LCD limited coverage to one test per patient per clinical encounter in most cases.

### 5. Defendants' Subtle Changes to the LCD Coverage Description in their SEC Filings Establish Their Knowledge

98. On March 10, 2022, the Company filed its Form 10-K for the fiscal year ended December 31, 2021, which represented, in substantially the same language as quoted *supra*, that the Pigmented Lesion Assay was granted an LCD which expanded coverage to two tests per date of service, but subtly added the qualifier (emphasized below) that the "Medicare final LCD (the 'Final LCD') first made available on December 26, 2019 expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service ***for a certain percentage of patients*** . . ."

99. The additional qualifier "for a certain percentage of patients", which appeared in the 2021 10-K signed by Dobak and Sun establishes their knowledge that the second test at the same clinical encounter was ***not*** covered by the Final LCD unequivocally. However, even this vague and subtle modification, included under the "Strategy" section of DermTech's 10-K, was still misleading because the "certain percentage of patients" that might qualify for reimbursement under Medicare's LCD for a second test site was limited to just 10% according to the billing and coding article A58052, but *that information* was still unknown to investors. And, only in "rare

cases" and following an appeal, would more than two tests be potentially reimbursed. *See* ¶88 *supra*.

100. **Defendants then removed the "for a certain percentage of patients" qualifier**. While Defendants included a vague qualifier within the fine print of DermTech's 10-K – albeit with no explanation as to what percentage of patients are covered for the second test — Defendants ***removed that language*** from DermTech's Form 10-Qs for the periods ending March 31, 2022 and June 30, 2022, filed on May 3, 2022, and August 8, 2022, respectively.

101. For example, in the Q1 2022 10-Q, the language read, in pertinent part, as follows:

> The final Local Coverage Determination, or LCD, expanded the coverage proposal in the draft LCD from one to two tests per date of service and it allows clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

102. As shown above, Defendants sought to and did conceal any qualification about the true coverage of the Final LCD.

103. Similarly, DermTech's Q2 2022 10-Q also did not have the "certain percentage of patients" qualifier.

### E. According to Multiple Former Employees, DermTech Had Widespread and Undisclosed Testing Issues That Were Also Negatively Impacting ASP

104. Compounding DermTech's inability to be reimbursed for multiple tests per site, DermTech's DMT faced two additional undisclosed structural issues that also had the effect of suppressing DMT's ASP.

105. First, according to FE1,[19] medical professionals who spent time administering the DMT (essentially applying the sticker), could not bill for such time

[19] FE1 was a Regional Sales Manager at DermTech from September 2021 through July 2023.

– so there was a strong disincentive for the dermatologist to do it his or herself. As a result, it would often by the medical assistants who applied the stickers, which oftentimes resulted in not enough genetic material being collected. And when that would happen, the test would need to be readministered. Of course, the patient would not be charged in such a scenario, and that would of course lower the ASP.

106. FE1 estimated that more than 21% to 22% of submitted samples had quality problems that required them to be retaken.

107. Second, on top of incorrect application of the sticker itself, FE1 also stated that every month there were incidents in which one or two plates (with each plate holding between 50 to 75 test samples) were accidentally dropped in the lab and could not be tested. This necessitated that sales reps return to the physicians' offices and ask for the provider to run the test again, which would also be at no cost. These issues became more pronounced after the Company moved to its new lab in March 2023, according to FE1.

108. FE2, a former Manager of Strategic Channels at DermTech from February 2022 through July 2023, observed that "a recurring issue was that the test samples did not provide enough [genetic] material to run the test." FE2 said that when this happened, the test would be designated as "QNF" which stood for "Quality Not Sufficient" and that it occurred so frequently that a "task force was assembled to address it."

109. FE2 represented that FE2 listened to DermTech earnings call "any chance [FE2] got." FE2 felt there was "a lot of sugarcoating" in the calls FE2 listened to and that "things sounded a lot better [on the calls] than FE2 sensed was the case, such as the numbers of QNFs or claims about utilization which did not mention the billing and collections issues."

110. FE2 also communicated that Sun "signed off on any deal" involving reimbursement and was "heavily involved with sales."

111. FE3, a DermTech Reimbursement Specialist at DermTech from June 2021 through December 2022, who worked on appealing denied claims, confirmed FE2's account that many DermTech tests had not collected enough genetic material. And, in the case of FE3, FE3 stated that "there was a backlog of denied claims pending appeals by DermTech." According to FE3, this backlog was maintained in a spreadsheet called XiFin, that was distributed on a monthly basis. According to FE3, sometimes claims were denied because the DMT sticker was not large enough to cover the entire tested lesion, and other times it was denied because "not enough information was available from the sample that had been collected." According to FE3, "many thousands" of denied claims existed in the monthly spreadsheet that FE3 received. FE3 estimated that there were "600 to 700" newly denied claims added to the monthly spreadsheet that FE3 received.

**F. DermTech's Scheme to Artificially Boost Revenue and Prop up DermTech's Stock To Capitalize on Equity Offerings**

112. Defendants' scheme to overstate DermTech's revenue and thus prop up its stock price had at least two motivations — to enable the Individual Defendants to sell shares at artificially inflated prices; and to allow the Company to similarly sell shares at artificially inflated prices via its "at-the-market" (or "ATM") offerings.

113. Throughout 2021, DermTech publicly offered newly issued securities to the general public on a continuous basis though ATM offerings. ATM offerings, as defined in Rule 415 of the Securities Act of 1933, are a type of shelf-based registered offering under which a listed securities issuer incrementally sells shares directly into the market at prevailing market prices. Thus, unlike a traditional underwritten offering — where a fixed under of shares are sold at a fixed price at one time — ATM offerings happen continuously.

114. On November 10, 2020, DermTech, entered into a sales agreement with Cowen and Company, LLC, ("Cowen"), with respect to an at-the-market offering program relating to the sale of shares of the Company's common stock from time to

time with an aggregate offering price of up to $50.0 million through Cowen as its sales agent.

115. For the year ended December 31, 2021, the Company issued an aggregate of 530,551 shares of common stock pursuant to its ATM Offerings at a weighted average price of $46.33, resulting in aggregate gross proceeds of approximately $24.6 million, or $23.8 million in net proceeds after transaction costs.

116. DermTech's weighted average sales price of $46.33, for shares offered through its ATM Offerings, was roughly 20 times its share price of $2.31 on May 5, 2023, which was the last day of the Class Period.

117. But for Defendants' scheme to inflate DermTech's share price, DermTech's stock price would not have had the same artificial inflation that it did, and Defendants would not have been able reap the same proceeds from the ATM Offerings. Those proceeds from the ATM offerings did two things: (1) they kept the lights on at DermTech by continuing to fund operations; and (2) they were used in part to fund the Defendants' compensation, even if indirectly.

## G. The Truth Begins to Emerge

### 1. Q2 2022 Results

118. The truth began to emerge on August 8, 2022, after the market close, when the Company reported its financial results for the period ending June 30, 2022 (the "Q2 2022 Financial Results"). At that time, DermTech issued a press release announcing its Q2 2022 Financial Results, along with revised Assay Revenue guidance. Therein, the Company's 2022 Assay Revenue guidance was lowered to between $16 to $19 million, from a prior range of $22 to $26 million.[20] The Company

[20] Because the Company had reported Assay Revenue of $3.5 million in Q1 2022, and $4.1 million in Q2 2022, or $7.66 million over the first half of 2022, full year guidance of between $16 to $19 million implied second half 2022 assay revenue guidance of between $8.3 million ($16.0 million – $7.66 million) to $11.3 million ($19.0 million - $7.66 million).

attributed the reduced guidance to softness in ASP and some potential pressure on billable sample volume from an uptick in sales force turnover.

119. The Company elaborated that it expected "a lower average selling price (ASP) for [its] DMT," due to purported "Medicare billing code edits . . . as well as less favorable collection patterns from commercial payors."

120. On the same day, the Company hosted an earnings call in which Dobak and Sun participated (the "Q2 2022 Earnings Call"). During the Q2 2022 earnings call on August 8, Defendant and CFO Sun stated:

> So with Medicare billing and the LCD, there is a limitation of number of body site tests that can be done on the same patient on the same date of service. We've seen a trend where that proportion has been increasing. And as that increases, it just pushes delays for when we can actually collect on those claims and when we can recognize the revenue for those.

121. Also during the Q2 2022 Earnings Call, CEO Dobak explained that these purported "edits" resulted in Medicare "***reject[ing] claims where patients have multiple body sites tested on the same day***" and that "[s]ome commercial payers have also" therefore rejected claims where multiple body sites were tested on the same day. Defendant Dobak stated, in relevant part:

> As it relates to the average selling price, or ASP, component of our assay revenue, we are now seeing pressure from 2 primary areas: ***ongoing Medicare billing impacts*** and less favorable collection patterns from commercial payers. We believe these emerging trends may last for a few quarters.
>
> Specifically, Medicare insurance claim processing ***has been problematic*** due to code edits that ***reject claims where patients have multiple body sites tested on the same day.*** Some commercial payers have also adopted these code edits, further eroding the ASP**.**
>
> In the second quarter, we engaged with Medicare's billing contractor, NCCI, and expect new insurance code edits to be adopted in the fourth quarter of 2022 that will improve this issue. We also expect commercial payers to adopt this change, but it's

> difficult to predict exactly when their billing systems will be updated.

122. Dobak's explanation was only half-true because it was not "code edits" causing Medicare and commercial payers to reject claims for patients with multiple body sites — but rather, it was *the Final LCD*, which had consistently stated that it would not cover more than one test per patient per visit 90% of the time as alleged above. *See* ¶¶67-92.

123. During the Q2 2022 Earnings Call, Dobak further partially revealed that the Company was facing reimbursement challenges from patients who had more than one body site tested with the DMT:

> There's always this concern from payers about overutilization, and that was a concern with Medicare in the early days of the LCD. And the way they wanted to address it was to put a limit on the number of tests that could be collected on the same date of service.

124. Sun also partially revealed the falsity of Defendants' prior LCD coverage statements by acknowledging that only one test per clinical encounter was covered, and that in turn was pressuring DermTech's ASP (and by extension revenue). Although Sun misleadingly described the Final LCD coverage limitation as a supposed code edit:

> The current ***code edit is*** set up for 1, but then also if there's 2 or more, the entire claim gets denied. So under the LCD, we should be paid now ***at least for 2 tests*** on the same date of service ***without anything else***. And then again we would have to appeal with medical records when it's 3 or more body sites so that we can demonstrate the medical necessity to Medicare.
>
> * * *
>
> … there are more tests that are being done on average per patient now than there were a year ago in this period, and ***that is what is causing some of the pressures we're seeing on the ASPs.***

125. Sun's explanation was, similar to Dobak's, only half-true. The truthful aspect of Sun's statement was that "if there's 2 or more, the entire claim gets denied" — because that is what the Final LCD says, with limited exceptions. The misleading aspect of Sun's statement was when he said "under the LCD, we should be paid now at least for 2 tests on the same date of service ***without anything else***." This quoted portion of Sun's statement was untrue because the Final LCD covered just one test per patient per visit 90% of the time—and that was the case consistently during the Class Period, including at the time of Sun's August 8, 2022 statement and even thereafter.

