Kara M. Wolke (SBN 241521)
  *kwolke@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

Ray D. Sulentic (SBN 316913)
  *rsulentic@glancylaw.com*
**GLANCY PRONGAY & MURRAY LLP**
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150

*Counsel for Lead Plaintiff*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DERMTECH, INC. SECURITIES LITIGATION | Case No. 3:23-cv-01885-DMS-JLB<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Hearing Date: June 3, 2025<br>Time:          1:30 p.m.<br>Courtroom:  13A<br>Judge:        Hon. Dana M. Sabraw |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................................................................1

II. LEGAL STANDARD FOR THE TWO ELEMENTS AT ISSUE...................3

III. DEFENDANTS IGNORED PLAINTIFFS' KEY ALLEGATIONS..............4

IV. THE SAC STATES A CLAIM UNDER § 10(b) and 20(a) ...........................7

    A. The SAC Pleads a Strong Inference of Scienter .....................................7

        1. Defendants' Insider Selling Supports Scienter.............................7

        2. The Company's Own Selling Further Supports Scienter ...........10

        3. Dobak's resignation supports scienter........................................11

        4. SOX Certifications.......................................................................11

        5. Revenue Misstatements to Hit Analysts' Estimates...................11

        6. Core Operations Doctrine Supports Scienter .............................12

        7. Defendants' Access to Information Supports Scienter...............13

        8. Defendants' Half-Truths Support Scienter .................................14

        9. GAAP Violations Support Scienter.............................................17

        10. Viewed holistically, Plaintiffs Easily Allege Scienter ..............18

    B. The SAC Adequately Pleads Falsity as to Four Sets of Statements.....20

        1. Defendants' Revenue Statements Were False............................20

        2. Defendants' ASP Statements Were Materially Misleading .......21

        3. The Safe Harbor Does Not Apply ...............................................24

        4. Defendants LCD Statements Were Materially Misleading........24

    C. Plaintiffs Allege Control Person Liability (Section 20(a)) ...................25

V. CONCLUSION: DEFENDANTS' MOTION SHOULD BE DENIED.........25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Baron v. Hyrecar Inc.*,
2022 WL 17413562 (C.D. Cal. Dec. 5, 2022)........................................................8

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008) .........................................................8

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ..................................................................12, 21, 24

*Bielousov v. GoPro, Inc.*,
2017 WL 3168522 (N.D. Cal. July 26, 2017) ......................................................11

*Bruce v. Suntech Power Holdings Co.*,
64 F. Supp. 3d 1365 (N.D. Cal. 2014).....................................................................9

*Crews v. Rivian Auto., Inc.*,
2023 WL 4361098 (C.D. Cal. July 3, 2023) ..................................................13, 23

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
316 F.3d 1048 (9th Cir. 2003) ..............................................................................25

*Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) ..................................................................20

*Friends of Yosemite Valley v. Kempthorne*,
520 F.3d 1024 (9th Cir. 2008) ................................................................................4

*Gebhart v. SEC,*
595 F.3d 1034 (9th Cir. 2010) ................................................................................2

*Glazer Cap. Mgmt., LP v. Magistri*,
549 F.3d 736 (9th Cir. 2008) ................................................................................11

*Gruber v. Gilbertson*,
2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018)......................................................5, 9

*Howard v. Everex Sys., Inc.*,
  228 F.3d 1057 (9th Cir. 2000) ......................................................................6, 7, 14, 25

*In re Accredo Health, Inc. Sec. Litig.*,
  2005 WL 8152649 (W.D. Tenn. Apr. 11, 2005) ......................................................18

*In re Akorn, Inc. Sec. Litig.*,
  240 F. Supp. 3d 802 (N.D. Ill. 2017) .......................................................................12

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) .............................................................................9, 13, 14

*In re Genius Brands Int'l, Inc. Sec. Litig.*,
  97 F.4th 1171 (9th Cir. 2024) .....................................................................................3

*In re GoHealth Sec. Litig.*,
  2022 WL 1016389 (N.D. Ill. Apr. 5, 2022) ..............................................................22

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) .......................................................................22

*In re Iso Ray, Inc. Sec. Litig.*,
  189 F. Supp. 3d 1057 (E.D. Wash. 2016).................................................................25

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
  78 F. Supp. 3d 1215 (N.D. Cal. 2015)................................................................12, 20

*In re Mullen Auto. Sec. Litig.*,
  2023 WL 8125447 (C.D. Cal. Sept. 28, 2023) ...................................................10, 13

*In re New Century*,
  588 F. Supp. 2d 1206 (C.D. Cal. 2008).....................................................................18

*In re Omnivision Techs.*,
  2005 WL 1867717 (N.D. Cal. July 29, 2005) .............................................................9

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ...........................................................................3, 5, 24

*In re Read-Rite Corp. Sec. Litig.*,
  335 F.3d 843 (9th Cir. 2003) .......................................................................................7

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003)..................................................................8

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015)....................................................................12

*In re UTStarcom, Inc., Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009)....................................................................9

*In re Vaxart, Inc. Sec. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. 2021)..................................................................22

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006).........................................................................12

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) .................................................................................3

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ...............................................................................23

*Lloyd v. CVB Fin. Corp.*,
   2012 WL 12883522 (C.D. Cal. Jan. 12, 2012)......................................................21

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).................................................................................................4

*Miller v. Thane Int'l, Inc.*,
   519 F.3d 879 (9th Cir. 2008) .................................................................................3

*Mulderrig v. Amyris, Inc.*,
   492 F. Supp. 3d 999 (N.D. Cal. 2020)..................................................................10

*Nguyen v. Radient Pharms. Corp.*,
   2011 WL 5041959 (C.D. Cal. Oct. 20, 2011) .......................................................10

*Nursing Home Pernsion Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ...............................................................................8

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996)..............................................................................25

*Reese v. BP Expl. (Alaska) Inc.*,
  643 F.3d 681 (9th Cir. 2011) ................................................................... 3

*Roberti v. OSI Sys., Inc.*,
  2015 WL 1985562 (C.D. Cal. Feb. 27, 2015) ....................................... 17

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................ 16

*Salzman v. ImmunityBio, Inc.*,
  753 F. Supp. 3d 1050 (S.D. Cal. 2024) ........................................... 13, 22

*Schlagal v. Learning Tree Int'l*,
  1998 WL 1144581 (C.D. Cal. Dec. 23, 1998) ....................................... 8

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ........................................................ 3, 6, 19

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  2019 WL 2491935 (N.D. Cal. June 14, 2019) ...................................... 10

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  2019 WL 4859099 (N.D. Cal. Oct. 2, 2019) ......................................... 10

*SEC v. Cotton*,
  2006 WL 6382128 (C.D. Cal. Dec. 21, 2006) ...................................... 21

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) ................................................................ 2

*SEC v. Todd*,
  642 F.3d 1207 (9th Cir. 2011) ......................................................... 12, 22

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ............................................ 11, 16

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) ......................................................... 5, 20

*Stocke v. Shuffle Master, Inc.*,
  615 F. Supp. 2d 1180 (D. Nev. 2009) ................................................ 9, 11

