# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE DERMTECH, INC. SECURITIES LITIGATION | Case No.: 23-cv-1885-DMS-JLB <br><br> **ORDER DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |

Pending before the Court is Defendants' Motion to Dismiss Plaintiff's Second Amended Consolidated Class Action Complaint ("SACAC"). (Defendants' Motion ("Defs.' Mot."), ECF No. 41). Plaintiff filed an Opposition, (Plaintiff's Opposition ("Opp'n"), ECF No. 42), and Defendants filed a Reply, (Defendants' Reply ("Reply"), ECF No. 43). For the following reasons, Defendants' renewed Motion to Dismiss is **DENIED**.

## I.    INTRODUCTION

Defendants' Motion to Dismiss again challenges Plaintiff's claims under the Securities Exchange Act of 1934 ("Exchange Act"). The SACAC asserts two causes of action: (1) violation of § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; and (2) violation of § 20(a) of the Exchange Act. (Plaintiff's SACAC

("SACAC"), 98–103).  The background of this case is summarized in a prior Order and need not be repeated.[1]  (ECF No. 36 at 1–2).  This Court granted Defendants' first Motion to Dismiss because Plaintiff did not plead sufficient facts for the Court to infer that Defendants acted with scienter.  (*Id.* at 17–32).  Because the deficiencies may have been curable, the Court gave Plaintiff leave to amend.  (*Id.* at 33).  With respect to the SACAC, at issue here, Defendants raise the same arguments as in their first Motion, namely that Plaintiff—despite incorporating new allegations—still fails to adequately plead falsity[2] and scienter.  (Defs.' Mot. 7).

## II.    JUDICIAL NOTICE AND INCORPORATION BY REFERENCE

Defendants seek judicial notice of twenty-one exhibits.  (ECF No. 41-24).  The Court previously granted Defendants' request with respect to Exhibits 1–18 and upholds that determination here.  (ECF No. 36 at 4–5).  Plaintiff does not oppose judicial notice of Exhibits 19–21.  Accordingly, Defendants' request for judicial notice of their exhibits is **GRANTED**.  *See, e.g.*, *Rodriguez v. Mondelez Glob. LLC*, 703 F.Supp.3d 1191, 1203 (S.D. Cal. 2023) ("The Court takes judicial notice of Exhibits 1, 3, 9–11, and 14, which are unopposed."); *Salinas v. IA Lodging San Diego, LLC*, 2021 WL 1578957, at *2 (S.D. Cal. Apr. 22, 2021) ("Moreover, courts within this District have granted unopposed requests for judicial notice pursuant to Civil Local Rule 7.1(f)(3)(c)."); *Haddad v. Bank of Am., N.A.*, 2014 WL 67646, at *1 n.1 (S.D. Cal. Jan. 8, 2014) ("Pursuant to Federal Rule of Evidence 201 and Civil Local Rule 7.1(f)(3)(c), the unopposed Requests for Judicial Notice are granted.").

---

[1] For clarity, the Court will incorporate rule statements from its prior Order.

[2] Plaintiff's First Amended Consolidated Class Action Complaint ("FACAC") alleged falsity as to four sets of statements made by Defendants.  (ECF No. 36 at 10).  The Court found that one set of statements—about Medicare's Local Coverage Determination ("LCD") of the Company's DermTech Melanoma Test ("DMT")—was materially misleading.  (*Id.* at 10–13).  Plaintiff failed to demonstrate the other three sets of statements were false.  (*Id.* at 13–17).  The SACAC realleges falsity as to Defendants' statements about the main drivers of the DMT's average selling price ("ASP") and revenue accounting.  (SACAC 8–11).  Defendants challenge them again here.  (Defs.' Mot. 27–29).

23-cv-1885-DMS-JLB

### III.   LEGAL STANDARD

**A. Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), a party may file a motion to dismiss on the grounds that a complaint "fail[s] to state a claim upon which relief can be granted". Fed. R. Civ. P. 12(b)(6).   A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).   To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Id.* "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.   "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.   If the plaintiff "ha[s] not nudged [his] claims across the line from conceivable to plausible," the complaint "must be dismissed." *Id.* at 570.

In reviewing the plausibility of a complaint on a motion to dismiss, a court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).   But courts are not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

**B. Heightened Pleading Standard**

In addition to Federal Rule of Civil Procedure 12(b)(6), "[a] securities fraud complaint under § 10(b) and Rule 10b-5 must satisfy the dual pleading requisites" of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

23-cv-1885-DMS-JLB

("PSLRA"). *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 701 (9th Cir. 2012). "[W]here a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the 'time, place, and specific content of the false representations'". *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). In other words, "[a]verments of fraud must be accompanied by 'the who, what, when, where, and how' of the misconduct charged." *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009). To satisfy Rule 9(b), a plaintiff must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A plaintiff's allegations must be "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong." *Bly-Magee v. Cal.*, 236 F.3d 1014, 1019 (9th Cir. 2001) (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993)) (internal quotation marks omitted).

The PSLRA also imposes "more exacting pleading requirements" on private securities fraud complaints. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), *as amended* (Feb. 10, 2009). Under the PSLRA, a plaintiff in a securities fraud action must "plead with particularity both falsity and scienter." *Id.* (internal quotation marks and citation omitted).