126. Still, despite Defendants' half-truths, the combination of the above partially revealed two things to investors. ***First***, it partially revealed that Defendants' prior statements about the Final LCD coverage having been expanded from one to two tests was untrue, and that was pressuring DermTech's ASP. Indeed, Sun would admit during the Q2 2022 Earnings Call that higher test usage per patient was "***causing*** some of the pressures we're seeing on the ASPs." ***Second***, contrary to Defendants' prior representations about the drivers of the Company's ASP – ASP was, at all relevant times, also materially impacted by how many sites per patient per visit were tested, a metric the company tracked but did not disclose.[21] Accordingly,

---

[21] During the Company's Q2 2022 earnings call, Sun stated that the Company had not (and does not), disclose those metrics:

> ALEXANDER DAVID NOWAK: Okay. Understood. And regarding, I guess, the big drop in the ASP this quarter, it doesn't sound like those code edits went into effect this quarter. That's been kind of an ongoing trend. It's really due to more of the samples are coming from the same patients. So maybe the question is, how many -- or ***what is the average number of samples per patient today compared to, let's say, last year***?
>
> KEVIN SUN: ***We haven't disclosed those metrics***, but what we can say the trends are is that there are more tests that are being done on average

(footnote continued)

to grow the Company's ASP, it was not as straightforward as just "increasing the Medicare and covered billable sample proportion" as Dobak represented during the Q4 2021 Earnings Call. Nor were the "three main variables", or "main drivers", of the Company's ASP, limited to those that Defendants previously disclosed.[22] Rather, regardless of how many commercial payers were brought on, DermTech's ASP, and thus revenue, was also highly dependent upon on how many sites per-patient-per-visit were tested at any given time.

127. On August 9, 2022, analysts from William Blair wrote that the Company's lowered guidance stemmed from lower ASP which was due to "1) Medicare billing code edits and 2) less favorable collection patterns from private payers." William Blair also wrote that "this was a tough update from the company" and [t]he pricing situation is not straightforward for investors to digest."

128. William Blair surmised the code edit change as follows:

> The Medicare pricing issue is associated with ***cases where patients have multiple body sections tested with the DMT during a single visit***. Previously, in these "multiples" scenarios where two or more body sections are tested, DermTech was paid on one of the tests and had to appeal the second (which involves the company supplying additional medical information to support coverage). ***This, however, was in conflict with CMS's Local Coverage Decision (LCD) for DMT***, which indicates two body sites would be covered without requiring any appeal during the LCD process.
>
> Management has been working to correct this coding error to align with the LCD and (with the help of the company's local congressmen) has succeeded in getting CMS's National Correct Coding Initiative (NCCI) program to issue a code edit that will go into effect in the fourth quarter. However, until the code edit

> per patient now than there were a year ago in this period, and that is what is causing some of the pressures we're seeing on the ASPs.

[22] *See* ¶¶48-51, *supra* (increasing Medicare proportion, increasing appeal success, and getting new payors).

> goes into effect, DermTech is not being paid on any "multiples" cases.

129. On all this news, the Company's stock price fell $2.87, or 34%, to close at $5.56 per share on August 9, 2022, on unusually heavy trading volume, thereby damaging investors.

**2. Q3 2022 Results**

130. On November 3, 2022, the Company reported its financial results for the period ending September 30, 2022 in a press release (the "Q3 2022 Financial Results"). Therein, the Company disclosed that it had changed collection estimates for tests run in prior periods due to reduced commercial payers covering the DMT, which partially revealed that prior periods' assay revenue was false, and that prior periods' guidance was false and/or misleading and/or lacked a reasonable basis because: (1) prior periods' reported revenue and revenue guidance included revenue that was subject to reversal — contrary to the Company's stated accounting policies that the Company "recognized revenue up to the amount of variable consideration that is ***not*** subject to a significant reversal"; and (2) DermTech's revenue had improperly been over-accrued in prior periods.

131. Also on November 3, 2022, the Company reduced its revenue guidance for full year 2022, to $13 million, which implied fourth quarter 2022 revenue guidance of just $1.9 million in Assay Revenue, a 45% decrease from the already reduced third-quarter assay revenue of $3.4 million, thus revealing that the Company had not properly limited the amount of variable consideration to the unconstrained portion of such consideration. The Company's reduced full-year guidance of just $13 million was roughly half of the high-end of its original full-year revenue guidance given on March 1, 2022, and reaffirmed on May 3, 2022, when Sun projected full-year 2022 revenue guidance of between $22 to $26 million. In other words, in a six-month period, DermTech's annual revenue forecast was essentially cut in half—which roughly tracks a 50% reduction in ASP.

132. The same day, DermTech held an earnings call (the "Q3 2022 Earnings Call"). During the Q3 2022 Earnings Call, Sun stated, "[t]he code edit was implemented at the beginning of October [2022]" and the Company "did take some benefit of this into the past couple of quarters and it has again some positive impact to ASP." His full statement reads:

> KEVIN SUN: Yes. The code edit was implemented at the beginning of October [2022]. It does appear that they backdated the code edit to when the Medicare LCD was first effective, which is January-February of 2020. ***We did take some benefit of this into the past couple of quarters*** and it has again some positive impact to ASP. But I'd say it takes a little while to flush it out completely. And it has been netted with any other, say, negative or other prior period adjustments as we've reported in our financial statements.

133. But Sun's statement was not completely true because the October 6, 2022 Billing and Coding revision to DermTech's DMT (fka the PLA) did not change the number of tests that are approved. *See* **Figure 8** below:

**Figure 8**



LCD Reference Article | Billing and Coding Article

Billing and Coding: MolDX: Pigmented Lesion Assay

A57915

Expand All | Collapse All

Other Coding Information

N/A

Revision History Information

| Revision History Date | Revision History Number | Revision History Explanation |
|---|---|---|
| 11/16/2023 | R3 | Revision Effective: 11/16/2023<br>Revision Explanation: Updated LCD Reference Article section. |
| 10/06/2022 | R2 | Revision Effective Date: 10/06/2022<br>Revision Explanation: Annual review, no changes made. |
| 12/23/2021 | R1 | Revision Effective Date: 12/23/2021<br>Revision Explanation: Under ***CMS National Coverage Policy*** added regulation, CMS Internet-Only Manuals, Pub 100-02, Medicare Benefit Policy Manual, Chapter 15, §80.1.2 A/B MAC (B) Contacts With Independent Clinical Laboratories. Under ***Article Text*** added verbiage regarding instructions on how to submit claims information. Formatting was corrected throughout the article. |

134. As shown above, the October 6 2022 revision did not change the number of tests that were approved. In fact, the October 2022 revision above says, "***no changes made***."[23] And if Sun was trying to say that the October 2022 "code edit" increased Final LCD approval from one, to two, tests *going forward* (i.e., from October 2022 and thereafter), that is also not supported by the October 2022 revisions to DermTech's LCD Billing and Coding Revision History, nor by changes to DermTech's Medicare LCD that are tracked by CMS. *See* ¶¶67-92, 133. Nevertheless, it seems Sun sought to give investors a reason for why DermTech's revenue was decreasing now, even though the Final LCD that had been implemented years prior: so he blamed an administrative code edit and said that this code edit had been backdated. But the October 2022 revision he cites does not support his representation.

135. Thus, while Sun's statement in ¶132 above partially revealed that DermTech's ASP, and by extension, its revenue, had been inflated in prior periods from Defendants' improper Class Period revenue recognition[24]—Sun did not fully reveal the true reason. The real reason is that the LCD had consistently limited approval to just one test per clinical encounter in most cases since it was first effective. Instead of admitting that, Sun said the code edit had been "backdated."

136. DermTech's 10-Q further partially reveals that Defendants had been improperly and prematurely recognizing revenue during the Class Period. On November 3, 2022, the Company issued its form 10-Q for the period ending September 30, 2022 (the "Q3 2022 10-Q"). The Q3 2022 10-Q further partially

---

[23] The LCD that was updated in October, 2022, was L38111. L38111, as in effect from October 06, 2022 to October 25, 2023 which stated, "Only one test may be used per patient per clinical encounter." L38111, currently in effect and last updated on 10/19/2023 continues to state "[o]nly one test may be used per patient per clinical encounter."

[24] Which was partially revealed by Sun's admission that "we did take some benefit of this" in the "past couple of quarters" (i.e., before Q3 2022).

revealed that the Company had updated its estimate of the variable consideration recognized for previously delivered performance obligations which "resulted ***in a decrease*** of $0.5 million and $0.5 million of revenue reported for the three and nine months ended September 30, 2022, respectively, and an additional $18,000 and $0.1 million of revenue reported for the three and nine months ended September 30, 2021, respectively."

137. On all this news, the Company's stock price fell $1.34, or 44.7%, to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

138. Following Q3 2022 Financial Results, analysts at Stephens noted that "DMTK's 3Q22 revenue fell short of our/Street expectations. ASP and volume growth issues appear to be driven ***mainly by commercial payers increasing denials/implementing*** tactics to discourage customers from utilizing DermTech's test." Stephens continued, "The issue is that other factors (commercial payers pressuring ASP/volumes + ***Medicare denying claims for tests above the 2 tests/patient/day limit***) could either slightly or more than offset the ASP benefit. The result ***is limited to no visibility into NT ASP/test, and ultimately revenue***."

139. Similarly, in response to DermTech's Q3 2022 Financial Results, analysts at William Bliar downgraded DermTech shares from Outperform to Market Perform (essentially from buy to hold) on November 4, 2022, due in part to "the continued worsening of commercial payer collections impacting revenue per test. In addition, some commercial payers ***increased scrutiny on utilization***." William Blair noted that its view would change and it "would look to upgrade shares when there is better line of sight and ***transparency*** into payer coverage and contracting decisions."

### 3. Q4 2022 and FY 2022 Results Confirmed the Q3 2022 Corrective Disclosure

140. On March 2, 2023, after the market close, the Company reported its financial results for the period ending December 31, 2022 ("Q4 2022" and "FY 2022") in a press release and Form 8-K filed with the SEC.

141. As is customary, the Company also hosted an earnings call on March 2, 2023, to discuss its quarterly and year-end results. On the earnings call, Sun admitted that "Full-year 2022 assay revenue increased 25% to $13.8 million, ***which included $1.8 million of net downward prior period adjustments***", thus confirming the falsity of prior periods' financials and noncompliance with the Company's revenue recognition policy.

142. The same day, the Company also filed its Form 10-K for the year ended December 31, 2022 ("the 2022 10-K"). Therein, the Company admitted that:

> The Company periodically updates its estimate of the variable consideration recognized for previously delivered performance obligations. ***These updates resulted in a decrease of $1.8 million of revenue reported for the year ended December 31, 2022, and an additional $0.2 million of revenue reported for the year ended December 31, 2021***. These amounts included (i) adjustments for actual collections versus estimated variable consideration as of the beginning of the reporting period and (ii) cash collections and the related recognition of revenue in the current period for tests delivered in prior periods due to the release of the constraint on variable consideration, offset by (iii) reductions in revenue for the accrual for reimbursement claims and settlements.

143. The Company also hosted an earnings call the same day. During the Q&A portion of the Q4 2022 Earnings Call, Sun was asked:

> I was just curious, so on your Q3 call, you indicated that you have to update the Medicare code edit that was implemented at the beginning of October, and was back dated to early 2020 when the Medicare LCD went effective. So I just wanted to make sure, have all your Medicare challenges been resolved at this point?