*Sun v. Han,*
  2015 WL 9304542 (D.N.J. Dec. 21, 2015) ...........................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.,*
  551 U.S. 308 (2007).................................................................................3, 4, 6

*Thomas v. Magnachip Semiconductor,*
  167 F. Supp. 3d 1029 (N.D. Cal. 2016).................................................................7

*United States v. Advanced Dermatology & Skin Cancer Specialists, P.C.,*
  2024 WL 1680074 (C.D. Cal. Feb. 21, 2024) ......................................................14

*United States v. Bailey,*
  444 U.S. 394 (1980).................................................................................1, 2

STATUTES

15 U.S.C. §78u-4(b)(2) ................................................................................3

This is Plaintiffs' response to Defendants' Motion to Dismiss (ECF 41).[1]

## I.    INTRODUCTION

Defendants' Motion challenges two elements—falsity and scienter. The Court previously found Plaintiffs' adequately alleged falsity as to one statement. *See* Order Granting Defendants' Motion to Dismiss Plaintiff's First Amended Consolidated Class Action Complaint (ECF 36) ("the Order") at 12 (finding Plaintiffs adequately alleged falsity as to the Medicare LCD statements). Nothing in Defendants' Motion changes the Court's finding that it was materially misleading for Defendants to claim that Medicare had supposedly "expanded coverage" for DermTech's DMT testing device from one to "two tests per date of service" when the truth was that Medicare covered the second test just 10% of the time. Order at 10-13 ("A reasonable investor would interpret them as meaning that the Final LCD included two tests per date of service *all the time*, which is 'a state of affairs that differs in a material way from the one that actually exists', i.e., that the second test is rarely covered.") (emphasis in original). Plaintiffs again allege the same false statements, and Defendants do not ask the Court to reconsider its falsity finding. Mot. at 24-25. Plaintiffs start halfway there.

That leaves scienter. On scienter, the requisite mental states "are commonly identified, in descending order of culpability, as purpose, knowledge, recklessness, and negligence." *United States v. Bailey*, 444 U.S. 394, 404 (1980). To state a claim for securities fraud, the minimum mental state in the Ninth Circuit is "deliberate recklessness" (Mot. at 9, *infr*a 3). And that means, given the culpability hierarchy, if Plaintiffs demonstrate that Defendants *knew* their statements were false when made,

---

[1] "Defendants" refers to John Dobak ("Dobak") and Kevin Sun ("Sun"). Former Defendant, DermTech Inc. ("DermTech" or "the Company") was voluntarily dismissed on June 20, 2024. ECF 28. Additionally, unless otherwise noted, all emphasis is added; all internal case citations or quotations are omitted; and all ¶_ refer to Plaintiffs' Corrected Second Amended Consolidated Complaint (ECF 40) ("SAC"). Citations to Defendants' Motion to Dismiss Plaintiffs' SAC (ECF 41-1) are referred to as "the Motion" or "Mot."

then Plaintiffs adequately alleged scienter: because knowledge of falsity necessarily exceeds deliberate recklessness. *Id*.

Plaintiffs' most persuasive allegations of Defendants' knowledge of falsity are those that Defendants ignored in their Motion: that Defendants modified language in DermTech's SEC filings — that both Dobak and Sun signed — showing the addition *and then removal* of a subtle and vague qualifier that Medicare coverage had purportedly been expanded "to two tests per date of service *for a certain percentage of patients*." ¶¶98-103; 245-248; § III *infra*. That language was added to DermTech's 2021 10-K when it was not in DermTech's 2020 10-K. And then—Defendants *removed* the "certain percentage of patients" qualifier from later Form 10-Qs during the Class Period. *Id*. Such changes establish, at a minimum, Defendants' *knowledge* that the purported LCD coverage expansion was qualified. By describing it in a vague, obfuscatory way, Defendants evince purposeful deceit: they wanted investors to have an incomplete picture. Worse, by later removing their curt qualifying language, Defendants' conduct supports an inference of *purposeful* conduct: they sought to conceal even their vague, uninforming disclosure from investors. And nothing changed with respect to the Final LCD's coverage over that time. Plaintiffs easily clear the deliberate recklessness hurdle. "Scienter requires 'either knowledge of falsity *or* conscious recklessness.'" *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (quoting *Gebhart v. SEC,* 595 F.3d 1034 (9th Cir. 2010)) (cleaned up).

Nor do Defendants argue *any* non-culpable reason for removing that qualifier from DermTech's Q1 2022 and Q2 2022 quarterly filings—because they can't. Defendants devote no argument to these allegations. Mot. at 17-18. Defendants give no explanation for their removal of the "certain percentage of patient" qualifier. *Compare* Mot. at 4 (acknowledging "certain percentage of patients" qualifier added to 2021 10-K) with Mot. at 17-18 (purporting to address Defendants' access to information but ignoring Plaintiffs' allegations about removing the "certain

percentage of patients" from DermTech's 2022 Q1 and Q2 10-Qs). With falsity established and Defendants unable to explain their conduct, Plaintiffs have enough to state a claim. Defendants' Motion should be denied.

## II.    LEGAL STANDARD FOR THE TWO ELEMENTS AT ISSUE

"To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege: (1) a material misrepresentation or omission ('falsity'), (2) made with scienter, (3) in connection with the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Genius Brands Int'l, Inc. Sec. Litig.*, 97 F.4th 1171, 1180 (9th Cir. 2024) (citation omitted). Here, Defendants challenge just falsity and scienter.

***Falsity***. A complaint adequately alleges falsity when it "'specifi[es] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading[.]'" *In re VeriFone Holdings, Inc. Sec. Litig.,* 704 F.3d 694, 701 (9th Cir. 2012) (some alterations in original). A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *Reese v. BP Expl. (Alaska) Inc.,* 643 F.3d 681, 691 (9th Cir. 2011). Even "literally true" statements may be misleading due to "their context and manner of presentation[.]" *Miller v. Thane Int'l, Inc.,* 519 F.3d 879, 886 (9th Cir. 2008). And "once defendants choose to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 705-06 (9th Cir. 2016).

***Scienter***. The PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2); *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). "In this circuit, the 'required state of mind' is a mental state that not only covers intent to deceive, manipulate, or defraud, but also 'deliberate recklessness'." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1144 (9th Cir. 2017). "[C]ourts

must consider the complaint in its entirety. . .The inquiry [] is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23. "In making this determination, the court must review all the allegations holistically.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011). A strong inference of scienter arises if, a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324-26.

## III.   DEFENDANTS IGNORED PLAINTIFFS' KEY ALLEGATIONS

Plaintiffs' brief tracks Defendants' Motion. Plaintiffs' Section IV.A.1 responds to Defendants' Section IV.A.1, and so on.[2] The one exception is that Defendants ignored a key section of Plaintiffs' new allegations. *Compare* SAC §VII.B *with* Defendants' Motion. So Plaintiffs analyze the ignored scienter allegations immediately below, and then the headings will track Defendants' Motion heading-by-heading in §IV.