## IV.   DISCUSSION

### A. § 10(b) of the Exchange Act and Rule 10b-5

§ 10(b) of the Exchange Act prohibits the:

> use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). One rule promulgated under the Exchange Act is Rule 10b-5, which makes it "unlawful for any person . . . in connection with the purchase or sale of any security": (1) "[t]o employ any device, scheme, or artifice to defraud"; (2) "[t]o make any

untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading"; or (3) "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person".  17 C.F.R. § 240.10b-5.

To prevail on his § 10(b) and Rule 10b-5 claim, Plaintiff must prove "(1) a material misrepresentation or omission by [D]efendant[s]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Investment Partners, LLC v. Scientific–Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011).  Defendants contend that Plaintiff has failed to sufficiently plead the first two elements, falsity and scienter.  (Defs.' Mot. 7, 15).

### a.  Material Misstatements or Omissions (Falsity)

To meet the first element of his § 10(b) claim, Plaintiff "must show that [Defendants] made a statement [or omission] that was '*misleading* as to a *material* fact.'"  *Matrixx Initiatives*, 563 U.S. at 38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  When analyzing whether a plaintiff has met this burden, courts in the Ninth Circuit apply "the objective standard of a 'reasonable investor.'"  *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 764 (9th Cir. 2023) (internal citation omitted).  A statement or omission is material "when there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'"  *Id.* (quoting *Basic*, 485 U.S. at 231–32).  In other words, a "reasonable investor" must be substantially likely to "consider [the fact] important in his or her decision making".  *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 934 (9th Cir. 2003).

A finding on materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him".  *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).  "[T]hese

assessments are peculiarly ones for the trier of fact." *Id.* "Only if . . . reasonable minds cannot differ on the question of materiality is the ultimate issue of materiality appropriately resolved as a matter of law" at the pleading stage. *Id.* (internal quotation marks and citations omitted). Otherwise, materiality "is a question for resolution at trial." *S.E.C. v. Phan*, 500 F.3d 895, 912 (9th Cir. 2007).

Per the PSLRA's heightened pleading standard, a plaintiff must also "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading". 15 U.S.C. § 78u-4(b)(1). "[I]f an allegation regarding the statement or omission is made on information and belief," the plaintiff must "state with particularity all facts on which that belief is formed." *Id.* Misleading is not synonymous with incomplete. *See Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Rather, a statement or omission is misleading when it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Id.* "Even if a statement is not false, it may be misleading if it omits material information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008–09 (9th Cir. 2018) (citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1054 (9th Cir. 2014)).

The FACAC sufficiently alleged that Defendants' statements about the Final LCD were materially misleading. (ECF No. 36 at 10–13). Defendants' statements about the main drivers of the DMT's ASP and revenue recognition as alleged in the FACAC, by contrast, were not. (*Id.* at 13–15). The SACAC realleges the falsity of the latter two sets of statements. (SACAC 8–11).

### i. ASP Statements

The Court's prior Order found Defendants' statements about ASP growth incomplete, but not misleading. (ECF No. 36 at 13) (citing *Brody*, 280 F.3d at 1006). The Court noted that "the number of tests patients received at each visit is a sub-component of broader payer coverage." (*Id.*) (internal quotation marks and citation omitted). The SACAC contains similar allegations of falsity with respect to Defendants' statements describing the main drivers of ASP growth. (*See, e.g.*, SACAC 8–9, 19–23). Plaintiff

urges this Court to revisit its prior analysis because the Court "implicitly made a factual determination" about reasonable investors' interpretation of "broader payer coverage". (Opp'n 29–30). Plaintiff believes the factfinder should determine whether the ASP statements were misleading. (*Id.* at 30).

The Court now finds that the parties both put forth plausible theories about how a reasonable investor would interpret "broader payer coverage". An expansive reading of the phrase would lead to the conclusion—which the Court previously drew—that "payers increase their coverage when they *either* (1) sponsor more patients or (2) sponsor more tests per patient". (ECF No. 36 at 13–14) (emphasis in original); *see Brody*, 280 F.3d at 1007 ("[A]lthough the press release did not provide all the information that THC possessed about its possible sale, the information THC did provide—and the reasonable inferences one could draw from that information—were entirely consistent with the more detailed explanation of the merger process that Brody and Crawford argue the press release should have included."). On the other, a reasonable investor could have interpreted "broader payer coverage" as referring *only* to payers covering more patients because, until the August 8, 2022 earnings call,[3] Defendants represented the Final LCD as covering two tests per date of service without qualification. *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) ("[A]n issuer's public statements cannot be analyzed in complete isolation. Some statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.") (internal quotation marks and citation omitted).

---

[3] This excludes DermTech's 2021 Form 10-K, which stated that the Final LCD "expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service *for a certain percentage of patients*". (SACAC 39) (emphasis in original).

Because investors assumed the second test was covered, the only way to broaden payer coverage would have been for payers to reimburse tests for more patients.

Plaintiff has thus satisfied his burden of showing that Defendants' ASP statements were misleading. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)."); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) (letting securities fraud case proceed because plaintiffs put forward theory about misleading nature of statements that was "just as likely" as defendants' theory).