144. Sun responded, "Yeah. I'd say many of the Medicare challenges have been resolved with the code edit."

**4. March 14, 2023 Oppenheimer Healthcare Conference**

145. On March 14, 2023, the Company attended the Oppenheimer Healthcare Conference, wherein John Dobak and Kevin Sun gave a presentation and answered investor questions.

146. In response to an analyst's question, Dobak made the following admission about the Company's revenue writeoffs:

> FRANK BRISEBOIS: Okay, great. And then just to be clear on the last quarter call, there was a -- it almost looked like the ASP went down, but on the normalized side actually went up. So just maybe help investors and listeners understand how you get to that normalized ASP versus if you -- just volumes and sales?
>
> JOHN DOBAK: Sure. Last quarter, we had -- what happened in the second half of last year with the payers -- like I said, the payers ramped up all their tactics. Not only were they sending our customers letters and making it challenging. They also began to clamp down on their reimbursement. So whereas some payers were paying us 10% to 15% of the time in the back half of last year, they just stop paying us. And it went down to mid-single digits.
>
> What that created is -- are when ***we accrue our revenue in a particular quarter, we had to adjust those accruals downward***. And that means we had ***write-offs from prior periods***.
>
> So we had to take about ***$1.5 million of write-offs from revenue from samples that were processed 12 to 18 months before***. And so that brought our overall revenue number down. And then consequently, if you take that revenue divided by the total number of samples we did, which was about 18,000, ASP looks lower than it really was. If you look at the intra-quarter accrual, what we were actually seeing from payers at that point, our ASP was $240 instead of the $170 or $190 that we reported. I can't remember exactly. Forgive me, it's in the transcript.
>
> But – so the intra-quarter accrual was actually higher. When you add in ***those write-downs that we had from prior periods***, that brings it down below $200.

147. Dobak's admission above confirmed that when the Company reduced guidance for the fourth quarter 2022, that reduction was due in large part to a write-off of revenue from samples taken 12 to 18 months before—when DermTech had been over-accruing or prematurely recognizing revenue.

148. On this news, DermTech's stock fell 3.02% to close at $3.59 per share, thereby damaging investors.

**5. Q1 2023 Results**

149. On May 4, 2023 after the market close, the Company reported financial results for the period ending March 31, 2023 (the "Q1 2023 Financial Results"). Therein, DermTech announced that despite a 24% increase in sample volumes, test revenues dropped 3%, largely due to a downward revenue adjustment due to changes in collection estimates from prior periods. The Company also announced that Dobak would be departing the Company.

150. On the same day, the Company hosted an earnings call with investors (the "Q1 2023 Earnings Call"). On the earnings call, Sun admitted that that "ASP remains difficult to forecast" and the Company would not be "providing revenue guidance until we have better visibility on these factors."

151. On all this news, DermTech's stock fell $0.84 per share, or 31.0%, on significant trading volume, to close on $2.31 per share on May 5, 2023, thereby damaging investors.

152. The next day, analysts at Craig-Hallum wrote that "2022 reimbursement challenges for DMTK are spilling into 2023."

153. On May 8, 2023, analysts at the investment firm, Stephens, downgraded DermTech's stock and lowered their price target on DermTech's shares to $2.50 from $7.00 per share. They noted "we're moving to the sidelines until we gain clarity on coverage and DMTK's operations going forward."

**H. The Company's "Little r" restatement**

154. As shown by the Company's 2022 10-K, Defendants' decision to write off revenue that was accrued during the Third Quarter, by amounts of revenue that were previously booked in prior quarters, amounts to a "Little r" restatement," as does the Company's reclassification of deferred revenue from an asset to a liability.

155. Many financial market commentators, and the SEC have written about how a company can, as DermTech did, downplay accounting errors through a series of changes to prior-period accounting entries through creative—though misleading—use of, alternatives to restatements – such as "revisions", "reversals", "reclassifications," or words to similar effect.[25] Such a tactic has come to be known as a "little r" restatement.

156. The SEC's Acting Chief Accountant, Paul Munter ("Munter") describes the difference between traditional and "little r" restatements:

> Central to the process a registrant must follow when an error is identified in its historical financial statements is determining whether the error is *material* to those historical financial statements. The Supreme Court has held that a fact is material if there is:
>
> > "a substantial likelihood that the ... fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."
>
> When an error is determined to be material to previously-issued financial statements, the error must be corrected by restating the prior-period financial statements. This type of restatement is sometimes referred to colloquially as a reissuance restatement or a "Big R" restatement.

---

[25] *See e.g.*, Paul Munter (Acting Chief Accountant for the SEC), *Assessing Materiality: Focusing on the Reasonable Investor When Evaluating Errors*, March 9, 2020, *available at* https://www.sec.gov/news/statement/munter-statement-assessing-materiality-030922

> If the error is not material to previously-issued financial statements, but either correcting the error or leaving the error uncorrected would be material to the current period financial statements, a registrant must still correct the error, but is not precluded from doing so in the current period comparative financial statements by restating the prior period information and disclosing the error. This type of restatement is sometimes referred to colloquially as a revision restatement or a "little r" restatement.
>
> It is important to note that ***both of these methods—reissuance and revision, or "Big R" and "little r"—constitute restatements to correct errors in previously-issued financial statements as those terms are defined in U.S. GAAP***. In either case, such errors should be transparently disclosed to investors.

*Id*. (internal citations omitted).[26]

157. According to the SEC, "while the total number of restatements by registrants declined each year from 2013 to 2020, 'little r' restatements as a percentage of total restatements ***rose to nearly 76% in 2020***, up from approximately 35% in 2005. *Id*.

158. Munter further noted that "we have observed that some materiality analyses appear to be biased toward supporting an outcome that an error is not material to previously-issued financial statements, resulting in 'little r' revision restatements." *Id*.

159. Munter added that issuers' arguments for electing a "little r" restatement are often self-serving and "unpersuasive," stating in relevant part:

> One variation of this argument is that certain elements of financial statements prepared in accordance with U.S. GAAP or International Financial Reporting Standards ("IFRS") do not provide useful information to investors, so an error in those elements cannot be material. A related argument is that

[26] Supra n. 24. https://www.sec.gov/news/statement/munter-statement-assessing-materiality-030922

> historical financial statements, or specific line items in those financial statements, are irrelevant to investors' current investment decisions. We have not found these types of arguments to be persuasive because ***such views could be used to justify a position that many errors in previously-issued financial statements could never be material regardless of their quantitative significance or other qualitative factors***.

160. The SEC separately observed that overstatements of revenue lead to ***larger*** impacts on share price than other metrics. *See, e.g.*, Lynn E. Turner, Chief Accountant, SEC Speech by SEC Staff: *Revenue Recognition* (May 31, 2001) ("Based on research performed by my office, restatements for revenue recognition also result in larger drops in market capitalization than any other type of restatements.").[27]

161. In sum, whether called a "reclassification" or a "restatement", the result is the same: a tacit admission of the falsity of previously-reported financial statements.

### I. DermTech's "Little r" Restatement is a de facto admission of Falsity

162. Federal regulations strictly govern what must be included in documents filed with the SEC. In particular, federal regulations required Defendants to comply with United States generally accepted accounting principles ("GAAP"), which are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.

163. SEC Regulation S-X requires that financial statements as filed with the SEC be prepared in accordance with GAAP. Filings that do not comply with GAAP are "presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

164. Effective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities. Rules and interpretive releases

[27] Available at http://www.sec.gov/news/speech/spch495.htm

of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. See Policy Statement: Reaffirming the Status of the FASB as a Designated Private-Sector Standard Setter, Release No. 33-8221 (Apr. 25, 2003) [68 FR 23333 May 1, 2003].

165. According to its 2021 10-K, DermTech purported to ASC 606 when it recognized revenue. ASC 606-10-05-03 sets forth a five-step process that Companies must follow to adhere to GAAP.

166. For completeness, the five steps are: (1) Identify Contracts with customers; (2) Identify Performance Obligations; (3) Determine the Transaction Price; (4) allocate the transaction price; and (5) recognize revenue when (or as) performance obligations are satisfied. ASC 606-10-25 through ASC 606-10-41. As relevant here though, it is the third through fifth steps that Defendants violated.

167. Under the first step, the "contract with the customer" relates to the arrangement with the patient. Because DermTech provides the services requested by the patient, and the patient agrees to pay for those services. In instances where a third-party, such as Medicare, establishes negotiated prices for the services those arrangements are considered in determining the transaction price (i.e., ASP) for the contract between the provider and patient. Thus, Medicare's involvement directly impacts DermTech's ASP.

168. ASC 606-10-32-2 sets forth how one should determine the transaction price when any compensation that a provider expects to have to return to a government payer, such as Medicare and Medicaid.

169. Under ASC 606, DermTech is only supposed to recognize revenue up to the amount of variable consideration that is not subject to a significant reversal until additional information is obtained or the uncertainty associated with the additional payments or refunds is subsequently resolved. Moreover, the potential for adjustments, such as refunds to Medicare, must also be estimated and excluded from revenue in the periods that the related services were provided. ASC 606-10-32-2.

170. Importantly, differences between DermTech's original estimates of the transactions price and subsequent revisions, including final settlements, represent changes in the estimate of variable consideration and *are included in the period in which such revisions are made*.

171. Therefore, the fact that DermTech reclassified *prior periods of revenue*, it thus violated ASC 606, and thus GAAP, as well as the Company's own accounting policy. Moreover, such a reversal is tantamount to a restatement, *see* § IV.I *supra*, and restatements constitute an admission that financials statements were false and misleading when originally issued. (Accounting Principles Board Opinion ("APB") No. 20 at ¶¶ 7-13; Financial Accounting Standards Board Statement No. 154 at ¶ 25). Thus, DermTech's "Little r" restatement here likewise operates as an admission that its prior financial statements were false and/or misleading.

**J. Defendants Were, at a Minimum, Deliberately Reckless In Recording Revenue Above Amounts that Could be Later Reversed**

172. DermTech's revenue is accrual based, which means that it generally recognizes revenue on "the date a patient's successful test result is delivered to the patient's ordering physician." That is, DermTech estimates the revenue that it expects to receives and, at times, recognizes such revenue before it receives any cash payment. In cases where DermTech recognizes revenue but has not yet received the cash expected from such revenue, the amount of cash expected to be received appears on DermTech's balance sheet as Accounts Receivable, sometimes abbreviated as A/R. Once the cash is ultimately collected from a patient who pays DermTech, the Accounts Receivable balance decreases by the amount of cash received. So Accounts Receivable should not grow too much faster than revenue because if it does, that suggests that the revenue may not be collectable, and thus should not be recognized in the same way that it is.

173. Accounts receivable is a metric that appears on DermTech's balance sheet every quarter. A derivative metric of Accounts Receivable is Days Sales

Outstanding, or "DSOs." DSOs are calculated by dividing Accounts Receivable by Sales (i.e., Revenue), multiplied by the number of days in the period. Investors look at DSOs to assess how long it is taking a company to collect its revenue. In other words, all components of DermTech's DSOs appear on either DermTech's publicly-filed Income Statement (where Revenue appears) or Balance Sheet (where Accounts receivable appears). As CFO, Sun signed DermTech's 10-Ks and 10-Qs, so he had access to both DermTech's Revenue and Accounts receivable.

174. Additionally, according to DermTech's 2022 10-K, with respect to Accounts Receivable, "The Company prepares an analysis on reimbursement collections and data obtained for each financial reporting period to determine the amount of receivables to be recorded relating to tests performed in the applicable period."