**Defendants' changes to DermTech's 10-K, establish an intent to conceal or mislead**. Defendants do not address Plaintiffs' allegations about how Defendants changed DermTech's' LCD disclosures. Compare SAC §VII.B (¶¶98-103, 245-253) with Defendants' §IV.A (failing to address ¶¶245-253).[3] Defendants' subtle changes to DermTech's 2021 10-K—the only filing during the Class Period before the truth

[2] As recommended by Southern District Judges at the 2024 Judith Keep Seminar.

[3] Last time, Defendants' opening brief was silent on Plaintiffs' allegations about code edit inconsistencies. *Compare* ECF 27-1(Defendants' opening brief) at 11-19 *with* ECF 33 (Defendants' Reply) at 1-2. Then they made a new argument on reply – that *two* different code edits purportedly existed. ECF 33 at 1. Plaintiffs could not respond to that argument, and the Court credited Defendants' explanation. *See* Order at 23. Defendants should not be allowed to dispute that the LCD language change supports scienter in their reply given their failure to address it in their opening brief. *See, e.g.*, *Friends of Yosemite Valley v. Kempthorne*, 520 F.3d 1024, 1033 (9th Cir. 2008) ("Arguments not raised by a party in its opening brief are deemed waived.").

was revealed that included any qualification of the LCD's coverage — supports an inference of both purposeful conduct and knowledge. And if the Court finds Plaintiffs have adequately alleged a mental state evincing purpose or knowledge, that necessarily means they have satisfied the less demanding pleading standard of deliberate recklessness that applies to scienter allegations in the Ninth Circuit. *See Quality Sys.,* 865 F.3d at 1144; *cf. Gruber v. Gilbertson*, 2018 WL 1418188, at *11 (S.D.N.Y. Mar. 20, 2018) ("plaintiffs' allegations suffice to state a claim based on recklessness when they ... specifically allege defendants' knowledge of facts or access to information contradicting their public statements.") (cleaned up).

**Purposeful conduct**. Defendants *added* a vague and nondescript qualifier to DermTech's 2021 10-K, signed by both Sun and Dobak (depicted below). That change shows two things. First, it shows that Defendants *knew* the LCD coverage as of 2021 was not for two tests without qualification by, *at the latest*, March 10, 2022. ¶98. It also shows that Defendants did not want investors to know the full truth— because they could have easily just said that the "certain percentage" was 10%, if Defendants wanted to be transparent with investors. Instead, it seems Defendants sought to give *just enough* disclosure to try to immunize their conduct (though they fell far short) without actually disclosing the harmful information (*i.e.*, just how low the "certain percentage" was). That conduct, in turn, shows not just that Defendants knew the contrary facts, but that they wanted to hide them. That is quintessential scienter. *Cf. Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1183 (9th Cir. 2009), *aff'd,* 563 U.S. 27 (2011) ("Withholding reports of adverse effects of and lawsuits concerning the product responsible for the company's remarkable sales increase is 'an extreme departure from the standards of ordinary care" and "presents a danger of misleading buyers or sellers.'").

245. In DermTech's 2020 10-K, which was signed by both Dobak and Su Defendants described their LCD coverage, in pertinent part, as follows:

> The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service, and allows clinicians to order our PLA if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by our PLA.

246. The following year, DermTech's 2021 10-K, which was also signed t both Dobak and Sun, revised the LCD coverage description to read, in pertinent pa

> The Final LCD, first made available on December 26, 2019, expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service **for a certain percentage of patients**, and allowed clinicians to order the DMT if they have sufficient skill and experience to decide whether a pigmented lesion should be biopsied or assessed by the DMT.

The way the qualification is worded thus supports scienter. The inference is even stronger because Defendants then ***removed this language altogether*** from DermTech's quarterly Form 10-Q for Q1 2022, *i.e.*, the very next quarter (¶¶245-248) and continued their false statements thereafter, such as on May 3, 2022 (¶¶217-221) and August 8, 2022 (¶100). Such deception shows a purposeful intent to conceal. ¶249. Further reflecting a purposeful effort to conceal, at least as to DermTech's payers, is Dobak's candid admission that they "don't really try to bring on the multiple body site issue with other payers unless they bring it up." ¶¶256-257. "Defendants' own response to the issue contributes to an inference of scienter here." *Schueneman v. Arena Pharm.,* 840 F.3d at 708. Because Defendants admit that they purposely kept the issue from payers, it is *at least as compelling* that they did the same to investors. *Tellabs*, 551 U.S. at 324-26.

**Knowingly**. Dobak and Sun signed DermTech's 2020 and 2021 Form 10-Ks. ¶¶99, 245. Thus, they are charged with knowledge of their contents. *Howard v. Everex*

---

*Sys., Inc.*, 228 F.3d 1057, 1062 (9th Cir. 2000).[4] The 2021 10-K also contradicts the 2020 10-K, which further supports scienter.  Both the 2020 10-K and the 2021 10-K refer back to the LCD *as it existed in 2019* (¶¶245-246) and the reimbursement rate in 2019 was the same as it was in 2020 and 2021. ¶¶88-92. Only Defendants claimed that it changed. So if Defendants knew about the LCD's coverage in 2019—knowledge that they essentially admitted (*e.g.*, ¶256), then they knew throughout the Class Period. Thus, the contradiction between the 2020 and 2021 10-Ks strongly supports scienter because "[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement." *In re Read-Rite Corp. Sec. Litig.*, 335 F.3d 843, 846 (9th Cir. 2003); Order at 23. When the truth was partially revealed during the Q2 2022 earnings call, Dobak admitted as much, saying, "there's **always** this concern about overutilization and that was a concern with Medicare **in the early days of the LCD**." ¶256-57.

**IV.     THE SAC STATES A CLAIM UNDER § 10(b) and 20(a)**

**A.     The SAC Pleads a Strong Inference of Scienter**

**1.     Defendants' Insider Selling Supports Scienter**

The Court previously found that Plaintiffs failed to allege the percentage of shares sold by CEO Dobak; how those sales related to the alleged false statements; and failed to provide Dobak's trading history. Order at 20. The SAC cures this.

---

[4] Defendants' falsity argument, that Plaintiffs supposedly failed to allege their *personal* statements (Mot. 21, n.15), is foreclosed by Ninth Circuit precedent holding that by signing the form 10-Ks and 10-Qs, Defendants are the makers of such statements. *Howard*, 228 F.3d at 1062-63; *Thomas v. Magnachip Semiconductor*, 167 F. Supp. 3d 1029, 1047 (N.D. Cal. 2016) ("the Ninth Circuit held that a corporate official who 'signs a SEC filing containing misrepresentations' is, in doing so, 'making a statement so as to be liable as a primary violator under § 10(b).") (citing *Howard*) (cleaned up).

***First – percentage sold.*** Plaintiffs alleged that Dobak's Class Period sales represented 22.1% of the shares that he held as of the first day of the Class Period. ¶239.[5] Courts have found smaller percentages support scienter. *See Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (sales of 7% of holdings were suspicious); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (sales of 7.6% of holdings supported scienter).