### ii. Revenue Statements

After reviewing the FACAC, the Court did not conclude that "Defendants' adjustment of assay revenue and reclassification of contract revenue establish falsity" because the FACAC did not "describe transactions violating GAAP." (ECF No. 36 at 15). In response, the SACAC alleges that Defendants violated ASC 606[4] by reclassifying prior periods of revenue. (SACAC 9–10, 57–62); (Opp'n 28) ("Defendants violated GAAP by essentially prematurely recognizing revenue on DMT tests that had been administered but not reimbursed. And, while Defendants were allowed to estimate ASP under GAAP, they were not allowed to recognize revenue until the uncertainty associated with being reimbursed by a third-party had been resolved.") (citations to SACAC omitted).

As the Court articulated in its first Order, "restatements[5] are not by themselves sufficient to show that [financial reports] were false when made." *In re Ramp Networks, Inc. Sec. Litig.*, 201 F.Supp.2d 1051, 1065 (N.D. Cal. 2002). If a restatement is not "accompanied by . . . [a] defendan[t's] admi[ssion] that the restatements were necessitated

---

[4] According to the SACAC, "[e]ffective for financial statements issued after September 15, 2009, the Financial Accounting Standards Board ("FASB") established the FASB Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by nongovernmental entities." (SACAC 57).

[5] At the pleading stage, the Court will accept Plaintiff's allegation that the financial statements at issue are restatements. *Iqbal*, 556 U.S. at 678.

23-cv-1885-DMS-JLB

by accounting errors", a plaintiff must "alleg[e] specific facts concerning particular transactions during the same time period that violated GAAP". *Id.* at 1065–66. "Such allegations would raise an inference that . . . the restatements were necessitated by incorrect accounting." *Id.* at 1066. "Financial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate". 17 C.F.R. § 210.4-01. "If properly pled, overstating of revenues may state a claim for securities fraud, as under GAAP, revenue must be earned before it can be recognized." *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (internal quotation marks, italics, brackets, and citation omitted). Plaintiffs must provide "enough information for a court to discern whether the alleged GAAP violations were minor or technical in nature, or whether they constituted widespread and significant inflation of revenue." *Id.* at 1020 (internal quotation marks, brackets, and citation omitted).

Construing the pleadings in the light most favorable to Plaintiff, as the Court must, the SACAC includes sufficient detail explaining violations of GAAP. Plaintiff alleges that in DermTech's May 2022 guidance, Defendant Sun represented that by the year's end, the Company would receive $22 to $26 million in assay revenue. (SACAC 9). "DermTech generated just $13.8 million in [a]ssay [r]evenue for 2022" because the guidance allegedly "included amounts that were subject to reversal" in violation of ASC 606. (*Id.* at 9); (*see also id.* at 58) ("Under ASC 606, DermTech is only supposed to recognize revenue up to the amount of variable consideration that is not subject to a significant reversal until additional information is obtained or the uncertainty associated with the additional payments or refunds is subsequently resolved."); (*see also id.* at 54) ("[W]hen the Company reduced guidance for the fourth quarter 2022, that reduction was due in large part to a write-off of revenue from samples taken 12 to 18 months before—when DermTech had been over-accruing or prematurely recognizing revenue."). "Certainly, prematurely recognizing millions of dollars in revenue is not minor or technical in nature." *Daou*, 411 F.3d at 1020.

Defendants argue that the May 2022 guidance is protected by the PSLRA's safe harbor provision. (Defs.' Mot. 30). The Court disagrees. The revenue projection "can

23-cv-1885-DMS-JLB

reasonably be viewed as a misrepresentation of [DermTech's] current business conditions". *Mallen v. Alphatec Holdings, Inc.*, 861 F.Supp.2d 1111, 1126 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cnty. Employees' Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F.App'x 694 (9th Cir. 2015). The statement, made in May 2022, includes recorded revenue from the four months prior, January–April 2022, as part of its full-year outlook for assay revenue. (SACAC 9); (Defs.' Mot. Exhibit 19). Defendant Dobak also described the first quarter as "kick[ing] off the year on a record pace". (*Id.*). The 2022 revenue projection is thus a "mixed" statement because it contains "non-forward-looking statements about current and past facts as well as forward-looking statements about projected growth in revenue and earnings." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1141 (9th Cir. 2017). "[T]he safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts." *Id.* at 1142. Although Defendants cautioned that "the reimbursement of DermTech's tests by Medicare and private payors" could negatively impact *future* revenue, they did not explain that the first-quarter results included revenue that had not been reimbursed (and was thus subject to reversal). (Defs.' Mot. Exhibit 19) (showing cautionary language); *Quality Sys.*, 865 F.3d at 1148 ("Because Defendants made materially false or misleading non-forward-looking statements about the state of QSI's sales pipeline, virtually no cautionary language short of an outright admission that the non-forward-looking statements were materially false or misleading would have been adequate."). The safe harbor provision is therefore inapplicable.