175. Accordingly, DermTech's increasing inability to collect from customers should have been apparent to Defendants because of, *inter alia*, DermTech's swelling accounts receivable ("A/R") DSOs balances.

176. Generally speaking, a higher DSO suggests that a company is experiencing delays in receiving payments.[28] Typically, a DSO under 45 days is considered good, and the national average during the Second Quarter of 2022, as calculated by the Credit Research Foundation was 37.3 days.[29] By Contrast, just before taking its Little r Restatement, DermTech's DSOs hit a high of ***just under 160 days***, almost doubling from an already above average 76 days as of the end of Q1 2021.

---

[28] https://www.investopedia.com/terms/d/dso.asp#:~:text=If%20a%20company's%20DSO%20is,payment%20to%20drive%20increased%20sales. (last accessed March 9, 2024).

[29] https://www.investopedia.com/terms/d/dso.asp#:~:text=If%20a%20company's%20DSO%20is,payment%20to%20drive%20increased%20sales.

177. Simply put, as the Class Period went on, both DermTech's A/R and DSOs increased markedly. These metrics were glaring red flags to Defendants that a looming write-off was on the horizon. Yet Defendants' improper accounting persisted.

| | Q1 2021 | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 | Q3 2023 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Assay Revenue | 2,190 | 2,910 | 2,954 | 2,969 | 3,518 | 4,147 | 3,433 | 2,692 | 3,425 | 3,565 | 3,692 |
| Accounts Receivable | 1,854 | 2,185 | 2,819 | 3,847 | 4,995 | 5,962 | 6,101 | 4,172 | 3,690 | 3,865 | 3,605 |
| DSOs | 76.2 | 67.6 | 85.9 | 116.6 | 127.8 | 129.4 | 159.9 | 139.5 | 97.0 | 97.6 | 87.9 |

178. And shown by the below graph, the DSO increases peaked just as DermTech lowered its revenue guidance to reflect the Q4 2023 assay revenue write-off.




179. Another metric that evinces slowing collections from customers here is DermTech's growing backlog of uncollected claims. *See* ¶111 above.

180. Medicare can deny claims for various reasons, one of which is, according to Sun on the Q2 2022 earnings call, if "there's 2 or more [test per date of service] the entire claim gets denied." Thus, as Medicare denied more claims as a result of a patient having multiple tests done on the same clinical encounter, DermTech's backlog of denied claims ("Denied Claims Backlog") would correspondingly increase. Therefore, DermTech's growing DSOs and swelling Denied Claims Backlog would often reflect opposite sides of the same coin: an inability of DermTech to collect money from patients who had been administered the DMT.

181. So DermTech's DSOs and Denied Claims Backlog are related. As DSOs grow, it is a red flag that revenue has been recognized but is not being collected upon.

And as the Denied Claims Backlog grows, it is a red flag that more claims are being denied. As they both grow at the same time (as here), it creates a red flag that revenue is likely being recognized on claims that are being denied. And that is exactly what happened here.

182. That is, DermTech was recognizing revenue for DMT's administered even in cases where multiple tests were used by the same visit at a single visit. But, when Medicare denied those multiple-test claims (i.e., after DermTech improperly recognized the revenue for those multiple-test claims), those denied claims appeared as two different data points: (1) as an additional denied claim on the Denied Claims Backlog spreadsheet (after it had been denied); (2) and as an accounts receivable on DermTech's balance sheet.

183. The red flags above put Defendants on notice that DermTech's Assay Revenue was not being collected from customers in a timely way and thus warranted prompt attention to see if DermTech's accounting accurately reflected its financial results.

184. Defendants' premature recognition of revenue an inference of supports scienter.

**K. Post Class Period Events**

185. On May 9, 2023, CEO Dobak was replaced.

186. On June 28, 2023, the Company announced that Chief Commercial Officer Wood would be separating from the Company as of July 3, 2023. As part of his separation agreement with the Company, Wood represented that, as of the time of his July 10, 2023 separation agreement, that he had "not filed any complaints, claims, charges, actions, grievances or arbitrations against the Company[] or otherwise contacted any U.S. federal, state or local governmental agency or commission that has applicable jurisdiction to regulate the Company (each a 'Government Agency') regarding the Company."

187. On January 29, 2024, the Company announced in a Form 8-K that COO Ibarra and the Company "mutually agreed" that Ibarra's last day of employment would be February 2, 2024. As part of Ibarra's separation agreement with the Company she represented that, as of her February 5, 2024 separation agreement that she had "not filed any complaints, claims, charges, actions, grievances or arbitrations against the Company[] or otherwise contacted any U.S. federal, state or local governmental agency or commission that has applicable jurisdiction to regulate the Company (each a 'Government Agency') regarding the Company."

188. On January 31, 2024, the Company issued a press release announcing an additional restructuring action and reduction in force. In that press release, the Company's new CEO, Bret Christiansen, reiterated that "Growing revenue remains our primary objective."

189. In mid-February 2024, the Company received notice from the College of American Pathologists ("CAP") that its accreditation would not be renewed on its renewal date, and thus the Company would lose its CAP accreditation as of April 6, 2024.

190. On June 18, 2024, DermTech filed for bankruptcy.[30]

## V. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS AND/OR OMISSIONS DURING THE CLASS PERIOD

### A. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Fourth Quarter and FY 2020 Results

191. The Class Period begins on March 8, 2021, the first trading day after DermTech filed its annual report on Form 10-K with the SEC during after-market hours, reporting the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K").

[30] Case No. 24-11378 (District of Delaware Bankruptcy Court).

192. With respect to DermTech's Revenue Recognition, the 2020 10-K stated, in relevant part:

> *Transaction Price*
>
> The transaction price is the amount of consideration that the Company expects to collect in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties (for example, some sales taxes). The consideration expected from an agreement with a customer may include fixed amounts, variable amounts, or both.
>
> The consideration derived from the Company's agreements is deemed to be variable, though the variability is not explicitly stated in any agreement. Rather, the implied variability is due to several factors, such as the amount of contractual adjustments, any patient co-payments, deductibles or patient compliance incentives, the existence of secondary payors and claim denials.
>
> The Company estimates the amount of variable consideration using the expected value method, which represents the sum of probability-weighted amounts in a range of possible consideration amounts. When estimating the amount of variable consideration, the Company considers several factors, such as historical collections experience, patient insurance eligibility and payor reimbursement agreements.
>
> The Company ***limits the amount of variable consideration included in the transaction price to the unconstrained portion of such consideration***. In other words, the Company ***recognizes revenue up to the amount of variable consideration that is not subject to a significant reversal*** until additional information is obtained or the uncertainty associated with the additional payments or refunds is subsequently resolved. Differences between original estimates and subsequent revisions, including final settlements, represent changes in the estimate of variable consideration and ***are included in the period in which such revisions are made***. Revenue

> recognized from changes in transaction prices was not material for the years ended December 31, 2020 and 2019, respectively.
>
> The Company monitors its estimates of transaction price to depict conditions that exist at each reporting date. If the Company subsequently determines that it will collect more consideration than it originally estimated for an agreement with a patient, it will account for the change as an increase in the estimate of the transaction price (i.e., an upward revenue adjustment) in the period identified. Similarly, if the Company subsequently determines that the amount it expects to collect from a patient is less than it originally estimated, it will generally account for the change as a decrease in the estimate of the transaction price (i.e., a downward revenue adjustment), ***provided that such downward adjustment does not result in a significant reversal of cumulative revenue recognized.***
>
> When the Company does not have significant historical experience or that experience has limited predictive value, the constraint over estimates of variable consideration may result in no revenue being recognized upon delivery of a patient's test result to the ordering physician, with recognition, generally occurring at the date of cash receipt.

193. The emphasized statements in ¶192 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: (1) the Company omitted that one factor that drives the transaction price within its Assay Revenue is how many tests per-patient-per-visit are given by the medical provider and that multiple testing sites per patient per visit were often not reimbursed; (2) Defendants falsely represented that DermTech recognized revenue only up to the amount "that is not subject to a significant reversal" even though later periods' revenues were reversed as the Company would later admit; and (3) Defendants falsely represented that any changes in the estimate of variable consideration were included "in the period in which such revisions are made" and that any discovery of collections

which are below estimates would not result in "a significant reversal of cumulative revenue recognized", yet Dobak would later admit during the March 14, 2023 Oppenheimer Healthcare Conference that DermTech took revenue reversals for $1.5 million of revenue "from samples that were processed 12 to 18 months before

194. With respect to the Company's LCD coverage, the 2020 10-K stated:

> In March 2019, MolDX, which performs technology assessments for genomic tests, issued a favorable Draft LCD for the PLA. In late October 2019, the AMA provided us with the PLA Code. Pricing of $760 for the PLA Code was released on December 24, 2019 as part of the CLFS for 2020. The Final LCD, first made available on December 26, 2019, ***expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service,*** and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA. Our PLA became eligible for Medicare reimbursement on February 10, 2020. Our local Medicare Administrative Contractor, Noridian, relies upon MolDX for technology assessments of genomic-based tests and has adopted the Final LCD issued by MolDX. Noridian has issued its own LCD announcing coverage of our PLA. Even though the effective date of Noridian's LCD is June 7, 2020, Noridian began reimbursing us for our PLA as of February 10, 2020.

195. The emphasized statements in ¶194 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: as discussed in ¶¶67 - 92 above, DermTech's Medicare LCDs had consistently recommended coverage for more than one test per encounter in just 10% of cases, and only recommended more than two tests in "rare cases" and that such "rare cases" where more than two tests were administered required an appeal, and, as a result, DermTech was overstating its potential to increase its ASP through the LCD coverage determinations in place at the time of the above statement.

**B. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's First Quarter 2021 Results.**

196. On May 13, 2021, DermTech issued a press release announcing its first quarter 2021 financial results (the "Q1 2021 Press Release"). The same day, the Company filed its Form 10-Q for the period ending March 31, 2021 which represented that the Pigmented Lesion Assay was granted an LCD which expanded coverage to two tests per date of service, stating in relevant part:

> The Pigmented Lesion Assay, which we refer to as PLA, became eligible for Medicare reimbursement on February 10, 2020. In late October 2019, the American Medical Association, or AMA, provided us with a Proprietary Laboratory Analyses Code, or PLA Code. Pricing of $760 for the PLA Code was published on December 24, 2019 as part of the Centers for Medicare and Medicaid Services Laboratory Fee Schedule, or CLFS, for 2020. The Medicare Final Coverage Decision, or Final LCD, ***expanded the coverage proposal in the Draft LCD from one to two tests per date of service*** and it allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

197. The emphasized statements in ¶196 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: as discussed in ¶¶67-92 above, DermTech's Medicare LCDs had consistently recommended coverage for more than one test per encounter in just 10% of cases, and only recommended more than two tests in "rare cases" and that such "rare cases" where more than two tests were administered required an appeal, and, as a result, DermTech was overstating its potential to increase its ASP through the LCD coverage determinations in place at the time of the above statement.

**C. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Second Quarter 2021 results**

198. On August 4, 2021, DermTech issued a press release announcing its second quarter 2021 financial results (the Q2 2021 Press Release"). The same day, the Company held an earnings call ("the Q2 2021 earnings call"). During the

Company's Q2 2021 earnings call, Sun represented that "we continue to focus on the ***main drivers of ASP growth, which are sales mix, broader payer coverage, success with appeals and generation of additional data.*** " And on the Same earnings call, Dobak stated that "[t]he main variables we look to grow our ASP are increasing the Medicare and covered billable sample proportion two increasing our appeal success; and three, attaining additional payer coverage from third-party payers."