***Second – timing.***  Defendants' first false statement was made March 8, 2021. ¶191. The next month, Dobak sold $2.44 million in stock at a price of $48.85. ¶¶240-41. Dobak's stock sales thus "occurred on the heels of optimistic statements" which "constitutes circumstantial evidence that [the] statements were fraudulent when made." *Schlagal v. Learning Tree Int'l,* 1998 WL 1144581, at *10 (C.D. Cal. Dec. 23, 1998). Dobak also sold stock at $51 per share, $46 per share, and prices below that, for total sales of $5.5 million at a weighted average price of around $36.50 per share. ¶¶235-37. The Company is now bankrupt. ECF 29. Over the course of the Class Period, DermTech's stock fell from a Class Period high of $62.50 per share, to $2.31 on the last day. So Defendants' sales are suspiciously-timed and large enough to support scienter. *Cf. Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *15 (C.D. Cal. Dec. 5, 2022) ("Courts should give less weight to the fact sales 'may represent a small portion of the defendant's holdings' if the amount of money made from the sale is sufficiently high in magnitude.") (quoting *Oracle*, 380 F.3d 1226, 1232 (9th Cir. 2004)). Just as in *HyreCar*, where the CEO sales of $5.2 million in stock supported scienter, Dobak's sales of $5.5 also support scienter. *Contra* Mot. at 11-12.

---

[5] Defendants challenge Plaintiffs' calculation, calling it misleading. Mot. at 11. It is not. Plaintiffs cited how many shares Dobak had at the beginning of the Class Period, and divided his sales during the Class Period by his beginning balance. ¶¶235-239, n.33. He did not buy any shares, and because Dobak received substantial equity grants during the Class Period, there is no single percentage of his holdings that could be calculated otherwise (because the denominator differs after each subsequent grant). *See* ¶¶238, 239, n.33. Plaintiffs divided what he sold by what he started with.

***Third – pattern***. The SAC included Dobak's trading history. ¶237; ECF 37 at 106. That trading history shows just 3,256 shares sold at an average price of $11.07 per share in 2020, for proceeds of $36,054 and a total of 62,814 shares sold between 2019 and March 7. 2021. *Id*. By comparison, Dobak's Class Period sales of 153,030 shares for $5.5 million in proceeds (¶241) are multiples greater. *Cf. In re Omnivision Techs*., 2005 WL 1867717, at *4 (N.D. Cal. July 29, 2005) (pattern of selling supported scienter where 7% of shares sold before the Class Period and 18% sold during). Dobak argues that DermTech was not public before 2019, and that he had a lock-up agreement that prevented him from selling until early 2020. Mot. at 12-13. He argues those facts skew the comparative analysis but cites no authority nor explains why being newly public matters. An equally plausible inference is that he waited until after his false statements inflated DermTech's share price to sell.

Dobak also argues that he had a 10b5-1 plan, but that is an affirmative defense not at issue at the pleading stage. *See In re UTStarcom, Inc., Sec. Litig.*, 617 F. Supp. 2d 964, 976 n.16 (N.D. Cal. 2009). Even if it were considered now, the supposedly non-discretionary nature does not cut against an otherwise strong inference of scienter. *Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1193 (D. Nev. 2009) ("the Court cannot, as Defendants suggest, infer from the fact that Defendant Yoseloff entered into a 10b5–1 trading plan as a 'strong competing inference against scienter.'"); *contra* Mot. at 12.

Regardless of whether Dobak's shares are found to support scienter, "[a]llegations of suspicious stock sales or information from confidential witnesses are not needed where, as here, other allegations in the complaint raise a strong inference of scienter." *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 707 (9th Cir. 2021); *cf. Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1374 (N.D. Cal. 2014) ("For plaintiffs' fraud claim to go forward, the SAC need not allege that Shi had some pecuniary motive for making the challenged statements."); *see also*, *Gruber v. Gilbertson*, 2018 WL 1418188, at *11 (scienter adequately alleged based on

knowledge and access to information even though "none of the Officer and Director Defendants' stock sales support an inference of scienter").[6] Indeed, because Plaintiffs allege actual knowledge, the Court need not even reach the remaining scienter factors. *Cf. In re Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *9, n.6 (C.D. Cal. Sept. 28, 2023) ("Defendants argue that the AC insufficiently alleges motive, based on Michery's stock sales and the timing of the reverse merger. As the allegations regarding motive are supplemental to the other allegations of scienter in the AC (which are adequate), the Court does not address these arguments.").

### 2.    The Company's Own Selling Further Supports Scienter

Defendants caused DermTech to issue $23.8 million worth of DermTech stock at a weighted average price of $46.33 per share during 2021, which is more than 20 times the $2.31 share price on the last day of the Class Period. ¶¶3, 112-117. Without those sales, the Company–which generated no positive cash flow–would have been bankrupt even sooner than it was. ¶¶243-44. *Cf. Mulderrig v. Amyris, Inc*., 492 F. Supp. 3d 999, 1029 (N.D. Cal. 2020) ("though insufficient standing alone, allegation of motivation to inflate stock price in order to conduct a successful secondary public offering and obtain *much-needed* operating capital was motive evidence ... stronger than the generic 'desire to raise capital' which can be attributed to every company") (emphasis added); *Nguyen* , 2011 WL 5041959, at *8 (similar). Thus, Court may consider the Company's ATM offerings when conducting its holistic analysis.

---

[6] Defendants' authority underscores this point. Mot. at 10 (citing *SEB Inv. Mgmt. AB v. Symantec*). While initially dismissed, later allegations about the defendants' knowledge were enough to allege scienter. *Compare SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 2491935 (N.D. Cal. June 14, 2019) (dismissed on scienter) *with SEB Inv. Mgmt. AB v. Symantec Corp.*, 2019 WL 4859099, at *4 (N.D. Cal. Oct. 2, 2019) (scienter adequately alleged with knowledge of contrary facts).

### 3.    Dobak's resignation supports scienter

Dobak's resignation, which came shortly after the truth was revealed (¶¶264-265) supports scienter.[7] *See, e.g.*, *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) (resignations close in proximity to corrective disclosure and corroborated by CW accounts contributed to inference of scienter); *Bielousov v. GoPro, Inc.*, 2017 WL 3168522, at *6 (N.D. Cal. July 26, 2017) (resignation of the company's president bolstered the inference of scienter).

### 4.    SOX Certifications

The Court previously gave no weight to Plaintiffs' allegations about Defendants' Sarbanes-Oxley certifications (¶283). Order at 27. Plaintiffs respectfully reiterate their position to preserve the issue.[8] The Ninth Circuit has suggested that such certifications can be probative, as here, "if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Cf. Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008). So while insufficient *on their own*, the Court should not give no weight to the fact that Defendants attested to the accuracy of DermTech's financials.