Defendants further address Plaintiff's allegations by explaining their compliance with GAAP. (Defs.' Mot. 28) ("This policy *follows* ASC 606-10-32-14.") (emphasis in original); (Reply 9) ("In other words, KPMG independently determined DermTech's accounting *complied with GAAP*.") (emphasis in original). This argument, however, is premature. "Whether accounting practices are consistent with GAAP is a question of fact and the [C]ourt may not make such a factual determination at the pleadings stage." *Baron v. Hyrecar Inc.*, 2022 WL 17413562, at *5 (C.D. Cal. Dec. 5, 2022) (internal quotation

marks and citations omitted); *see also id.* at \*11 ("While Defendants raise several arguments regarding their interpretation of ASC 450-20-25 and an auditor's opinion, the court finds these arguments prematurely seek to resolve the factual dispute of whether Defendants actually violated GAAP."). The Court prefers to address the factual disputes regarding Defendants' accounting later, perhaps with the assistance of an accounting expert. *S.E.C. v. Cotton*, 2006 WL 6382128, at \*8 (C.D. Cal. Dec. 21, 2006) (noting that "consisten[cy] with GAAP is a question of fact, best resolved by expert testimony"); *cf. S.E.C. v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011) ("We recognize that GAAP tolerates a range of reasonable accounting treatments[.]") (internal quotation marks, brackets, and citation omitted). Therefore, at this stage, Plaintiff has alleged that Defendants' revenue statements were materially misleading.

In sum, the Court finds Plaintiff has sufficiently alleged that Defendants' Final LCD, ASP, and revenue statements were false. Plaintiff satisfies the first element of his § 10(b) claim.

### b. Scienter

The second element of a § 10(b) claim requires Plaintiff to "state with particularity facts giving rise to a strong inference that [Defendants] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To show scienter, a plaintiff must allege that the defendant acted "either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991 (internal quotation marks and citations omitted). Deliberately reckless conduct is "a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Hollinger v. Titan Cap. Corp.*, 914 F.2d 1564, 1569 (9th Cir. 1990) (adopting 7th Cir. standard articulated in *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044–45 (7th Cir. 1977)). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable

inference of intent[] but are not sufficient to establish a strong inference of deliberate recklessness." *In re VeriFone*, 704 F.3d at 701.

The relevant inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007) (internal citations omitted) (emphasis in original).  A "court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324.  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*  Although "[t]his is not an easy standard to comply with", *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003), if there are multiple plausible theories at the motion to dismiss stage, "a tie goes to the plaintiffs", *Eclectic Properties E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 n.8 (9th Cir. 2014).

Under Ninth Circuit law, the Court must "conduct a two-part inquiry for scienter: first, [it] determine[s] whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegation is sufficient, [it] conduct[s] a holistic review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011).

Plaintiff alleges there is a strong inference of scienter based on (1) insider sales of stock; (2) DermTech's at-the-market ("ATM") offerings; (3) changes to how Defendants described the Final LCD; (4) Defendant Dobak's departure; (5) Defendants' exposure to the Company's "core operations"; (6) Defendants' motive to satisfy analysts' estimates; (7) the making of Sarbanes–Oxley certifications; and (8) adjustment and reclassification of revenue.  (SACAC 57–62, 80–92).

The Court is satisfied that Plaintiff's allegations about insider sales, descriptions of

the Final LCD, and core operations show scienter.  The other allegations are supplemental and will not be elaborated on here.[6]  Because several allegations were "sufficient to support an inference of scienter by [Defendants]", "a holistic review is . . . unnecessary".  *New Mexico State Inv. Council*, 641 F.3d at 1095.  However, Plaintiff's allegations "certainly support an inference of scienter when viewed collectively" as well.  *Id.* (listing other allegations of scienter found in complaint).

### i.  Insider Sales

Plaintiff's FACAC pleaded insufficient factual content for the Court to infer that Defendant Dobak's insider sales raise a strong inference of scienter.  (ECF No. 36 at 20–21).  The FACAC alleged only the number of shares Defendant Dobak sold and their price.  (*Id.* at 20).  For insider sales to constitute evidence of scienter, they must be "unusual or suspicious".  *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted).  "[I]nsider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize personal benefit from undisclosed inside information."  *Id.* (internal quotation marks and citation omitted).  "[T]hree factors that must be considered to determine whether stock sales raise a strong inference of deliberate recklessness are: (1) the amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the sales were consistent with the insider's prior trading history."  *Id.* (internal quotation marks and citation omitted).  The SACAC cites more facts related to these factors.  (SACAC 80–82).

Looking to the first factor, the Ninth Circuit generally gives "great weight to the percentage of stock sold."  *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004).  However, when "stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings."  *Id.* (finding strong inference of defendant's scienter from $900

---

[6] The Court conducted a more comprehensive analysis of Plaintiff's allegations in its prior Order.  (*See* ECF No. 36 at 17–32).

million in net sales).  Plaintiff states that "Defendant Dobak executed the direct sale of 120,366 shares on the open market[] and received in exchange $5,592,843 in proceeds . . . throughout the Class Period."  (SACAC 80–81).  Because $5,592,843 in net proceeds is not "significant enough to stray from the Ninth Circuit's typical percentage analysis", the Court must assess the percentage of stock sold.  *Hadian v. Fate Therapeutics, Inc.*, 2024 WL 4246083, at *38 (S.D. Cal. Sept. 19, 2024) (finding $58.8 million in net sales insufficient to apply Ninth Circuit exception to traditional analysis); (ECF No. 36 at 20).