199. **Sun's statements** in ¶198 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because the Company did not disclose that, the number of test sites per patient per visit was a key determinant of DermTech's ASP, and thus its revenue, as was whether the collecting technician obtained enough genetic material for DermTech to run the test in its labs. And **Dobak's statements** in ¶198 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because increasing the proportion of Medicare patients would not, by itself, increase DermTech's ASP because DermTech's ASP could be reduced by a high proportion of Medicare patients who happened to have multiple tests per clinical encounter. Thus, by choosing to speak on this topic, Dobak was required to speak truthfully, yet he did not.

200. On August 4, 2021, the Company also issued its Form 10-Q for the period ending June 20, 2021 (the "2Q 2021 10-Q"), which stated:

> The Pigmented Lesion Assay, which we refer to as PLA, became eligible for Medicare reimbursement on February 10, 2020. In late October 2019, the American Medical Association, or AMA, provided us with a Proprietary Laboratory Analyses Code, or PLA Code. Pricing of $760 for the PLA Code was published on December 24, 2019 as part of the Centers for Medicare and Medicaid Services Laboratory Fee Schedule, or CLFS, for 2020. The Medicare Final Coverage Decision, or Final LCD, ***expanded the coverage proposal in the Draft LCD from one to two tests*** per date of service and it allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

201. The emphasized statements in ¶200 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: (1) as discussed in ¶¶67-92 above, commercial payers and/or DermTech's LCDs had consistently denied coverage for more than one test per encounter or limited reimbursable tests to one patient per clinical encounter in most cases and, as a result, DermTech was overstating its ASP based on its estimates for future collection; (2) the Company did not disclose that, the number of test sites per patient was a key determinant of DermTech's ASP, and thus its revenue.

### D. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Third Quarter 2021 results

202. On November 9, 2021 the Company issued its Form 10-Q for the period ending September 30, 2021 ("the 3Q 2021 10-Q"), which stated:

> The Pigmented Lesion Assay, which we refer to as PLA, became eligible for Medicare reimbursement on February 10, 2020. In late October 2019, the American Medical Association, or AMA, provided us with a Proprietary Laboratory Analyses Code, or PLA Code. Pricing of $760 for the PLA Code was published on December 24, 2019 as part of the Centers for Medicare and Medicaid Services Laboratory Fee Schedule, or CLFS, for 2020. The Medicare Final Coverage Decision, or Final LCD, ***expanded the coverage proposal in the Draft LCD from one to two tests*** per date of service and it allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

203. The emphasized statements in ¶202 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: (1) as discussed in ¶¶67-92 above, commercial payers and/or DermTech's LCDs had consistently denied coverage for more than one test per encounter or limited reimbursable tests to one patient per clinical encounter in most cases and, as a result, DermTech was overstating its ASP based on its estimates for future collection; (2) the

Company did not disclose that, the number of test sites per patient was a key determinant of DermTech's ASP, and thus its revenue.

### E. Defendants' False and/or Misleading Statements and/or Omissions Related to DermTech's Fourth Quarter and Full Year 2021 Results

204. On March 1, 2022, DermTech issued a press release announcing its fourth quarter and full year 2021 financial results (the "Q4 2021 Press Release"), which stated, in relevant part:

> Fourth Quarter and Full Year 2021 Highlights
>
> - Billable sample volume of approximately 11,780 for the fourth quarter of 2021, a 42% increase compared to approximately 8,300 recorded for the fourth quarter of 2020. Billable sample volume for the full year 2021 of approximately 44,620, an 86% increase compared to 2020.
>
> - Assay revenue of $3.0 million for the fourth quarter of 2021, a 90% increase compared to the fourth quarter of 2020. Assay revenue for the full year of 2021 of $11.0 million, a 160% increase compared to 2020.
>
> - Total revenue of $3.2 million for the fourth quarter of 2021, a 49% increase compared to the fourth quarter of 2020. Total revenue for the full year of 2021 of $11.8 million, a 101% increase compared to 2020.

205. The Company also affirmed its full-year 2022 outlook for assay revenue of between $22 million and $26 million.

206. The statements in ¶¶204-205 above about the Company's guidance were misleading and/or failed to state material facts and/or lacked a reasonable basis because the Company's guidance created a material undisclosed risk that it would be unable to obtain such guidance because the assay revenue guidance of $22 to $26 million included $1.5 million of revenue that was subject to later reversal, contrary to the Company's accounting policy and was also based in part on revenue that was being over-accrued (i.e., prematurely recognized) in violation of GAAP.

207. The same day, the Company also hosted the Q4 2021 Earnings Call with analysts and investors. During the Q4 2021 Earnings Call, Defendants stated, inter alia:

> JOHN D. DOBAK: The main variables we look at to grow our ASP are increasing the Medicare and covered billable sample proportion; two, increasing our appeal success; and three, attaining additional payer coverage from third party payers.
>
> * * *
>
> KEVIN SUN: Yes. As we mentioned on the call, ***so increasing our ASP, we've got 3 main variables***; increasing the Medicare and covered billable sample proportion. So being that Medicare was 23% in Q4, we've got opportunity to improve our ASP by getting more Medicare patients as we raised the awareness in that population. And then also the covered contracts we have in California, Texas, Illinois, and others. We also plan to increase our appeal success, and then additional coverage.
>
> So we model moderate growth over the year, because we can't predict when a payer will come on-board. But as we can pull these levers with proportion and appeal success that we can drive activity in, we model some steady growth throughout the year. And then that's how we say that the revenue guide is essentially at least doubling from 2021 with the upside based on our top-end of the range of our guidance.

208. The statements in ¶207 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because Defendants failed to disclose that a material omitted variable — the number of test sites administered per patient per visit — materially altered the Company's ASP because commercial payers would often deny coverage for instances where a patient had more than one test site per visit submitted for reimbursement, under then existing LCD guidelines, as Defendants would later reveal. Therefore, by choosing to speak on the topic, Defendants triggered a duty to not omit facts that render the statement misleading. Here, when Sun discussed how the proportion of Medicare patients impacted

DermTech's ASP, Sun was required to also disclose that ASP could be reduced by instances where patients had multiple sites tested at the same clinical encounter because the Final LCD did not cover more than one test per clinical encounter in most cases. That omission renders Sun's ASP statement misleading.

209. On March 10, 2022, DermTech filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2021 (the "2021 10-K").

210. The 2021 10-K represented the following with respect to how it recognizes revenue for its Assay Revenue:

> *Transaction Price*
>
> The transaction price is the amount of consideration that the Company expects to collect in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties (for example, some sales taxes). The consideration expected from an agreement with a customer may include fixed amounts, variable amounts, or both.
>
> The consideration derived from the Company's agreements is deemed to be variable, though the variability is not explicitly stated in any agreement. Rather, the implied variability is due to several factors, such as the amount of contractual adjustments, any patient co-payments, deductibles or patient compliance incentives, the existence of secondary payors and claim denials.
>
> The Company estimates the amount of variable consideration using the expected value method, which represents the sum of probability-weighted amounts in a range of possible consideration amounts. When estimating the amount of variable consideration, the Company considers several factors, such as historical collections experience, patient insurance eligibility and payor reimbursement agreements.
>
> ***The Company limits the amount of variable consideration included in the transaction price to the***

> ***unconstrained portion of such consideration***. In other words, the Company ***recognizes revenue up to the amount of variable consideration that is not subject to a significant reversal*** until additional information is obtained or the uncertainty associated with the additional payments or refunds is subsequently resolved. Differences between original estimates and subsequent revisions, including final settlements, represent changes in the estimate of variable consideration and ***are included in the period in which such revisions are made***. Revenue recognized from changes in transaction prices was not material for the years ended December 31, 2021, 2020, and 2019, respectively.
>
> The Company monitors its estimates of transaction price to depict conditions that exist at each reporting date. If the Company subsequently determines that it will collect more consideration than it originally estimated for an agreement with a patient, it will account for the change as an increase in the estimate of the transaction price (i.e., an upward revenue adjustment) in the period identified. Similarly, if the Company subsequently determines that the amount it expects to collect from a patient is less than it originally estimated, it will generally account for the change as a decrease in the estimate of the transaction price (i.e., a downward revenue adjustment), ***provided that such downward adjustment does not result in a significant reversal of cumulative revenue recognized***.
>
> When the Company does not have significant historical experience or that experience has limited predictive value, the constraint over estimates of variable consideration may result in no revenue being recognized upon delivery of a patient's test result to the ordering physician, with recognition, generally occurring at the date of cash receipt.

211. The emphasized statements in ¶¶209-210 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: (1) the Company omitted that one factor that drives the transaction price is

how many tests per patient are incurred as multiple testing sites were often not reimbursed; (2) the Company falsely represented that it recognized revenue only up to the amount "that is not subject to a significant reversal" even though later periods' revenues were reversed as the Company would later admit; (3) the Company falsely represented that any changes in the estimate of variable consideration were included "in the period in which such revisions are made", yet Dobak would later admit that it took reversals for $1.5 million in revenue "from samples that were processed 12 to 18 months before"; and (4) the Company falsely represented that revenue recognized from changes in the transaction prices was not material for the years ending 2019 through 2021, as would later be revealed by the deletion of that representation in the Company's 2022 10-K.

212. The Company also reported revenue of $11.0 million of assay revenue. This figure was false because $200,000 of such revenue was improperly included but should not have been because it was recorded in excess of an amount that was subject to a reversal, as the Company would later admit in its 2022 10-K.[31]

213. The 2021 10-K further represented that:

> **Secure broad reimbursement coverage for our assays**. We have targeted regional and national commercial payors to secure favorable coverage decisions for the reimbursement of our tests. The DMT has completed the necessary analytical validity, clinical validity, and clinical utility studies that payors require molecular tests to undertake. As discussed above, we also published a United States health economic impact study of the DMT (without the add-on test for TERT) in JAMA Dermatology, which shows that the DMT significantly reduces the relative cost to assess a pigmented lesion. The cost to fully adjudicate a pigmented lesion suspicious for melanoma is $947

[31] Admitting that "The Company periodically updates its estimate of the variable consideration recognized for previously delivered performance obligations. These updates resulted in a decrease of $1.8 million of revenue reported for the year ended December 31, 2022, and ***an additional $0.2 million of revenue reported for the year ended December 31, 2021***."

in the United States. We believe the DMT could lead to cost savings of greater than $650 million per year in aggregate savings, based on approximately 4 million surgical biopsies performed per year to rule out melanoma, and assuming the DMT was to become the standard of care in the United States.

As discussed above, in March 2019, MolDX, which performs technology assessments for genomic tests, issued a favorable Draft LCD for the DMT (without the add-on test for TERT). Each reference to the DMT in this paragraph refers only to the DMT without the add-on test for TERT. In late October 2019, the AMA provided us with the PLA Code. Pricing of $760 for the PLA Code was released on December 24, 2019 as part of the CLFS for 2020. ***The Final LCD, first made available on December 26, 2019***, ***expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service for a certain percentage of patients***, and allowed clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by the DMT. The DMT became eligible for Medicare reimbursement on February 10, 2020. Our local Medicare Administrative Contractor, Noridian, relies upon MolDX for technology assessments of genomic-based tests and has adopted the Final LCD issued by MolDX. Noridian has issued its own LCD announcing coverage of the DMT. Even though the effective date of Noridian's LCD is June 7, 2020, Noridian began reimbursing us for the DMT as of February 10, 2020. No LCD covers the optional add-on test for TERT available to those ordering the DMT.