### 5.    Revenue Misstatements to Hit Analysts' Estimates

Similarly, the Court found that the desire to hit analysts' estimates was too general and that Plaintiffs alleged no facts showing Defendants' intent to overstate the progress of DermTech's contracts. Order at 24. Given the Order, Plaintiffs acknowledge that their prior allegations about new contract wins do not support

---

[7] Defendants argue Dobak's resignation came months after disclosure of the adverse facts (Mot. at 13, n.10), but the Oppenheimer conference provided more context about how intra-quarter accruals affected ASP that did not appear in DermTech's 10-K. Compare ¶146 with ¶141-42.

[8] It is a subtle difference, but in *Zucco Partners*, which the Court relied on (Order at 27), the Ninth Circuit said SOX certifications add "nothing substantial" to the scienter inquiry. 552 F.3d 1004. But that is different from adding *nothing at all*. *Cf. Stocke v. Shuffle Master, Inc.*, 615 F. Supp. 2d 1180, 1190 (D. Nev. 2009) ("Courts have found that certifications filed under the SOA may provide additional evidence of scienter").

scienter, but they did not intend for their allegations about meeting analysts' estimates to be limited to just revenue from new contract wins. E.g., ¶282, n.37; *contra* Mot. at 15. Analysts based their price targets on DermTech's revenue growth generally — from all sources (*e.g.*, ¶¶63-64), and Defendants "often field[ed] questions from the investment community about the overall speed of our revenue." ¶65. That analyst emphasis on revenue provides motive for Defendants to overstate it. *See In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015) ("the most powerful evidence of scienter is the content and context of the statements made by [Defendants], which were made in response to analysts questions."). So, to preserve the issue, Plaintiffs respectfully reiterate that courts have found that a desire to hit analysts' estimates contributes to an inference of scienter. *See SEC v. Todd*, 642 F.3d 1207, 1222 (9th Cir. 2011) ("had [DermTech] not met analysts' expectations or [Defendants] had disclosed the true source of the revenue, the investing public would have been alerted"); *In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 820 (N.D. Ill. 2017); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006).

### 6.    Core Operations Doctrine Supports Scienter

The core operations inference (¶266) "allows even generalized allegations about management's role to suffice 'in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that that management was without knowledge of the matter." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1226 (N.D. Cal. 2015) (that 71% of revenue came from related party transactions supported an inference that defendants knew they were related- party transactions).

DermTech relied on the DMT for between 90-95% of its revenue. ¶266. Given Medicare reimbursements made the difference between the Company receiving $760 or nothing for the sale of a small plastic sticker, "it would be 'absurd to suggest' that top management was unaware of" whether one or two stickers per visit were covered by Medicare. *Berson*, 527 F.3d at 989. "It is simply not credible that [DermTech]

senior executives would be unaware of the" main driver of its revenue, the Medicare reimbursement rate. *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *14. Plaintiffs thus allege a "core operations" theory that supports scienter. *Cf. Alphabet,* 1 F.4th at 706; *Salzman v. ImmunityBio, Inc.*, 2024 WL 3100274, at *11; *Cf. Mullen Auto. Sec. Litig.*, 2023 WL 8125447, at *9.

Defendants argue the "SAC fails to identify a single statement by Defendants prior to the corrective disclosures in Q2 2022 to suggest either had actual knowledge", yet Defendants' statements in DermTech's 10-Ks, discussed in § III above show both did have actual knowledge. *Contra* Mot. at 17. The combination of those statements with the fact that sales of the DMT constituted 90-95% of DermTech's revenue, renders this a quintessential case where the core operations doctrine applies.

### 7.   Defendants' Access to Information Supports Scienter

**GAAP/Revenue recognition**. The 2021 10-K, signed by Dobak and Sun, stated that, with respect to its revenue recognition, the "Company monitors it estimates of transaction price to depict conditions that exist at the reporting date." ¶262. That accounting speak, broken into its component elements is telling because: (a) Assay Revenue is units times price (¶¶44-46); and (b) Defendants said they monitored price; and (c) price is determined in part by the "variable consideration"; and (d) the variable consideration is in turn determined by "patient insurance eligibility" (¶262), so it necessarily follows that Defendants knew what the LCD covered—***because they couldn't accurately calculate their revenue without it***. ¶262. Either way there is scienter: if Defendants did not know the true LCD coverage, then they were deliberately reckless in how they calculated revenue. Or if they did know, then they purposefully misled investors about the extent of their coverage. *Supra*, §III.

Sun explained how LCD coverage denials impact revenue recognition: "it just pushes delays for when we can actually collect on those claims and when we can recognize the revenue for those." ¶261; *see also* ¶273 for additional context. Sun also knew how many patients received multiple tests per visit: during the Q2 2022 earnings

call, Sun cited a *year-over-year* comparison, which establishes his access to the number of individuals receiving multiple tests per visit by Q1 2021 *at the latest*. ¶260. *Cf. Alphabet,* 1 F.4th at 706 ("Although the complaint does not directly allege that Page read the Privacy Bug Memo, we may consider a senior executive's role in a company to determine whether there is a cogent and compelling inference that the senior executive knew of the information at issue.").

**LCD Reimbursement**. Dobak admitted that "we presented to Medicare" (¶255); and that "there's ***always this concern from payers about overutilization***, and that was a concern with Medicare in the early days of the LCD", meaning Medicare wanted to "put a limit on the number of tests that could be collected on the same date of service." ¶256. It is implausible that Dobak, a medical doctor, would have known about "the limit on the number of tests" during "the early days of the LCD", but not known whether the LCD covered one or two tests thereafter because the actual coverage has consistently been the same. ¶¶277-78. *Cf. United States v. Advanced Dermatology & Skin Cancer Specialists, P.C.*, 2024 WL 1680074, at *13 (C.D. Cal. Feb. 21, 2024) (scienter adequately alleged in an FCA claim in part because doctors must certify that claims they submit to Medicare and Medicaid are accurate). At a minimum, if Defendants were unsure, they could have easily checked, which makes them deliberately reckless if they did not know the true reimbursement rates. *See Howard*, 228 F.3d at 1064 ("We have held that an actor is reckless if he 'had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [he] could have done so without extraordinary effort.'").

### 8. Defendants' Half-Truths Support Scienter

Previously, the Court credited Defendants' version of the facts that they asserted in their Reply brief about Plaintiffs' code edit allegations. *See* ECF 33 at 1-2; Order at 23, n.10 ("Defendants' statements were not contradictory because there

were two code edits at issue."). The SAC clarified that the statements that Defendants previously cited were themselves misleading. ¶¶132-134, 270-278.

Defendants' code edit statements were a misleading excuse. That is, during the 2Q 2022 earnings call in August, Dobak said a purported code edit led to Medicare denying claims for patients with more than one test per visit, so the Company was forced to lower its revenue forecast. ¶¶270-71. Dobak stated, "we are revising our full-year 2022 outlook [downward] to reflect a lower average selling price (ASP) for our DMT. The ASP pressure is primarily the result of Medicare billing code edits." ¶270. During the earnings call, Dobak stated that a "code edit" was causing Medicare to reject claims "where patients have multiple body sites tested on the same day." But that was misleading because it was no mere administrative change driving the rejection, nor a recent one, the LCD's coverage *that existed since 2019* caused the rejection of more than one body site per patient per visit. ¶¶271-72.