According to Plaintiff, Defendant Dobak's sales during the Class Period "represent[] 22.1% of the shares that he held as of the first day of the Class Period."  (SACAC 81). Defendants take issue with this percentage because it does not account for shares acquired during the Class Period.  (Defs.' Mot. 16 n.7).[7]  Even accepting Plaintiff's percentage calculation, Defendant Dobak's total sale of 22.1% of his holdings is insufficient to raise suspicion.  *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) ("Moore sold only 37% of his total stock holdings during the Class Period.  We typically require larger sales amounts . . . to allow insider trading to support scienter."); *In re AnaptysBio, Inc.*, 2021 WL 4267413, at *9 (S.D. Cal. Sept. 20, 2021) ("So, his sale of 169,741 shares of AnaptysBio common stock during the Class Period . . . was a mere 20 percent of his total shares when accounting for his vested options.  In the Ninth Circuit, selling 20 percent of one's shares does not constitute suspicious activity.") (internal quotation marks and citations omitted); *Constr. Laborers Pension Tr. of Greater St. Louis*

---

[7] The Court agrees.  *See In re Herbalife, Ltd. Sec. Litig.*, 2015 WL 12734014, at *4 (C.D. Cal. July 28, 2015) ("Defendants argue that the relevant percentage should compare Johnson's holdings at the start of the class period (5.14 million) to his holdings at the close of the class period (4.54 million), a figure that takes into account the sale and acquisition of shares (including vested stock options) over the class period. Although neither party offers controlling authority, Defendants' method appears better suited for an analysis interested in the suspiciousness of an insider's sales.  Selling 2.3 million shares becomes far less suspicious when accompanied by a simultaneous acquisition of more than one million shares.").

*v. Neurocrine Biosciences, Inc.*, 2008 WL 2053733, at *7 (S.D. Cal. May 13, 2008) (no inference of scienter when defendant sold 23.4% of his holdings).

Regarding the second factor, plaintiffs must "plead how the timing of any specific sale . . . is linked to intentional misrepresentations or omissions or gives rise to an inference of scienter as to specific misstatements or omissions." *In re LeapFrog Enterprises, Inc. Sec. Litig.*, 527 F.Supp.2d 1033, 1052 (N.D. Cal. 2007). "[W]hen the [c]lass [p]eriod is long[,] 'it becomes difficult to see how particular stock sales would strengthen allegations that particular statements were uttered with deliberate recklessness at the times they were made.'" *Hadian*, 2024 WL 4246083, at *37 (quoting *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1093 (9th Cir. 2002)). "Sales according to pre-determined plans may rebut an inference of scienter." *Metzler*, 540 F.3d at 1067 (internal quotation marks, brackets, and citation omitted); *see also In re Twitter, Inc. Sec. Litig.*, 506 F.Supp.3d 867, 890 (N.D. Cal. 2020), *aff'd sub nom. Weston Fam. P'ship LLLP v. Twitter, Inc.*, 29 F.4th 611 (9th Cir. 2022) ("In general, automatic sales made pursuant to Rule 10b5-1 plans do not support a strong inference of scienter."). However, the "plan [must be] in place before the alleged inside information is received". *Constr. Laborers*, 2008 WL 2053733, at *7 n.10.

Plaintiff alleges that on March 8, 2021, "Defendants falsely stated that the Final LCD expanded the coverage from one test per date of service to two tests per date of service." (SACAC 81). Then, in the month of April, "Dobak sold 50,000 DermTech shares for approximately $2.44 million at a weighted-average price of $48.85." (*Id.*). Defendants, in response, contend that these sales—and all other sales by Defendant Dobak during the Class Period—were non-discretionary. (Defs.' Mot. 18). Although eleven of Defendant Dobak's sales were made pursuant to a Rule 10b5-1 trading plan, this plan was "not adopted until after the motive and opportunity to mislead investors allegedly arose". *Alger Dynamic Opportunities Fund v. Acadia Pharms. Inc.*, 2024 WL 4647297, at *15 (S.D. Cal. Oct. 31, 2024). Defendant Dobak entered into this plan on March 12, 2021, four days after Defendants first allegedly misled investors by stating that the "Final LCD expanded the

coverage from one test per date of service to two tests per date of service."[8]  (SACAC 81). Given the closeness in time between these two events, the timing of the sales is suspicious. *Compare Backe v. Novatel Wireless, Inc.*, 642 F.Supp.2d 1169, 1191 (S.D. Cal. 2009) (finding suspicious timing when defendants allegedly "all adopted or amended their 10b5-1 trading plans to allow them to sell more shares of stock months before the market learned of Sprint's decision to cancel orders of the 720 USB modem"), *with Constr. Laborers*, 2008 WL 2053733, at *7 (explaining sales weren't suspicious because defendant entered into 10b5-1 trading plan "ten months before the FDA's non-approvable letter").