214. The emphasized statements in ¶213 were false and/or misleading because (1) DermTech's commercial payers and/or DermTech's LCDs had consistently denied coverage for more than one test per encounter or limited reimbursable tests to one patient per clinical encounter in most cases; (2) the emphasized statements failed to state material facts because the above representation did not disclose that the reimbursement restrictions imposed by DermTech's LCDs could (and indeed did) materially impact DermTech's ASP; and (3) the "certain number of patients" is misleading because it does not disclose that the "certain

percentage" is just 10% and/or in "rare cases", meaning most instances the Final LCD only covers one test per patient per clinical encounter.

215. Appended as an exhibit to the 2021 10-K were 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "[t]he [2020 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "[t]he information contained in the [2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

216. The statements in ¶215 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because Defendants were not recognizing revenue in accordance with GAAP.

### F. Defendants' False and/or Misleading Statements and/or Omissions Relating to DermTech's First Quarter 2022 Results

217. On May 3, 2022, DermTech announced its first quarter 2022 financial results in a press release that stated, in relevant part:

> First-Quarter 2022 Financial Results
>
> - Billable sample volume grew 53 percent from the first quarter of 2021 to approximately 14,370.
> - Assay revenue was $3.5 million, up 61 percent from the first quarter of 2021, primarily due to higher billable sample volume.
> - Total revenue was $3.7 million, a 47 percent increase from the first quarter of 2021, driven by higher assay revenue.
>
> * * *
>
> 2022 Outlook
>
> The Company affirmed its full-year 2022 outlook for assay revenue between $22 million and $26 million.

218. The statements in ¶217 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because: (1) the Company's actual first quarter revenue was not $3.7 million as reported because the Company would later admit that DermTech's 2022 revenue included $1.8 million of "net

downward prior period adjustments"; (2) the Company's 2022 assay revenue guidance of between $22 and $26 million was misleading and/or failed to state material facts and/or lacked a reasonable basis it included amounts that were subject to reversal, contrary to the Company's stated revenue recognition policy as set forth in the Company' s 2021 10-K; and (3) was misleading in light of the Company's repeated statements that more than one test per patient per visit was covered because if the truth (that only 10% second tests per visit are covered) had been disclosed, investors would have been given reason to know that the Company's revenue guidance was unachievable.

219. On May 4, 2022, the Company also filed its Form 10-Q for the period ending March 31, 2022 ("the Q1 2022 10-Q"). The Q1 2022 10-Q represented that "As of March 31, 2022, there have been no material changes in the Company's significant accounting policies from those that were disclosed in the Company's Annual Report on Form 10-K for the year ended December 31, 2021," thereby incorporating the Company's description of how it accounted for revenue recognition for its Assay Revenue.

220. The Q1 2022 10-Q stated the following with respect to the Company's LCD:

> The DMT (without the add-on test for TERT) became eligible for Medicare reimbursement on February 10, 2020. Each reference to the DMT in this paragraph refers only to the DMT without the add-on test for TERT. In late October 2019, the American Medical Association provided us with a PLA Code. Pricing of $760 for the PLA Code was published on December 24, 2019 as part of the Clinical Laboratory Fee Schedule for 2020. ***The final Local Coverage Determination, or LCD, expanded the coverage proposal in the draft LCD from one to two tests per date of service*** and it allows clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied. Our local Medicare Administrative Contractor, Noridian has issued its own Local Coverage Decision, or Noridian's LCD, announcing

> coverage of the DMT. Even though the effective date of Noridian's LCD was June 7, 2020, Noridian began reimbursing us for the DMT as of February 10, 2020. With Medicare coverage granted, we have the opportunity to approach commercial payors, and as a result, we believe that the DMT may generate significant revenues in 2022 and 2023. No LCD currently covers the optional add-on test for TERT available to those ordering the DMT.

221. The emphasized statements in ¶220 above were false and/or misleading and/or failed to state material facts and/or lacked a reasonable basis because DermTech's Medicare LCDs had consistently recommended coverage for more than one test per encounter in just 10% of cases, and only recommended more than two tests in "rare cases" and that such "rare cases" where more than two tests were administered required an appeal, and, as a result, DermTech was overstating its potential to increase its ASP through the LCD coverage determinations in place at the time of the above statement.

## VI. LOSS CAUSATION

222. Plaintiffs incorporate by reference the allegations set forth above, particularly those in §IV.G. The truth of Defendants' misrepresentations was revealed over a series of partial corrective disclosures and/or materializations of the risk.

223. On August 8, 2022, after the close of trading, the Company announced financial results for the Second Quarter 2022 (Q2 2022). Therein, the Company partially disclosed that it faced ongoing issues getting reimbursed where patients had multiple body sites tested on the same day; and that ASP was also materially impacted by how many sites per patient are tested, which partially revealed that the Company's ASP was not just driven by three variables, and that Defendants' prior statements about the purported expansion of coverage from one site to two sites was misleading.

224. On this news, DermTech's stock price fell $2.87 per share or 41.6% per share, to close at $5.56 per share on August 9, 2022, on unusually heavy trading volume, thereby damaging investors.

225. On November 3, 2022, after the close of trading, the Company announced financial results for the Third Quarter 2022 (Q3 2022). Therein, the Company disclosed that it had changed collection estimates for tests run in prior periods due to reduced commercial payers, which partially revealed that prior periods' revenue and guidance were false and/or misleading and/or lacked a reasonable basis. The Company also reduced its revenue guidance for full year 2022, to $13 million, which implied fourth quarter 2022 revenue guidance of just $1.9 million in assay revenue, or almost a 50% decrease from the already reduced third-quarter assay revenue, thus partially revealing that prior guidance lacked a reasonable basis for including such improperly recorded revenue.

226. On this news, the Company's stock price fell $1.34, or 44.6%, to close at $1.66 per share on November 4, 2022, on unusually heavy trading volume.

227. On March 14, 2023, the Company participated in the Oppenheimer healthcare conference. During the March 14, 2023 conference, Dobak admitted that the Company had "to take about $1.5 million of write-off from revenue from samples that were processed 12 to 18 months before."

228. On this news, DermTech's stock price fell $0.11 per share or 3.02%, to close at $3.59 per share on March 14, 2023, thereby damaging investors.

229. On May 4, 2023, after the close of trading, the Company reported Q1 2023 results. Therein, DermTech announced that, despite a 24% increase in sample volumes, test revenues dropped 3%, largely due to a downward revenue adjustment due to changes in collection estimates from prior periods. The Company also announced that Dobak would be departing the Company.

230. On the same day, the Company hosted an earnings call with investors (the "Q1 2023 Earnings Call"). On the earnings call, Sun admitted that that "ASP remains difficult to forecast" and the Company would not be "providing revenue guidance until we have better visibility on these factors."

231. On this news, DermTech's stock price fell $0.84 per share or 31.0% to close at $2.31 per share on May 5, 2023, on unusually heavy trading volume, thereby damaging investors.

232. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

233. During the Class Period, Plaintiff and the Class purchased DermTech's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

234. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DermTech, their control over, and/or receipt and/or modification of DermTech's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DermTech, participated in the fraudulent scheme alleged herein.

### A. Defendants' Motive To Prop Up DermTech's Share Price For Pecuniary Gain

#### 1. Insider Selling Supports Scienter

235. ***Dobak***. Forms filed with the SEC show that Defendant Dobak executed the direct sale of 120,366 shares on the open market, and received in exchange

$5,592,843 in proceeds from these open market sales throughout the Class Period. This $5.5 million in proceeds reaped by Dobak, from sales at artificially-inflated prices, represents multiples of 9.36x, 9.64x, and 11.6x Dobak's salary in 2022, 20221, and 2020, respectively.[32] A summary of Dobak's trading history is attached hereto as Plaintiffs' Exhibit 1.

236. Dobak's Class Period sales were both out of line with his pre-Class Period selling and sold at times designed to maximize personal benefit.

237. As alleged above, the Class Period here begins March 8, 2021. During the calendar year before the Class Period (i.e., during all of 2020), Dobak sold just 3,256 shares for total proceeds of $36,054 at a weighted-average price of $11.07.

238. As of the first day of the Class Period, Dobak held 543,071 shares of DermTech stock.

239. Thus, Dobak's Class Period sales of 120,366 shares represents 22.1% of the shares that he held as of the first day of the Class Period.[33]

240. The first alleged false statement in the Class Period was made March 8, 2021, which is the first trading day after DermTech filed its 2020 10-K, wherein Defendants falsely stated that the Final LCD expanded the coverage from one test per date of service to two tests per date of service. Shortly thereafter, in the month of April 2021, Dobak sold 50,000 DermTech shares for approximately $2.44 million at a weighted-average price of $48.85.

---

[32] According to the Company's Proxy Statement filed with the SEC on April 11, 2023, Dobak earned a base salary of $597,400 in 2022, $580,000 in 2021, and $480,000 in 2020.

[33] Because Dobak was awarded equity compensation during the course of the Class Period, the percentage of shares that he sold during the Class Period will vary. For instance, Dobak was awarded: 29,195 shares on March 29, 2021; 209,527 on March 25, 2022, and another 56,407 shares on March 9, 2023, which is why his ownership interest in the Company increased.

241. Dobak's Class Period sales included, among others, 25,000 shares at an average price of $46.34 per share, for total proceeds of $1.158 million on April 12, 2021; 25,000 shares sold at $51.35 per share on April 27, 2021, for $1.28 million in proceeds; and 25,000 shares sold on May 3, 2021, at prices ranging from $40.51 per share to $42.45 per share.[34] On a weighted average basis, Dobak's sales of 153,030 shares for total proceeds of $5.592 million in proceeds equals $36.55 per DermTech share, which is 15.8x the $2.31 per share price on the last day of the Class Period.

242. Dobak's ownership in DermTech increased during the Class Period only because he was awarded significant amounts of stock as equity compensation. Dobak was awarded: 29,195 shares on March 29, 2021; 209,527 shares on March 25, 2022; and another 56,407 shares on March 9, 2023. Such an increase in ownership, when received as an award, does not cut against an inference of scienter because the Defendant paid nothing for such shares.

### 2. Defendants Were Motived to Prop Up the Company's Stock During the ATM Offering

243. As discussed in ¶¶112-117 above, throughout the course of 2021, the Company issued an aggregate of 530,551 shares of common stock pursuant to its ATM offerings at a weighted average price of $46.33 per share, resulting in net proceeds to the Company of approximately $23.8 million.

244. These material proceeds were necessary for the Company's continued viability because the Company has never generated positive cash flow from operations and was thus entirely dependent upon raising capital from outside investors and/or lenders.

## B. Defendants' Subtle Changes to the LCD Coverage Language in DermTech's Filings Establishes Defendants' Knowledge of Facts Contradicting Their Public Statements

[34] The weighted average sales price for Dobak's May 3, 2021 sales equals $40.95 per share ($1,023,905.90 in proceeds divided by 25,000 shares).

245. In DermTech's 2020 10-K, which was signed by both Dobak and Sun, Defendants described their LCD coverage, in pertinent part, as follows:

> The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA.