During the same earnings call, Sun reiterated that, "**under the LCD** we should be paid now **at least for 2** tests on the same date of service without anything else." ¶275. But Sun's statement was materially misleading, because "under the LCD", only *one* test per visit was covered in most cases. ¶276. Still, Sun said that a supposed code edit, that he expected in the fourth quarter of 2022, would fix the problem, and then the Company would get paid for two tests per visit. ¶¶273-275.

On October 6, 2022, there was indeed a Billing and Coding revision to DermTech's LCD. ¶133 Figure 8. The problem for Defendants' explanation, however, is that October 6 revision—**did not change** the number of tests that are approved. ¶¶132-134, SAC n.23, ¶143, ¶276. One month later, in November, when discussing the Company's Q3 2022 results, Sun said that a code edit was implemented "at the beginning of October [2022]", and that "code edit" supposedly had "some positive benefit" to ASP. ¶132. On the Q4 earnings call, Sun again referred to the "beginning of October" code edit. ¶143. Given the "beginning of October" timing that Sun cited, it seems clear that Sun was referring to the October 6, Billing and Coding

revision. ¶¶132-33. Defendants' explanations *are* contradictory and not explained by their proffered excuse. ¶134, SAC n.23 ("no changes made", "only one test may be used per patient per clinical encounter.").

And even if Sun was referring to something else, as Defendants now argue,[9] that factual argument should not be credited in his favor at the pleading stage. He still made a misleading statement by saying that October 2022 change was supposedly going to "match what the LCD approves, and so where we can get paid on two tests on a date of service." ¶273. But the LCD did not cover two tests on a date of service in October 2022. ¶¶273-278. Defendants' misleading attempt to blame *an administrative code edit* as prompting Medicare's refusal to refund more than one test per clinical encounter—when Medicare did that all along—supports scienter.

Defendants' contradictory explanations are not reconciled by the "two different code edits" story that they previously told. ¶134. Defendants' prior argument—that the first code edit caused a revenue shortfall but the second one fixed it (see ECF 33 at 2)—does not withstand the SAC's allegations. Plaintiffs' SAC is supported by screenshots of the revision from the LCD itself. ¶133 (Figure 8). Viewed in the proper context, Plaintiffs have the more compelling inference. "The federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *cf. Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1147 (N.D. Cal. 2017) ("by making detailed factual statements, contradicting important data to which [the Defendants] had access, a strong inference arises that they knowingly misled the public as to its clear meaning."). "[S]cienter can be established

[9] First they said there were two code edits (ECF 33 at 1-2), and now they say they are referring to CPT codes, not the LCD's "Billing and Coding" revision. Mot. at 18. Such disputes are squarely within the province of the fact-finder and not for the Court to determine as a matter of law, certainly not in Defendants' favor.

by the fact that the Defendants touched on the specific issue...in their [ ] statements." *Roberti v. OSI Sys., Inc.,* 2015 WL 1985562, at \*12 (C.D. Cal. Feb. 27, 2015).

### 9.    GAAP Violations Support Scienter

The Order previously ruled that Defendants' GAAP violations as alleged in the prior complaint failed to support scienter because: (a) Plaintiffs did not sufficiently allege Defendants' access to either DermTech's A/R and DSOs (Order at 26); and Plaintiffs failed to explain how the denied claims backlog supported scienter (Order at 31). The SAC cures both points. ¶¶164-169; 172-184. Each is discussed in turn.

**A/R and DSOs**. The SAC clarified that (1) DermTech's A/R appeared on DermTech's publicly-filed balance sheet, which Sun and Dobak both signed (¶172-73); and (2) that DermTech's 2022 10-K stated that the Company "prepares an analysis on reimbursement collections . . . to determine the amount of accounts receivables to be recorded related to tests performed in the applicable period." ¶174. So the SAC clarified that A/R and Medicare reimbursement are related. ¶¶180-81. When Medicare denies reimbursement consistently, as it was in the Class Period, such denials will appear on DermTech's accounts receivable balance on the Company's balance sheet. ¶182. And as A/R swells relative to sales, that ratio signals that the Company booked revenue for DMT patches that had not been reimbursed. ¶¶174-75. And the reason they weren't being reimbursed stems in large part from the applicable LCD coverage. ¶182. Put differently, DermTech was prematurely recognizing revenue in sufficiently large quantities such that it created a looming and inevitable revenue write-off (previously recorded on DermTech's balance sheet as A/R). And that's essentially what happened: Defendants wrote off prior periods' revenue (¶142) in contravention to GAAP and the Company's accounting policy. ¶¶169-171.

**Denied claims backlog**. Denied claims also appeared in DermTech's internally circulated Denied Claims Backlog, which similarly created a red flag of DermTech's inability to collect from Medicare. ¶¶111, 180-82. FE3 stated that there was a backlog of "many thousands" of denied claims that existed and were tracked in a spreadsheet

that was circulated monthly, called XiFin. ¶111. Sun further explained that claims can be denied if "there's two or more [tests per date of service]". ¶180. The Denied Claims Backlog and DermTech's A/R and DSO reflect opposite sides of the same coin: DermTech's inability to collect from Medicare. As those denied claims build, the Denied Claims Backlog grows, and A/R and DSOs do too. ¶182. When they are both growing at the same time, the red flag is even more prominent that DermTech was prematurely recognizing revenue subject to a later reversal in contravention to GAAP. *Cf. In re New Century*, 588 F. Supp. 2d 1206, 1230–31 (C.D. Cal. 2008) (growing backlog supported scienter for statements related to adequacy of reserve); *In re Accredo Health, Inc. Sec. Litig.*, 2005 WL 8152649, at *16 (W.D. Tenn. Apr. 11, 2005) ("Plaintiffs have alleged that there were 'red flags,' such as the 300 day DSO and $60 million dollars worth of uncollectible accounts receivable, that should have been obvious to Defendants[.]"); *Sun v. Han,* 2015 WL 9304542, at *17 (D.N.J. Dec. 21, 2015) (rising DSOs support scienter).

### 10.    Viewed holistically, Plaintiffs Easily Allege Scienter

Viewing the allegations holistically, as the Court must under *Tellabs*, Plaintiffs have **at least** a tie here. Previously, the Court credited a non-culpable inference that "upon learning of the Final LCD's coverage limitation to one test per visit, Defendants disclosed this information to the market and sought to resolve the issue." Order at 31-32. Defendants try to extend the Order to a different set of facts and still argue that it is more plausible that they educated themselves on the issues regarding reimbursement "arising in Q2 2022" ahead of the Q2 2022 earnings call. Mot. at 18. Defendants then say Medicare issued code edits in 2022 that altered reimbursement under the LCD. Mot. at 20. Defendants keep blaming code edits as if code edits caused DermTech's revenue shortfall, and they keep ignoring the more important point: the LCD has consistently denied coverage for more than one test per visit from 2019 through the end of the Class Period. ¶278. Sun said the code edit would "actually match what the LCD approves." ¶273. There was no material change *to what the LCD*

*approved* that occurred in Q2 2022 — the Final LCD has been substantially the same since 2019. ¶278. Defendants' inference should not be credited now because the SAC clarifies that the LCD was never alleged to have expanded coverage from one to two tests without qualification. ¶¶133-135; *see Schueneman.* 840 F.3d at 709.