Finally, the third factor requires plaintiffs to "provide a meaningful trading history for purposes of comparison to the stock sales within the class period." *Zucco*, 552 F.3d at 1005 (internal quotation marks and citation omitted).  This is a bright-line rule: the unavailability of a defendant's history, even if "for reasons beyond a plaintiff's control", does "not excus[e]" the plaintiff "from pleading the relevant history." *Id.*

Plaintiff alleges that Defendant Dobak's sale of 120,366 shares during the Class Period was out of line with his prior trading history because the year prior "(i.e., during all of 2020), Dobak sold just 3,256 shares for total proceeds of $36,054 at a weighted-average price of $11.07." (SACAC 81).  Defendant argues that this history is "incomplete and artificially skewed" because Defendant Dobak could not sell shares at all until February 25, 2020, a little over one year before the Class Period began. (Defs.' Mot. 18–19).  The Ninth Circuit, however, has found a defendant's trading activity in the ten months preceding the class period sufficient for comparison. *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989); *see also Am. W. Holding Corp.*, 320 F.3d at 939–40 (accepting *Apple Computer* framework).  Plaintiff has alleged a similar comparison.[9]

---

[8] The Court has already found Defendants' statements about the Final LCD materially misleading. (ECF No. 36 at 10–13).

[9] Because Defendant Dobak could not sell shares until February 25, 2020, Plaintiff has provided an approximately ten-month window into his prior trading history (February 25, 2020–December 31, 2020).

Throughout the Class Period, from 2021–2023, Defendant Dobak sold almost thirty-seven times[10] as many shares as he did in 2020.  Although the Class Period is longer in duration than Defendant Dobak's alleged trading history, this difference is substantial.  In the month of April 2021 alone, Defendant Dobak sold 50,000 shares, about fifteen times[11] as many shares as the calendar year prior.  (SACAC 81).  In exchange, he received approximately $2,440,000, which is $2,403,946[12] greater than his profits from sales of stock in all of 2020.  (*Id.*).  These differences illustrate that Defendant Dobak's sales before and during the Class Period were inconsistent.  *See In re Questcor Sec. Litig.*, 2013 WL 5486762, at *18 (C.D. Cal. Oct. 1, 2013) ("Given that the Individual Defendants sold over $101 million worth of Questcor shares during the Class Period compared with almost no shares in the prior 18 months, the Complaint adequately pleads that the Class Period sales are dramatically inconsistent with prior trading history."); *see also Backe*, 642 F.Supp.2d at 1185 (finding inconsistency when "Weinert had no sales in the five years prior to the class period, and then [allegedly] sold $3,305,560 worth of stock . . . in a span of a month and a half during the class period and just prior to the market learning of the alleged Sprint cancellation at near class period highs").

Considering the second and third factors, and the fact that Defendant Dobak profited $5,592,843 from his stock sales at a time when the share price was high, the Court finds that Defendant Dobak's sales raise an inference of scienter.  (SACAC 81).

### ii.  LCD Coverage

Plaintiff contends for the first time, at least explicitly, that language about the Final LCD shows Defendants' scienter.  (*Id.* at 37–40, 82–84, 87–88).  Of these arguments, the Court is convinced that "subtle changes" to language describing the Final LCD illustrate

---

[10] To calculate this figure, the Court divided 120,366 shares—the number Defendant Dobak allegedly sold during the Class Period—by 3,256 shares—the number Defendant Dobak allegedly sold in the year prior.  (SACAC 81).  120,366/3,256 = 36.9674447.

[11] 50,000/3,256 = 15.3562654.  (SACAC 81).

[12] 2,440,000 – 36,054 = 2,403,946.  (SACAC 81).

23-cv-1885-DMS-JLB

that Defendants acted intentionally or deliberately reckless. (*Id.* at 39–40, 82–84). On March 10, 2022, DermTech filed its 2021 Form 10-K, which stated that the Final LCD covering DermTech's DMT "expanded the coverage proposal in the Draft LCD from one test per date of service to two tests per date of service *for a certain percentage of patients*". (*Id.* at 39) (emphasis in original). In later forms filed with the SEC, the language was removed. (*Id.* at 40). For instance, DermTech's Form 10-Q for the period ending March 31, 2022 stated only that the Final LCD "expanded the coverage proposal in the [D]raft LCD from one to two tests per date of service". (*Id.*).

According to the Ninth Circuit, "[a] later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement". *In re Read-Rite Corp.*, 335 F.3d 843, 846 (9th Cir. 2003). Plaintiff alleges, and the Court is required to accept, that Defendants "possessed the power and authority to control the contents of the Company's reports to the SEC, press releases[,] and presentations to securities analysts". (SACAC 13). Defendants also signed the above-mentioned forms. (*Id.* at 83–84); *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000) (holding that corporate officials who sign SEC filings make statements so as to be liable under § 10(b)).

After the 2021 Form 10-K, which expressly referred to the Final LCD as *not* covering two tests all the time, Defendants were—at a minimum—deliberately reckless in proliferating descriptions of the Final LCD in absolute terms.[13] (*See* SACAC 83–84, 88–

---

[13] In their Reply, Defendants argue that DermTech's misleading SEC filings cannot establish Defendants' scienter because "Plaintiff must separately establish both falsity and scienter using allegations that meet Rule 9(b) and the PSLRA's heightened pleading standards." (Reply 4); (*see also id.* at 4–5) ("Put simply, Plaintiff must plead specific facts that independently establish that not only did Defendants make the misstatements in question (which could be satisfied with filing signatures), but also that . . . Defendants acted in deliberately reckless disregard of their truth or falsity.") (internal quotation marks and citation omitted). This argument is only partially true: although falsity and scienter are separate inquiries, "some facts might be used to support both an inference of scienter and an inference of falsity". *Glazer*, 63 F.4th at 766. Here, the Court infers scienter from the act of removing qualifying language more so than the misleading language itself.