246. The following year, DermTech's 2021 10-K, which was also signed by both Dobak and Sun, revised the LCD coverage description to read, in pertinent part:

> The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service **for a certain percentage of patients**, and allowed clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by the DMT.

247. The bolded text appearing in red font immediately above, which differs from DermTech's prior 10-K, establishes that Defendants were aware that the true coverage was not an unqualified expansion from one to two tests. By signing the 10-Ks Defendants are charged with the knowledge of its contents. And the subtle change adding the "for a certain percentage of patients" qualifier establishes Defendants' knowledge that the second test was not covered 100% of the time.

248. Still, with that knowledge, Defendants removed the "for a certain percentage of patients" qualifier in subsequent Form 10-Qs. For instance, in the very next quarterly filing, the Q1 2022 10-Q, Defendants stated the following with respect to the Company's LCD coverage:

> The final Local Coverage Determination, or LCD, expanded the coverage proposal in the draft LCD from one to two tests per date of service and it allows clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied.

249. As shown in the Q1 2022 10-Q excerpt above, Defendants sought to purposefully conceal from investors that the second DMT test was covered only 10% of the time. And while the change from the 2020 10-K to the 2021 10-K establishes Defendants' awareness of that fact, the subtle change from the 2021 10-K to the 2022 10-Q—removing the "certain percentage of patients" qualifier—reflects ***conscious behavior***. These language changes were not accidental, but a conscious step to deceive.

250. Moreover, the later statement, the Q1 2022 10-Q, contradicts the earlier statement, the 2021 10-K, which further supports scienter.

251. At a minimum, it would be deliberately reckless for Dobak and Sun to authorize the language changes without knowing what "certain percentage" of patients actually qualified for the second DMT test under the LCD.

252. All these subtle changes — none of which disclosed that the Final LCD actually denied coverage 90% of the time for the second test — support an inference of Defendants' scienter.

253. DermTech's Q2 2022 10-Q also removed the "certain percentage of patients" qualifier.

### C. Defendants' Had Access to Information that Contradicted Their Public Statements Which Supports Scienter

254. Defendants also had access to information which contradicted their public statements, specifically the Final LCD coverage determinations.

255. **Dobak**. As a Doctor, Dobak was well-versed in the intricacies of Medicare coverage and the CMS approval process. Dr. Dobak would, at a minimum, understand the difference between a Final LCD approval and a Response to Comments. Indeed, on March 14, 2023, at the Oppenheimer Virtual Healthcare Conference, Dobak stated that, "We presented to Medicare."

256. Moreover, during DermTech's Q2 2022 Earnings Call, Dobak tacitly admitted knowledge of the Final LCD's actual coverage:

> So we ***don't really try to bring on the multiple body site issue with other payers unless they bring it up***. It's not something we -- and we don't really have it written into the contracts that we have so far, and ***we've talked about that before***. There's ***always*** this concern from payers about overutilization, and ***that was a concern with Medicare in the early days of the LCD***. And the way they wanted to address it ***was to put a limit on the number of tests that could be collected on the same date of service***.

257. Dobak's statement above establishes his knowledge in two ways. ***First***, Dobak's statement that, since "the early days of the LCD", Medicare "put a limit on the number of tests that could be collected on the same date of service" further supports an inference that Dobak knew exactly what the LCD covered—because the multiple body site limitation had been present "since the early days of Medicare." And ***second***, by admitting that "we don't really try to bring on the multiple body site issue with other payers unless they bring it up", Dobak implies that he knew that the "multiple body site issue" was problematic for DermTech. He is, essentially, admitting to analysts that–in contracts that DermTech has with other commercial payers (i.e., not Medicare)–DermTech tries to avoid the multiple body site issue. That purposeful omission in DermTech's commercial contracts supports an inference that Defendants not only knew that multiple tests per encounter were problematic for reimbursement, but so problematic in fact that they purposefully tried to avoid it (or at least remain silent about it. Either way, Dobak seems to be admitting awareness of the issue.

258. **Sun**. On September 22, 2021, when speaking at the Oppenheimer Fall Healthcare conference, Sun stated that, "when we started and first got our Medicare LCD, we were at about 13% [proportion of Medicare versus commercial payors] and you can't market to Medicare patients until you have that approval." Sun's statement supports an inference that he was knowledgeable about and/or had access to the true Medicare LCD coverage because he was involved in the approval process. Accordingly, he thus knew or was deliberately reckless in not knowing that

DermTech's Final LCD covered more than one test per clinical encounter just 10% of the time.

259. Sun also had access to the Final LCD. Indeed, as he admitted during the Q2 2022 earnings call when he said, "[s]o with Medicare billing ***and the LCD***, there is a limitation of number of body site tests that can be done on the same patient on the same date of service."

260. Additionally, during DermTech's Q2 2022 earnings call, Sun was asked what "the average number of samples per patient today compared to, let's say, last year" was, to which Sun responded, "we haven't disclosed those metrics, but what we can say the trends are is [sic] that there are more tests that are being done on average per patient now ***than there were a year ago*** in this period." Thus, Sun implicitly admitted that he had been tracking the average tests used per patient per encounter by, at the latest, Q2 2021 (otherwise he could not have made a year-over-year comparison a year later).

261. Thus, Sun was aware of both the average number of tests per patient *and* the LCD restrictions on reimbursement per patient per clinical encounter. Moreover, in the same Q2 2022 earnings call, Sun acknowledged the impact on DermTech's revenue that Medicare's rejection of claims (for patients who had multiple sites tested) has, stating, "it just pushes delays for when we can actually collect on those claims and when we can recognize the revenue for those."

262. **Dobak and Sun**. In DermTech's 2021 10-K, under the Assay Revenue recognition heading, Defendants represented that the "Company monitors its estimates of transaction price to depict conductions that exist at the reporting date." One component of transaction price is the variable "consideration derived from the Company's agreements." One such agreement would be the Final LCD. Further, Defendants also represented that when estimating the amount of variable consideration in DermTech's revenue recognition, that the Company considers

"patient insurance eligibility", which would necessarily reflect, at least in part, the final LCD coverage determination.

263. The above examples access to information supports scienter for Defendants' LCD and reclassification of revenue statements.

**D. Dobak's Departure Supports Scienter**

264. Dobak was replaced by an executive from outside the Company just after the end of the Class Period, on May 9, 2023. While framed as a "resignation", the May 9, 2023 press release also stated Dobak's successor, Bret Christianson, was "replacing" Dobak. Whether viewed as a resignation or a termination, Dobak's departure supports scienter.

265. Dobak's departure came after the truth was revealed here and specifically on the heels of the Oppenheimer conference when Dobak admitted that the Company had "to take about $1.5 million of write-off from revenue from samples that were processed 12 to 18 months before."

**E. The Core Operations Doctrine Supports Scienter**

266. Sales of DermTech's DMT comprised roughly 90% to 95% of DermTech's revenue during the Class Period, depending on the particular reporting period. As alleged above, the key driver of revenue was how many DMTs were reimbursed. Thus, the key driver of the vast majority of DermTech's revenue was the number of DMTs reimbursed. Moreover, Defendants' position in the Company provide access to the metrics that drive DermTech's revenue, including the number of tests per patient per clinical encounter that Final LCD covered. Under these circumstances, it would be patently obvious to Defendants what percentage of tests are being reimbursed by Medicare.

**F. Defendants' Repeated Statements About LCD Coverage, Including in Response to Analysts' Questions Further Supports Scienter**

267. Plaintiffs reincorporate by reference their made allegations above.

268. As alleged above, Defendants made repeated false statements to the market about the extent of LCD coverage. E.g., ¶¶93-100.

269. That Defendants repeated such statements, at times in response to analysts' questions (e.g., ¶49) further supports an inference of scienter.

### G. Defendants' Half-truths Regarding Billing Code Edits Support Scienter

270. On August 8, 2022, after the market closed, DermTech announced its second quarter 2022 financial results. At that time, Dobak stated that "we are revising our full-year 2022 outlook [downward] to reflect a lower average selling price (ASP) for our DMT. The ASP pressure is ***primarily the result of Medicare billing code edits***, which are expected to be improved in the coming quarters, as well as less favorable collection patterns from commercial payors."

271. The same day, the Company held an earnings call (the "2Q22 Earnings Call"). During that earnings call, Dobak further stated that supposed billing code "edits" resulted in Medicare "reject[ing] claims where patients have multiple body sites tested on the same day" and that "[s]ome commercial payers have also adopted these edits, further eroding ASP." Dobak's statement was only half-true. The true part is that DermTech's ASP was pressured by Medicare rejecting claims where patients have multiple body sites tested on the same day." The misleading part was Dobak's suggestion that Medicare had recently changed the LCD in a way that had any bearing on how many tests per patient per visit would be reimbursed. In other words, the LCD had consistently limited the reimbursement to one test per patient per visit 90% of the time—pretty much since inception, according to CMS data.

272. Thus, during the Q2 2022 earnings call, the clear inference is that Dobak wanted the market to think that DMT's declining ASP, and thus DermTech's lowered guidance, was "primarily" the result of the purported code edit issue. Dobak sought to blame DermTech's revenue shortfall on a billing code edit—as if it were a mere clerical error. But it was not a clerical "code edit" that caused Medicare to reject the

claims – the LCD ***had consistently*** limited the number of tests per patient per visit that it reimbursed, since the LCD was finalized. *See* §IV.D. above.

273. Additionally, during the Q2 2022 earnings call on August 8, Sun stated:

> So with Medicare billing and the LCD, there is a limitation of number of body site tests that can be done on the same patient on the same date of service. We've seen a trend where that proportion has been increasing. And as that increases, it just pushes delays for when we can actually collect on those claims and when we can recognize the revenue for those.
>
> So the code edit that's being put in, we expect it in the fourth quarter. It changes the code edits to actually match what the LCD approves, and so where we can get paid on 2 tests on a date of service without having to file any appeals or require any additional medical records to get paid.

274. Then Sun was asked a follow up question:

> ALEXANDER DAVID NOWAK: I see. So the current LCD is set up for -- excuse me, the current billing code is set up for one test per date of service today, versus the LCD at 2.

275. And in response, Sun stated:

> The current code edit is set up for 1, but then also if there's 2 or more, the entire claim gets denied. So under the LCD, we should be paid now at least for 2 tests on the same date of service without anything else. And then again we would have to appeal with medical records when it's 3 or more body sites so that we can demonstrate the medical necessity to Medicare.

276. Sun's statements in ¶¶273-275 were only half-true. The <u>true portion</u> of his statement appears in ¶274, namely that the fourth quarter 2022 code edit did "match what the LCD approves" because in October 2022, DermTech's LCD was revised, but the reimbursement did not materially change.[35] *See* ¶¶87, ¶133-134. The

[35] The LCD that was updated in October, 2022, was L38111. L38111, as in effect from October 06, 2022 to October 25, 2023 which stated, "Only one test may be used (footnote continued)

false or misleading portion is Sun's statement that the "current code edit is set up for 1" — because it was *the LCD* that was then setup for 1. Moreover, Sun also falsely stated that "under the LCD, we should be paid now at least for 2 tests on the same date of service without anything else." But, as shown above, DermTech was not entitled to be paid for 2 tests unequivocally nor "without anything else" under the LCD—neither at the time that Sun made his statement, nor after the October 2022 revision. ¶¶67-92, 133-134.