It is not as if Medicare once approved the DMT for two tests, and then quietly removed the second test's approval and replaced it with a limitation without telling Defendants. Those are not our facts. The purported expansion never happened as Defendants described it. ***It never happened***. *Only Defendants* say the coverage was ever expanded to two tests without qualification. But as shown by the SAC, Defendants' version seems invented. *Compare* ¶¶93-97 *with* ¶¶86-92 and ¶¶132-135.

Defendants' proffered inference is further undermined by their "code edit" misdirection. §IV.A.8 *supra*. It is not as if Defendants misread the Medicare guidance and then came clean. They did the opposite by trying to lay blame on a code edit. But the SAC makes clear that the supposed second code edit that Sun said fixed the prior problem actually says "no changes made" ¶134. That in turn means the first code edit, if it existed at all, likely had nothing to do with how many tests were approved.

If Defendants really did discover in Q2 2022 that the Final LCD did not match a Response to Comments (which is implied by Defendants' suggested inference), but Defendants had no idea throughout the Class Period, consider what that would mean. It would mean that: (1) Defendants' were completely unaware of whether Medicare reimbursed 1.1 times on average rather than 2.0 times *as they repeatedly said*; (2) Defendants' subtly added language to DermTech's 2021 10-K—that they both signed—that was not in DermTech's 2020 10-K about a "certain percentage of patients" being covered for DermTech's second test, and neither Dobak nor Sun knew what that meant nor ever asked anyone why they were changing the disclosure; (3) upon supposedly learning the truth in Q2 2022, Defendants attributed the revenue shortfall—not to a prior over accrual of revenue or overestimation of ASP based on a mistaken but good-faith belief that two tests were reimbursed—but, inexplicably, to

an administrative "code edit" that had no bearing on how many tests the Final LCD actually covered, and they did all those things in good faith. *That inference* is not **more** compelling than an inference that Defendants either knew how many tests the LCD covered from the beginning or that they learned before they added the subtle qualification to the 2021 10-K (that was later removed) and then reiterated their false statements with such knowledge anyway. *Cf. Matrixx*, 585 F.3d at 1183 ("[T]he inference that Appellees withheld the information intentionally or with deliberate recklessness is at least as compelling as the inference that Appellees withheld the information innocently.").

The Order's prior conclusion that Defendants disclosed the adverse facts when they supposedly learned them (Order at 31-32) cannot be reconciled with Defendants' subtle modification to DermTech's 2021 10-K—adding a nondescript "certain percentage of patients" qualifier to it—which establishes Defendants' learned adverse facts by, *at the latest*, March 10, 2022. ¶98. Defendants *removed* this language the next quarter (¶¶245-248) and *continued* their false statements thereafter: such as on May 3, 2022 (¶¶217-221) and August 8, 2022 (¶100). The timeline establishes that they did not come clean when they learned the truth and that's because they knew their statements were misleading all along.

**B.     The CAC Adequately Pleads Falsity as to Four Sets of Statements**

The Court has already ruled that Plaintiffs have adequately alleged falsity of Defendants' LCD coverage statements (discussed in §IV.B.4 below).

**1.     Defendants' Revenue Statements Were False**

"Financial statements filed with the SEC which are not consistent with GAAP are presumed misleading." *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 78 F. Supp. 3d 1215, 1224 (N.D. Cal. 2015). As previously, argued,  when a company restates its financials, many courts have held that "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *Fresno Cty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 544

(S.D.N.Y. 2017). DermTech "reclassified" its assay revenue, a material metric, which the SEC calls a "little r" restatement because companies use them to avoid the stigma of a full-blown restatement. ¶¶154–160. The Order found that whether Plaintiffs' theory of a "little r" restatement were characterized as a traditional restatement or a routine accounting measure, Plaintiffs failed to allege enough specificity about the GAAP violations. Order at 15. The SAC cured this. ¶¶164-175, 179-182, 273.

Defendants violated GAAP by essentially prematurely recognizing revenue on DMT tests that had been administered but not reimbursed. ¶¶170-71. And, while Defendants were allowed to estimate ASP under GAAP (¶169), they were not allowed to recognize revenue until the uncertainty associated with being reimbursed by a third-party had been resolved. ¶169. And as Sun admitted during the Q2 2022 earnings call, Medicare reimbursement pushed delays for when DermTech could recognize revenue. ¶273. Yet DermTech had been recognizing it anyway (¶¶147, 182) as Dobak would implicitly admit during the March 14, 2023, healthcare conference by conceding that DermTech wrote off revenue from "prior periods." ¶¶146-47. That was a GAAP violation and DermTech's growing DSOs and Denied Claims Backlog created red flags that alerted Defendants to the very uncertainty that existed. ¶169.

Defendants claim they followed GAAP. Mot. at 22. But that is a question of fact: the "Court should not make such a factual determination at the pleadings stage." *Lloyd v. CVB Fin. Corp.*, 2012 WL 12883522, at *14 (C.D. Cal. Jan. 12, 2012) (cleaned up); *accord SEC v. Cotton*, 2006 WL 6382128, at *8 (C.D. Cal. Dec. 21, 2006) ("Whether [defendants'] accounting practices . . . were consistent with GAAP is a question of fact, best resolved by expert testimony.").

### 2. Defendants' ASP Statements Were Materially Misleading

The Order found that the ASP statements were incomplete, but not misleading. Order at 13. The Court reasoned that the number of tests patients received at each visit was a subcomponent of broader payer coverage. *Id*. "While this is a conceivable interpretation of this paragraph, it is hardly the only [ ] one." *Berson v. Applied Signal*

*Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008). The Court implicitly made a factual determination about whether investors would understand Defendants' representations about "broader payer coverage" to mean both (a) that more payers (such as Medicare) would cover the DMTs; and (b) that Medicare would cover more tests per patient per visit. Order at 13-14. The Order appeared to credit the fact that Defendants claimed on August 8, 2022 that multiple tests sites per visit can weigh on ASP as weighing against falsity. Order at 14, n.4. But that allegation supports Plaintiffs: August 8, 2022 was the alleged corrective disclosure. Defendants' eventual admissions should not undermine Plaintiffs' falsity theory before then. And, as the SAC clarified, Defendants' August 8, 2022 statement was also alleged to be half-true. ¶¶273-277.

Whether a reasonable investor would construe "broader payer coverage" as meaning Medicare covering *more patients* versus Medicare covering *more tests* for the same group of patients, "is a mixed question to be decided by the trier of fact." *SEC v. Todd*, 642 F.3d at 1220. "Dismissal at this stage is warranted only if the adequacy of the disclosure 'is so obvious that reasonable minds could not differ." *Salzman v. ImmunityBio, Inc.*, 753 F. Supp. 3d 1050, 1060 (S.D. Cal. 2024) (finding the question of whether a statement is misleading is factual).[10] "This is a high threshold[.]" *Id*. As explained below, reasonable minds *did* differ because analysts interpreted "broader payer coverage" differently than the Court.