90).  Aside from later SEC filings, Defendant Sun also made an absolute statement in DermTech's August 8, 2022 earnings call.  (*Id.* at 83–84, 89) ("[U]nder the LCD, we should be paid now at least for 2 tests on the same date of service *without anything else.*") (emphasis added).  The removal of qualifying language lends to the "compelling" inference that Defendants knew and acted with deliberate recklessness (or intent) when masking the limitations of the Final LCD.  *Tellabs*, 551 U.S. at 324; *see also City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 2022 WL 4491093, at *12 (S.D. Cal. Sept. 27, 2022) ("Defendants Davis and Stankovic possessed the power and authority to control the contents of Acadia's SEC filings, press releases, and other market communications and had access to material information available to them but not to the public.  Accordingly, Defendants plausibly would have been aware of the terms of any agreement with the FDA and the alleged shortcomings with the design and results of the Harmony and -019 Studies.  The FAC's allegations that Defendants affirmatively misrepresented the terms of the purported agreement with the FDA support an inference that Defendants acted with intent or deliberate recklessness.") (internal quotation marks and citations omitted).[14]

Additionally, the SACAC alleges that most of DermTech's revenue came from sales of its DMT.  (SACAC 17) ("[T]he Company . . . at all relevant times reported[] revenue in two segments: 'Assay Revenue' (for the DMT), and 'Contract Revenue[]' (for the services).  Assay Revenue represented the vast majority of the Company's overall revenue."); (*see also id.* at 87) ("Sales of DermTech's DMT comprised roughly 90% to 95% of DermTech's revenue during the Class Period.").  Even if Defendants made or affirmed statements throughout the Class Period thinking that the Final LCD covered two tests per date of service, it would be deliberately reckless if they did not know the extent to which Medicare covered DermTech's "flagship" product.  (*Id.* at 15); *see Patel v.*

---

[14] The Court is also persuaded by Plaintiff's argument that "[t]he way the qualification is worded . . . supports scienter."  (Opp'n 13).  The qualification is vague, revealing only that the Final LCD covered two tests per date of service "for a certain percentage of patients".  (*Id.* at 12).  It is plausible that Defendants elected for vagueness to obscure the low percentage.

23-cv-1885-DMS-JLB

*Axesstel, Inc.*, 2015 WL 631525, at *9 (S.D. Cal. Feb. 13, 2015) ("Although Defendants are correct that senior executives cannot be expected to know the details of every contract just by virtue of their officer roles, Axesstel is an exceedingly small company[,] and these were no ordinary contracts. The total of five contracts in question accounted for twenty to forty percent of the revenue Axesstel was recognizing in the respective quarters . . . Thus, while Hickock and Gray did not have to review every detail of these contracts, it was deliberately and consciously reckless for them to fail to at least confirm that such contracts existed."). Therefore, Defendants' statements about the Final LCD raise a strong inference of scienter.

### iii.   Core Operations

Differing from the FACAC, the SACAC alleges that scienter may be inferred from Defendants' exposure to factual information about DermTech's core operations. (SACAC 84–87). The core operations doctrine enables a court to "impute scienter based on the inference that key officers have knowledge of the 'core operations' of the company". *Reese v. Malone*, 747 F.3d 557, 575 (9th Cir. 2014) (internal citation omitted). Such allegations support scienter when "they are particular and suggest that defendants had actual access to the disputed information". *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008); *see also id.* at 785 ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company."). To meet this standard, a "plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations" or "witness accounts". *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). The doctrine also applies, even without specific allegations, "in rare circumstances where the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was

without knowledge of the matter." *S. Ferry LP*, 542 F.3d at 786 (quoting *Berson*, 527 F.3d at 988).

Plaintiff maintains that Defendants' positions "provide[d] access to the metrics that dr[o]ve DermTech's revenue, including the number of tests per patient per clinical encounter that [the] Final LCD covered." (SACAC 87). Plaintiff buttresses this general assertion with admissions by Defendants. Defendant Dobak stated that he was involved in meetings with Medicare and that "the multiple body site issue . . . was a concern with Medicare in the early days of the LCD." (*Id.* at 85). Defendant Sun, in an earnings call, discussed statistics about the average number of samples per patient. (*Id.* at 86). These statements indicate that Defendants possessed detailed knowledge about DermTech's DMT, including whether testing more than one body site on the same visit affected Medicare reimbursement (and therefore revenue). *See In re Obalon Therapeutics, Inc.*, 2019 WL 4729461, at *9 (S.D. Cal. Sept. 25, 2019) ("Lead Plaintiff points out Defendant Plovanic himself maintained 'we work closely with our audit committee to develop robust procedures for appropriately analyzing and recognizing revenue.' This fact provides a strong inference that Obalon Defendants closely monitored the Company's financials, and were aware of the state of Obalon's financial condition. Indeed, to suggest Obalon Defendants were not aware of the Company's financial conditions as it related to the revenue of the Company's only product—while Obalon Defendants were working closely with the audit committee—would strain credulity.") (internal citation omitted); *see also Patel*, 2015 WL 631525, at *10 ("[T]he amended complaint contains numerous statements from the individual defendants themselves indicating that they were directly involved in sales and knew the details of Axesstel's dealings with its African customers. As for Hickock, in February 2013, he told investors and analysts that 'reception [in Africa] has been fantastic.' Between February and May 2013, Hickock spent four weeks meeting with customers and logistic partners in Africa. Further, in a June 2013 press release, Axesstel announced that Hickock would be taking over the responsibilities of Chief Marketing Officer and had 'been increasingly active in key customer relationships.'") (brackets in

original).  As a result, the core operation doctrine supports Defendants' scienter when they made misleading statements about the Final LCD.[15]

Plaintiff has pleaded facts showing a strong inference of scienter.  Therefore, Plaintiff has adequately alleged a § 10(b) violation.  Defendants' Motion to Dismiss Plaintiff's § 10(b) claim is **DENIED**.