277. Defendants' attempts to recast the true cause of the ASP and revenue declines as a being prompted by purported billing code edit — rather than acknowledge the full truth—that the LCD had consistently limited coverage for multiple tests per patient per clinical encounter—supports scienter.

278. Indeed, as described above (¶¶78-92), DermTech's LCDs have consistently either denied coverage for more than one test per encounter or limited tests to one patient per clinical encounter in most cases, where only 10% of instances may a second site be tested and only in "rare cases" will more than two tests be reimbursed.

### H. Defendants Were Motived to Meet Analysts' Estimates, Which Support Scienter

279. In response to the Company's Q3 2022 results, analysts noted the uncertainty around DermTech's commercial payers. One analyst in particular, William Blair, noted that it would be more constructive on DermTech shares and would consider upgrading them upon DermTech's when there is better "transparency into payer coverage and contracting decisions." This report was issued November 4, 2022, and at that time, DermTech's stock closed at $3.00 per share.

---

per patient per clinical encounter." L38111, currently in effect and last updated on 10/19/2023 continues to state "[o]nly one test may be used per patient per clinical encounter." See also ¶133 at **Figure 8**.

280. A few months later, DermTech announced the January 10, 2023 and January 23, 2023 coverage recommendations for the Hawaii Blues plan and for TRIMARK, respectively. Following those two announcements, DermTech shares rose to $5.39 per share on January 23, 2023.

281. Indeed, announcing new payor contracts was key to satisfying analysts—one Wall Street analyst had previously expressed that DermTech's new payor contracts as "the best leading indicator of revenue growth."[36]

282. Moreover, revenue was the key metric that investors used to value DermTech's stock, with some analyst using a price to sales multiple, rather than a price to earnings multiple. As a result, Defendants were highly motivated to overstate revenue because it had a direct impact on DermTech valuation, and thus share price.[37]

### I. Defendants' Attestations on their SOX Certifications Supports Scienter

283. The Individual Defendants SOX certifications also contribute to a strong inference of scienter. Defendants Dobak and Sun certified the accuracy of each of the Q1 through Q3 2022 10-Qs and Q1 through Q3 2021 10-Qs, in accordance with Section 302 of the Sarbanes-Oxley Act of 2002, including that they were responsible for establishing and maintaining the Company's disclosure controls and procedures and had:

> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

---

[36] *See* Oppenheimer August 4, 2021 report titled, *Commercial Expansion Sets Table for Accelerating Topline in 2022; 2Q21 Beats on Revenue*.

[37] For example, given a hypothetical Price-to-sales multiple of 5.0x, for every $1 of sales per share that the Company overstates, it will have a corresponding $5 increase toward their valuation.

> (b)Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

### J. Corporate Scienter Allegations

284. The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

285. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

286. Aside from the scienter of the Individual Defendants, the facts alleged herein raise a strong inference of corporate scienter as to DermTech as an entity. Corporate scienter may be alleged independent of individual defendants where a statement is made or approved by a corporate official sufficiently knowledgeable about the company to know the statement was false or misleading. Here, the statements alleged were made to the investing public regarding the Company's revenue, revenue growth, new payor wins and their contribution to DermTech's revenue growth, and internal controls—all important topics that would necessarily require approval by appropriate corporate officers.

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

287. The market for DermTech's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, DermTech's securities traded at artificially

inflated prices during the Class Period. On March 22, 2021, the Company's share price closed at a Class Period high of $62.50 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DermTech's securities and market information relating to DermTech, and have been damaged thereby.

288. During the Class Period, the artificial inflation of DermTech's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DermTech's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of DermTech and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

289. At all relevant times, the market for DermTech's securities was an efficient market for the following reasons, among others:

(a) DermTech shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, DermTech filed periodic public reports with the SEC and/or the NASDAQ;

(c) DermTech regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other

similar reporting services; and by directly emailing its financials to investors who requested such alerts on DermTech's website and/or

(d) DermTech was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

290. As a result of the foregoing, the market for DermTech's securities promptly digested current information regarding DermTech from all publicly available sources and reflected such information in DermTech's share price. Under these circumstances, all purchasers of DermTech's securities during the Class Period suffered similar injury through their purchase of DermTech's securities at artificially inflated prices and a presumption of reliance applies.

291. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX. CLASS ACTION ALLEGATIONS

292. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired DermTech securities between March 8, 2021 and May 4, 2023, inclusive, and who were damaged thereby (the "Class").

Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

293. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, DermTech's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of DermTech shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by DermTech or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

294. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

295. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

296. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DermTech; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

297. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. UNDISCLOSED ADVERSE FACTS

298. The market for DermTech's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, DermTech's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired DermTech's securities relying upon the integrity of the market price of the Company's securities and market information relating to DermTech, and have been damaged thereby.

299. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of DermTech's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about DermTech's business, operations, and prospects as alleged herein.

300. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DermTech's

financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## XI. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND/OR BESPEAKS CAUTION DOCTRINE

301. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

302. The statements and omissions alleged to be false and misleading herein relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and/or there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DermTech who knew that the statement was false when made, and/or the statement lacked a reasonable basis.

## XII. CLAIMS FOR RELIEF

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder**

**Against All Defendants**

303. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

304. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase DermTech's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

305. Defendants (i) employed devices, schemes, and artifices to defraud; and/or (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and/or (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DermTech's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Any one of which is sufficient for Plaintiff to state a claim, and Plaintiff expressly alleges violations under all three sections of Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

306. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material

information about DermTech's financial well-being and prospects, as specified herein.

307. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DermTech's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DermTech and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

308. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

309. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DermTech's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

310. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DermTech's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired DermTech's securities during the Class Period at artificially high prices and were damaged thereby.

311. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DermTech was experiencing, which were not

disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their DermTech securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

312. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

313. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act

### Against the Individual Defendants

314. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

315. Individual Defendants acted as controlling persons of DermTech within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

316. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

317. As set forth above, DermTech and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XIV. JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: January 16, 2025

**GLANCY PRONGAY & MURRAY LLP**

By: *_/s/ Raymond D. Sulentic_*
Raymond D. Sulentic
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150
Email: rsulentic@glancylaw.com

Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email: kwolke@glancylaw.com

*Lead Counsel for Plaintiffs*

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
1999 Avenue of the Stars, Suite 1100
Los Angeles, CA 90067
Telephone: (310) 914-5007

*Additional Counsel for Plaintiffs*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On January 16, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on January 16, 2025.

*/s/ Raymond D. Sulentic*
Raymond D. Sulentic

# EXHIBIT 1

| Transaction Date | Type of Security | Number of Shares Sold | Share Price (or Weighted-Average Sale Price) | Total Proceeds | Securities Beneficially Owned Following Transaction* |
|---|---|---|---|---|---|
| 12/31/2019 | Common Stock | 59,558 | $12.40 | $738,519 | 439,280 |
| 9/10/2020 | Common Stock | 1,560 | $10.57 | $16,497 | 543,379 |
| 9/10/2020 | Common Stock | 910 | $11.25 | $10,238 | 542,469 |
| 12/8/2020 | Common Stock | 786 | $11.86 | $9,322 | 541,683 |
| --- Class Period Begins March 8, 2021 --- | | | | | |
| 3/8/2021 | Common Stock | 780 | $50.04 | $39,031 | 543,071 |
| 3/18/2021 | Common Stock | 7,150 | $53.35 | $381,453 | 535,921 |
| 4/12/2021 | Common Stock | 14,343 | $45.94 | $658,849 | 550,773 |
| 4/12/2021 | Common Stock | 9,736 | $46.79 | $455,534 | 541,037 |
| 4/12/2021 | Common Stock | 921 | $47.90 | $44,118 | 540,116 |
| 4/27/2021 | Common Stock | 25,000 | $51.35 | $1,283,750 | 515,116 |
| 5/3/2021 | Common Stock | 16,021 | $40.51 | $649,060 | 499,095 |
| 5/3/2021 | Common Stock | 6,808 | $41.53 | $282,708 | 492,287 |
| 5/3/2021 | Common Stock | 2,171 | $42.45 | $92,162 | 490,116 |
| 6/1/2021 | Common Stock | 2,970 | $40.22 | $119,453 | 487,146 |
| 6/2/2021 | Common Stock | 9,530 | $40.00 | $381,200 | 477,616 |
| 6/8/2021 | Common Stock | 1,118 | $43.43 | $48,555 | 476,498 |
| 6/11/2021 | Common Stock | 7,651 | $41.08 | $314,322 | 468,847 |
| 7/1/2021 | Common Stock | 9,200 | $40.91 | $376,386 | 459,647 |
| 7/1/2021 | Common Stock | 3,300 | $41.53 | $137,062 | 456,347 |
| 9/8/2021 | Common Stock | 1,162 | $36.19 | $42,053 | 455,544 |
| 9/13/2021 | Common Stock | 1,899 | $36.19 | $68,725 | 453,645 |
| 12/8/2021 | Common Stock | 1,119 | $18.46 | $20,657 | 452,526 |
| 12/13/2021 | Common Stock | 1,964 | $16.71 | $32,818 | 450,562 |
| 3/7/2022 | Common Stock | 2,561 | $13.03 | $33,370 | 419,466 |
| 3/8/2022 | Common Stock | 786 | $12.64 | $9,935 | 418,680 |
| 3/11/2022 | Common Stock | 1,326 | $14.55 | $19,293 | 417,354 |
| 3/7/2023 | Common Stock | 709 | $4.06 | $2,879 | 637,896 |
| 3/7/2023 | Common Stock | 23,246 | $4.06 | $94,379 | 614,650 |
| 3/13/2023 | Common Stock | 1,559 | $3.26 | $5,082 | 669,498 |
| --- Class Period Ends May 3, 2023 --- | | | | | |
| 5/27/2022 | Common Stock | 9,219 | $1.08 | $9,957 | 665,295 |
| 3/7/2023 | Common Stock | 709 | $4.06 | $2,879 | 667,091 |
| 3/7/2023 | Common Stock | 23,246 | $4.06 | $94,379 | 643,845 |
| 3/13/2023 | Common Stock | 1,559 | $3.26 | $5,082 | 698,693 |

| Summary Statistics | |
|---|---|
| Total shares sold between 2019 and March 7, 2021 | 62,814 |
| Total Class Period Sales (dollar value) | $5,592,832 |
| Total Class Period Sales (total shares) | 153,030 |

*Note that the above sales transactions do not reflect three equity awards that Dobak received. See SAC ¶244.


Dobak's Class Period sales included 50,000 shares sold at $48.85 per share in April 2021
Dobak's total Class Period sales equaled 153,030 shares at a weighted average price of $36.55 per share
$36.55
During 2020, Dobak sold **just 3,256 shares** at an **average price of $11.07**
$90.00
$80.00
$70.00
$60.00
$50.00
$40.00
$30.00
$20.00
$10.00
$0.00
8/30/2019
10/30/2019
12/30/2019
2/29/2020
4/30/2020
6/30/2020
8/31/2020
10/31/2020
12/31/2020
2/28/2021
4/30/2021
6/30/2021
8/31/2021
10/31/2021
12/31/2021
2/28/2022
4/30/2022
6/30/2022
8/31/2022
10/31/2022
12/31/2022
2/28/2023
4/30/2023
6/30/2023
8/31/2023
10/31/2023
12/31/2023
2/29/2024
4/30/2024
6/30/2024
8/31/2024
10/31/2024
12/31/2024