Until the truth was revealed, investors had been told that the LCD reimbursed two tests per patient per visit. ¶¶194, 196, 200, 202, etc. Moreover, in Dobak's March 1, 2022 statement, his reference to "broader coverage" pertained to "third-party payers", not Medicare. *See* ¶¶52, 198. Dobak listed Medicare separately from

---

[10] *See also*, *In re: Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1019 (S.D. Cal. 2005) ("Whether Defendants' statements were accurate is not an issue at this stage."). "At this stage, the Court need not determine that the statements were in fact misleading—plausibly alleging as much suffices." *In re GoHealth Sec. Litig.*, 2022 WL 1016389, at *5 (N.D. Ill. Apr. 5, 2022).

increasing "additional payer coverage from third-party payers." ¶198. *Cf. In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 671 (N.D. Cal. 2021) ("the press release must be considered in context, including the context of the investor expectations created by [Defendants'] other statements."). Indeed, no analysts are alleged to have speculated that LCD might expand *coverage per visit* beyond two tests. To analysts, "broader coverage" meant more patients covered.

That's known because analysts concluded that DermTech's ability to "secur[e] *new* reimbursement contracts" (*i.e.*, obtain broader coverage) was "the best leading indicator of revenue growth." ¶61. Analysts separately concluded that ASP would increase as payer mix shifted toward Medicare — "even on flat volumes", which is a critical point. ¶63 ("Importantly, as the payer mix shifts toward Medicare patients, ASP will increase, driving revenue growth (even on flat volumes)."). The quoted analyst concluded that as Medicare covered *more people* ASP would increase, which spotlights that analysts' unawareness of how multiple tests per visit have a countervailing effect on ASP. See ¶7 SAC n.1. Even if Medicare covered everyone (effectively removing payer mix from the equation), ASP would *go down* if patients had multiple tests per visit just. *Id*. Indeed, analysts were caught off guard by how "Medicare denying claims for tests above the 2 tests/patient/day limit) could either slightly or more than offset the ASP benefit [of broader coverage]." ¶138. "The result is limited to no visibility into NT ASP/test, and ultimately revenue." *Id*. Investors did *not* understand that the number of tests per visit impacted ASP until *after* the truth was revealed. Once they did, they forecasted revenue differently: analysts at William Blair downgraded DermTech in part because of worsening "revenue per test [*i.e.*, ASP]." ¶139. William Blair sought "better ***transparency*** into payer coverage."

While Plaintiffs of course respect the Court's prior decision, they respectfully submit that Defendants' ASP statements were misleading and are for the fact-finder. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008-09 (9th Cir. 2018) ("Even if a statement is not false, it may be misleading if it omits material

information."); *Crews v. Rivian Auto., Inc.*, 2023 WL 4361098, at *13 (C.D. Cal. July 3, 2023) (statements "painted a misleading picture by misidentifying and omitting the most important factor" impeding profitability.). And because Plaintiffs' theory concerns how a reasonable investor would have interpreted Defendants' statements, that question is better suited for the fact-finder. *Cf. Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Absent undisputed evidence that these were terms of art that investors would have understood to refer to [omitted facts], we cannot find, as a matter of law, that defendants disclosed [the omitted facts]").

### 3.    The Safe Harbor Does Not Apply

Defendants argue the PSLRA's safe harbor protects their false revenue statements. Mot. at 24. It does not. DermTech's full year (*i.e.*, January through December) 2022 guidance, given in May, already included several months for which revenue had *already been* prematurely booked (i.e., January through April), thus making the statements partially false when made. ¶¶8, 118, n.20, 130, 206. *Cf. Quality Sys.* 865 F.3d at 1142 ("the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts"). Sun admitted the next quarter that "we've seen a trend" where the proportion of people getting multiple tests "has been increasing. And as that increases, it just pushes delays for when we can actually collect on those claims and when we can recognize revenue for those." ¶273. By definition, a trend means that it's been ongoing. The January through April contribution to DermTech's annual revenue guidance was false when made: it included revenue that was prematurely booked and later written off.

### 4.    Defendants LCD Statements Were Materially Misleading

Throughout the Class Period, Defendants said the Final LCD had "expanded the coverage proposal in the draft LCD from one to two tests per date of service." ¶¶194, 196, 200, 202, etc. The Court ruled this was materially misleading because apart from DermTech's 2021 10-K, Defendants represented, without qualification,

that the Final LCD expanded coverage from one to two tests per date of service. Order at 10-13. That was materially misleading because the Final LCD stated that "only one test may be used per patient per clinical encounter *in most cases*" and specifically provided that a second test would be *denied 90% of the time*. ¶122. Defendants do not ask the Court to reconsider that ruling and seem to reiterate their truth-on-the-market defense. Mot. at 24-25. Plaintiffs reiterate their prior argument, which the Court credited (Order at 12-13), that the truth-on-the-market defense, should not be decided at the pleading stage. *See Provenz v. Miller*, 102 F.3d 1478, 1492-93 (9th Cir. 1996); *In re Iso Ray, Inc. Sec. Litig.*, 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016) ("As a general rule, the truth-on-the-market defense is intensely specific, so courts rarely dismiss a complaint on this basis.") (collecting cases). Neither the 2019 document Defendants cite nor the Final LCD was ever even transmitted to investors, let alone with the same "degree of intensity and credibility" as Defendants' many materially misleading statements here were. The LCD statements were false when made.

### C.    Plaintiffs Allege Control Person Liability (Section 20(a))

Defendants' main argument on Plaintiffs' §20(a) claim is the supposed lack of a primary violation, which rises or falls with Plaintiffs 10(b) claim. Mot. at 25. Defendants' alternative argument, a purported lack of control by the CEO and CFO over DermTech is, like many of their arguments, premature. *Howard*, 228 F.3d at 1065 ("Whether the defendant is a controlling person is an intensely factual question."). It is also their burden, which their one-sentence, unsupported and conclusory assertion fails to meet. *See id*.

### V.    CONCLUSION: DEFENDANTS' MOTION SHOULD BE DENIED

Should the Court grant any portion of Defendants Motion, Plaintiffs request leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("In this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error.").

DATED: April 21, 2025

**GLANCY PRONGAY & MURRAY LLP**

By:   */s/ Raymond D. Sulentic*

Raymond D. Sulentic
12526 High Bluff Drive, Suite 300
San Diego, California 92130
Telephone: (310) 201-9150
Email: rsulentic@glancylaw.com

Kara M. Wolke
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Email:  kwolke@glancylaw.com

*Lead Counsel for Lead Plaintiff and the Putative Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.  On April 21, 2025, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Southern District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 21, 2025.


*/s/ Raymond D. Sulentic*
Raymond D. Sulentic