### B.  § 20(a) of the Exchange Act

Under § 20(a) of the Exchange Act,

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t.  To succeed on a § 20(a) claim, a plaintiff must "demonstrate[] a primary violation of federal securities law and that the defendant exercised actual power or control over the primary violator." *Zucco*, 552 F.3d at 990 (internal quotation marks and citations omitted).  § 20(a) claims "may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of [§] 10(b)".  *Id.*; *see also LifeVoxel Virginia SPV, LLC v. LifeVoxel.AI, Inc.*, 622 F.Supp.3d 935, 947 (S.D. Cal. 2022) ("Section 20(a) requires an underlying violation of the 1934 Act.").

Defendants' Motion to Dismiss this claim "is predicated [almost] entirely on [their] argument that the [SACAC] fails to state a primary violation of [§] 10(b)".  (Defs.' Mot. 31); *Patel*, 2015 WL 631525, at *13.  Because the Court finds that Plaintiff has

---

[15] Defendants contend that Plaintiff uses only "corrective disclosures" to "establish [Defendants'] historical knowledge of the limitations of the Final LCD" and that "it is *more* plausible that [Defendants] educated themselves on the issues . . . concerning Medicare and private payer reimbursement under the Final LCD in preparation for the quarterly earnings call, so that each could properly advise investors of the issues . . . and the forthcoming impact on the Company's financial performance." (Defs.' Mot. 24) (emphasis added).  The Court disagrees.  It is *equally*, if not *more*, plausible that Defendants knew about the Final LCD's limitations, but avoided raising them with investors until revenue was adversely impacted.  Plaintiff need not allege the only plausible theory of Defendants' conduct to survive the pleading stage. *See Eclectic Properties*, 751 F.3d at 999 n.8.

23-cv-1885-DMS-JLB

"establish[ed] a primary violation of [§] 10(b), the [M]otion to [D]ismiss the [§] 20(a) claim fails" on this ground. *Id.*; *Acadia Pharms.*, 2022 WL 4491093, at *14 ("The Court has determined that Plaintiffs adequately allege facts in support of their § 10(b) claims against Defendants. Defendants' motion to dismiss Plaintiffs' § 20(a) claims is denied.").

In the alternative, Defendants argue that Plaintiff's § 20(a) claim fails because Plaintiff has not alleged "facts showing Defendants' actual exercise of power or control over DermTech". (Defs.' Mot. 31). Defendant provides no support for this argument. (*See id.*). Additionally, whether a defendant is a controlling person is an "intensely factual question". *Arthur Children's Trust v. Keim*, 994 F.2d 1390, 1396 (9th Cir. 1993). "[A]t the motion to dismiss stage, allegations about an individual's title and duties have been . . . sufficient to establish control." *Mueller v. San Diego Ent. Partners, LLC*, 2017 WL 3387732, at *6 (S.D. Cal. Aug. 7, 2017) (collecting cases). Plaintiff alleges that Defendants were officers of DermTech[16] and had control over the Company by virtue of their high-level positions, ownership rights, and awareness of DermTech's operations. (SACAC 101). Further, according to Plaintiff, Defendants influenced the dissemination of the Company's public statements and had authority to correct or prevent any misleading communications. (*Id.*). This is sufficient for pleading purposes. *See In re Immune Response Sec. Litig.*, 375 F.Supp.2d 983, 1031–32 (S.D. Cal. 2005) ("[T]he Complaint alleges that both Carlo and Moss were involved in the day-to-day business of IRC in their roles as Chief Executive Officer, and Chairman of the Board and co-founder, respectively. Plaintiffs do not simply allege that they held these positions; their roles are described. According to the Complaint, Moss and Carlo had the authority to control the contents of IRC's quarterly reports, press releases and presentations to securities analysts. They also had copies of IRC's reports and press releases before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or correct them . . . Therefore,

---

[16] Defendant Dobak was DermTech's Chief Executive Officer ("CEO"). (SACAC 12). Defendant Sun was DermTech's Chief Financial Officer ("CFO"). (*Id.* at 13).

Plaintiffs have stated a valid cause of action under section 20(a)[.]").  The Court **DENIES** Defendants' Motion to Dismiss Plaintiff's § 20(a) claim.

**V.   CONCLUSION AND ORDER**

Based on the foregoing, the Court **DENIES** Defendants' Motion to Dismiss.

**IT IS SO ORDERED.**

Dated:  June 5, 2025

Hon. Dana M. Sabraw
United States District Judge

23-cv-1885-DMS-JLB